## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JANET SIHLER, Individually and On
Behalf of All Others Similarly Situated;
CHARLENE BAVENCOFF,
Individually and On Behalf of All
Others Similarly Situated,

                      Plaintiffs,

v.

GLOBAL E-TRADING, LLC DBA
CHARGEBACKS911, GARY EATON,
MONICA CARDONE,

                      Defendants.

_____/

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

      Plaintiffs Janet Sihler ("Ms. Sihler") and Charlene Bavencoff ("Ms. Bavencoff"), individually and on behalf of all others similarly situated nationwide by and through the undersigned counsel, hereby file this Class Action Complaint against Defendants GLOBAL E-TRADING, LLC DBA CHARGEBACKS911 ("Chargebacks911"), GARY CARDONE, and MONICA EATON and allege as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter because this is a class action in which, on information and belief, the damages exceed $5 million, exclusive of interest and costs, the number of class members exceeds 100, and as demonstrated below, the parties are diverse pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The believed scope of the damages and number of class members are based on Plaintiffs' investigation and the BBB report attached as Exhibit 1.

2.    This court also has jurisdiction because Plaintiffs' Racketeer Influenced and Corrupt Organizations Act ("RICO") claim, 18 U.S.C. §§ 1961, *et seq.*, arises under federal law. *See* 28 U.S. Code § 1331.

3.    This Court has personal jurisdiction over Defendant Global E-Trading, LLC DBA Chargebacks911 because it is a Florida limited liability company and has its principal place of business in Florida.

4.    This Court has personal jurisdiction over Defendant Cardone because he resides in the State of Florida.

5.    This Court has personal jurisdiction over Defendant Eaton because she resides in the State of Florida.

6.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b)(1) because Chargebacks 911 resides in this judicial district and all the defendants are residents of Florida, the State in which this district is located.

## NATURE OF THE ACTION

7.     This action involves a form of fraud and cybercrime that has become increasingly common — and lucrative — across the Internet. This particular scam (the "Keto Racket") was designed to lure consumers into purchasing worthless weight-loss pills branded "Ultra Fast Keto Boost" and "Instant Keto" (collectively, the "Keto Products") by using fake celebrity endorsements and misrepresentations about the amount consumers will be charged if they buy the pills. The operators of this scam deceived consumers like Plaintiffs Sihler and Bavencoff by advertising that the Keto Products were endorsed by celebrities (they weren't) and that the purchase prices of the Keto Products were significantly lower than the amounts actually charged to the victims' debit or credit cards.

8.     Though consumers like Ms. Sihler and Ms. Bavencoff were the Keto Racket's ultimate targets, they weren't its only victims. The ability to accept and process credit card and banking information was the Keto Racket's lifeblood. Without access to banking and credit card processing services, those operating the Keto scam had no way to get at (and filch) victims' money. But for liability reasons, no legitimate standard acquiring bank or card processing company would agree

to handle transactions for merchant accounts it *knew* were used for fraud. The Keto Racket's success thus depended on deceiving payment processors and banks just as much as it did on duping consumers. The Keto Racket's composition reflects this reality: there are scammers focused on marketing, branding, distributing, and handling the returns of Keto Products, but there are also those whose contributions are oriented around keeping the scam sustainable and financially viable by hiding the illegitimate nature of the Keto Racket's activities from the fraud and dispute departments of banks and credit card companies as well as law enforcement. Defendant Chargebacks911 is in this latter category.

9.    At many financial institutions and credit card companies, fraud detection and merchant-risk management are a ratios game: if the percentage of a given merchant account's total transactions that is charged back[1] or disputed ticks up too high (often at or just under 1%), the merchant is inducted into a chargeback monitoring program and can face steep fees. Merchants who linger in Visa's Dispute Monitoring Program for more than a few months are dinged $50 per

---

[1]    Chargebacks, as Chargesbacks911's website explains, "are the primary tool banks use to resolve credit card payment disputes. When a consumer did not authorize a charge, or is unhappy with a product or service, they can challenge the charge with their issuing bank. If the bank feels the consumer's claim is valid, they will initiate a chargeback in order to reverse the payment." Chargebacks911, *The Complete Chargeback Guide for Merchants and Consumers*, https://chargebacks911.com/chargebacks/ (last accessed June 23, 2023).

chargeback and can get hit with a $25,000 account review fee if they don't clean up their act quickly. If a merchant's apparent fraud or chargeback issues persist long enough or are severe enough, they can be cut off from access to payment processing services and financial services from all standard banks. (Many banks consult the Member Alert to Control High-Risk Merchants List managed by Mastercard before extending financial services to a merchant account and blacklist merchants who appear on the list.)  As Chargebacks911's website succinctly puts it, a merchant's chargeback rate "could mean the difference between business as usual and losing your bank account and your right to process payment cards."[2]

10.    Unsurprisingly, a high chargeback rate was a constant problem for the Keto Racket: when you overcharge peoples' credit cards, a not insignificant number of them will initiate chargebacks. Those selling and handling order logistics for the Keto Products had honed the craft and logistics of fraudulently overcharging consumers like Ms. Sihler and Ms. Bavencoff for diet pills. But they wanted expert help when it came to keeping their underwriters in the dark about the fraudulent nature of their activities as reflected in the frequency with which consumer-victims charged back Keto-Products transactions. In August 2019, they turned to Defendant Chargebacks 911.

---

[2]    *See* Chargebacks911, January 16, 2023, *Chargeback Rate Learn How to Calculate This All-Important KPI*, https://chargebacks911.com/chargeback-rate/ (last accessed June 23, 2023).

11.     Chargebacks911 "delivers ongoing support for all aspects of chargeback management, from consultations to wholly implemented strategies."[3] "Don't spend another second worrying about chargebacks," its website invites, "[w]e're the experts: we'll handle the disputes while you focus on building a successful business."[4]

12.     Chargebacks 911 (unlike other members of the Keto Racket) made good on its website's promises: it "handle[d] the disputes" so that other members of the Keto Racket could "focus on building a successful business." The problem - the injustice this lawsuit seeks to remedy - is that both Chargeback 911's methods of "handling disputes" (wire fraud, bank fraud, money laundering) and the "business" it was knowingly helping its clients build (a cyberfraud operation) were illegal and injurious to consumers like Plaintiffs.

13.     Regarding its "handling" of the Keto Racket's chargebacks, Plaintiffs are informed and believe that as early as 2013 Chargebacks 911, Gary Cardone, and Monica Eaton orchestrated a scheme whereby the volume of transactions associated with a merchant's account was artificially inflated with tens of thousands of very small purchases such that there was an apparent reduction in

---

[3]     Chargebacks911, *Chargeback Management: Here's Everything You Need to Know*, https://chargebacks911.com/chargeback-management/ (last accessed June 23, 2023).
[4]     Chargebacks911, *Comprehensive Chargeback Management*, https://chargebacks911.com/comprehensive-chargeback-management/ (last accessed June 23, 2023).

the merchant's chargeback rate. In September 2019, Chargebacks911 advised the Keto Products' marketers and branders to execute a version of the scheme that Plaintiffs believe Cardone, Eaton and Chargebacks911 masterminded years earlier. Specifically, Chargebacks911 advised the Keto Products' sellers to offer a $0.99 e-book for sale and then pay a third-party — a scammer named Johnny De Luca who was hand-picked by Chargebacks 911 and with whom Chargebacks911 had been working in concert for years — to fabricate purchases of tens of thousands of those e-books, each in an individual transaction. The purpose of this scheme was to inflate the total number of transactions associated with the Keto Rackets' accounts so that the accounts' *percentage* of chargebacks as compared to total transaction volume would dip below approximately one percent even though a much higher percentage of the consumers ripped off by the Keto Racket charged back the fraudulent transactions.

14.    Chargebacks911 was also on the front lines of the Keto Racket's efforts to dissimulate its high chargeback rate by spreading transactions out over dozens of merchant identification numbers (MIDs) so that the absolute number of chargebacks associated with any one MID account would never be high enough, in absolute terms, to attract scrutiny. Additionally, it advised the Keto Products' marketers and branders about misrepresentations on their website and offered

software solutions that made it easier for other members of the Racket to cycle through their myriad sham accounts.

15.    This lawsuit seeks to hold Chargebacks911, Gary Cardone, and Monica Eaton accountable for their roles in defrauding Ms. Sihler and Ms. Bavencoff along with thousands of other consumers and their banks and credit card companies.

## ANTECEDENT LITIGATION

16.    Though Chargebacks 911 was an integral member of the Keto Racket, Plaintiffs only learned of its involvement in the scam through discovery in a putative class action they brought in the Southern District of California, *Sihler et al. v. The Fulfillment Lab, Inc. et al.*[5]   In that case, Plaintiffs Sihler and Bavencoff alleged, among other things, Civil RICO violations, against members of the Keto Racket who had ties to California.

17.    The defendants in *Sihler et al. v. The Fulfillment Lab, Inc. et al.* (collectively the "California Defendants") include: (1) **The Ringleaders —** David Flynn and Rickie Joe James were the guiding spirits behind the sales of Keto Products to consumers like Plaintiffs. They created the products and orchestrated the advertising campaigns that got consumers' credit card info into the Racket's

---

[5]    *See* Second Amended Class Action Complaint, *Sihler et al. v. The Fulfillment Lab, Inc. et al.*, 3:20-cv-01528-LL-MSB (S.D. Cal. March 7, 2022), ECF No. 120.

hands. Both Flynn and James are named defendants in *Sihler et al. v. The Fulfillment Lab, Inc. et al.* and both interacted with and communicated with Chargebacks911; (2) **The Keto Entities —** three of the corporate entities Flynn and James used to facilitate the scam are named defendants *Sihler et al. v. The Fulfillment Lab, Inc. et al.*: Beyond Global Inc., Brightree Holdings Corp. and BMOR Global LLC (collectively the "Keto Entities"). Plaintiffs are informed and believe that Chargebacks911's participation in the Keto Racket was mediated by a formal, written vendor-vendee contract between Chargebacks911 and Brightree Holdings Corporation; (3) **The Fulfilment Company and its President: —** The Fulfillment Lab, Inc. ("TFL") and its president Richard Nelson provided the logistical know-how and fulfilment services for the Keto Racket and actively participated in designing and executing the scam.

18.    Documents produced in *Sihler et al. v. The Fulfillment Lab, Inc. et al.*, specifically hundreds of pages of Skype chats, revealed to Plaintiffs that Chargebacks 911 was administering aspects of the Keto Racket — and getting paid handsomely to do it.

19.    On April 12, 2023, the Federal Trade Commission and the Office of the Attorney General for the State of Florida filed a complaint in this district, the Middle District of Florida, against Chargebacks911, Gary Cardone, and Monica Eaton. *See* Complaint, *FTC, et al. v. Global E-Trading, LLC et al.*, 8:23-cv-00795 (M.D.

Fl. April 12, 2023), ECF No. 1.

20.     That complaint (the "FTC complaint") alleges that Monica Eaton and Gary Cardone developed a service called "Value Added Promotions" ("VAP") for Chargebacks911 clients which Chargebacks911 offered to select clients between 2013 and 2019. The VAP offering described in the FTC's complaint is an in-house version of the same scheme that Chargebacks911, in concert with Johnny De Luca, used to injure victim-consumers like Ms. Sihler and Ms. Bavencoff and financial institutions and payment processors in this case. The FTC complaint alleges that "the glossary in a Chargebacks911 'Client Relations Manual' explained that VAP's purpose was 'to reduce or dilute the chargeback ratio by increasing the transaction count with supplemental transactions in addition to the regular sales.'" It also details the extent to which Defendants Cardone and Eaton were involved in implementing VAP. For example, it alleges that "Defendant Monica Eaton wrote to Defendant Gary Cardone reminding him to help a client with VAP, noting that 'this would help guarantee his [merchant accounts] are open.'"  And it alleges that "[i]n May 2016, Defendant Gary Cardone wrote to a VAP client: '[I]t looks like you need 6775 [VAP transactions] based on current stats at [a target chargeback rate of] 2.75% . . . .'"  And also that "[i]n April 2017, a Chargebacks911 employee wrote to Defendants Gary Cardone and Monica Eaton about a client, "They need triage to lower ratio. I suggest we just get them on vap.'"

21.     The FTC's complaint alerted Plaintiffs to Defendants Eaton and Cardone's role in conspiring to, with Chargebacks911 and, on information and belief, Johnny De Luca, the illegal scheme that Chargebacks911, as alleged in this complaint, ultimately carried out along with Johnny De Luca and certain of its associates in the Keto Racket.

## THE PARTIES

### Plaintiffs

22.     Plaintiff Janet Sihler is a citizen of the State of California and resides in the city of Coronado, County of San Diego, California.

23.     On or around December 11, 2019, Ms. Sihler signed up for an InstantKeto "Buy 3 bottles, Get 2 free" promotion. She used a Visa debit card issued by Wells Fargo bank to make this purchase.  She expected to be billed for three bottles of the product at $39.74 per bottle and to receive two additional "free" bottles, for a total purchase of $119.22. Without Ms. Sihler's authorization or consent, she was billed $198.70, or the total price for five bottles at $39.74 each. Ms. Sihler did not get two bottles free. She called the Customer Service number listed on the sparse packing slip that came with the pills to dispute the charge and request a refund. It didn't work. The customer service representative she spoke to told her that to get even a *partial* refund, she would have to ship the bottles back at her own expense. Ultimately, Ms. Sihler never recovered any of the money taken

from her by Defendants.

24.     Plaintiff Charlene Bavencoff is a citizen of the State of California and resides in the city of Santee, County of San Diego, California.

25.     On or around October 14, 2019, Ms. Bavencoff saw a Facebook advertisement for "Ultra Fast Keto Boost" and clicked it. The link took her to a fake news article claiming the product was unanimously endorsed by all six celebrity sharks on the hit series, "Shark Tank."  Ms. Bavencoff reviewed the purchase options and chose one that promised complimentary pill bottles with a full-price purchase. She used a Visa credit card to make this purchase. Like Ms. Sihler, Ms. Bavencoff did not expect to be billed for the additional "free" bottles. But just like Ms. Sihler, she was. After ordering, Ms. Bavencoff received five bottles of "Ultra Fast Keto Boost" in the mail and an unauthorized credit card charge of $198.70: the full price (at $39.74 per bottle) of the  five bottles of "Ultra Fast Keto Boost" Ms. Bavencoff received. Ms. Bavencoff neither consented to nor authorized this $198.70 charge.

26.     Ms. Bavencoff gave the "Ultra Fast Keto Boost" a try. It did not work. She called the Customer Service number listed on the packing slip to inquire about a refund. The number was disconnected. Ms. Bavencoff never recovered any of the money taken from her by Defendants.

## The Defendants

27.    Defendant GLOBAL E-TRADING, LLC DBA CHARGEBACKS911 is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 18167 US Highway 19N, Suite 600, Clearwater, FL 33764.

28.    Chargebacks911 offers chargeback prevention and revenue recovery services to merchants. Its website boasts that while its competitors rely on "[e]rror-prone automation" and have "[b]ank allegiance," Chargebacks911 uses an "[i]nherent manual review process with human forensics" and has "[m]intelligence" rather than "[b]ank allegiance."[6]

29.    Defendant Gary Cardone is Chargebacks911's founder and former CEO. (He stepped down from the role of CEO shortly after the filing of the FTC complaint.) As Chargebacks911's CEO, Gary Cardone was intimately involved in the company's operations and, Plaintiffs are informed and believe, liaised directly with the Keto Products' marketers and sellers. At all times relevant to the allegations of this complaint, Gary Cardone formulated, directed, participated and had the ability to control the acts and practices of Chargebacks911. Gary Cardone resides in this District.

30.    Defendant Monica Eaton is Chargebacks911's CEO. She is new to that

---

[6]  *See* Chargebacks911, *Tactical Chargeback Representation*, https://chargebacks911.com/tactical-chargeback-representation/ (last accessed May 7, 2023).

job. Previously, between the time of Chargebacks911's founding and shortly after the filing of the FTC Complaint, she was Chargebacks911's Chief Operating Officer. In that role, as in her current role, Monica Eaton formulated, directed, participated and had the ability to control the acts and practices of Chargebacks911. Monica Eaton resides in this District.

## FACTUAL ALLEGATIONS

## Background on the Scam

31.    The Internet has been plagued in recent years by a flood of scams enticing consumers to purchase worthless weight-loss products by using fake endorsements and bogus reviews about the supposed benefits of the products. The scammers advertise their products for a certain price, including with promotional offers such as "Buy 3 Bottles, Get 2 Free," then bill their victims full-price for more products than they actually agreed to pay for. The customers soon discover that their debit or credit cards were overcharged without their authorization or consent. It is a "straight sale" scam that is anything but straight.

32.    The scammers make the refund and return process very difficult, and as a result, most customers, like Ms. Sihler and Ms. Bavencoff, are unable to recover their money. Efforts by the Federal Trade Commission ("FTC") and other regulators to shut down these scams have created a virtual "whack-a-mole" where scammers close up shop with one bogus product, and then quickly pop up again

selling another product using the same fraudulent techniques.

33.     The Better Business Bureau ("BBB") issued a study in December 2018 titled "Subscription Traps and Deceptive Free Trials Scam Millions with Misleading Ads and Fake Celebrity Endorsements." *See* Exhibit 1 attached hereto. Written by C. Steven Baker, an International Investigations Specialist for the BBB and former Director for the Midwest Region of the FTC, the report explains in detail the tactics scammers use to fraudulently exploit customers and deceive the payment processing companies and financial institutions whose services they need to keep the grift going.

34.     According to the report, these scams have "infested the internet and social media." Ex. 1, at p. 1. Although the report focuses on "free trial" scams, the same fraudulent techniques used by those scammers are used by the Keto Racket. In fact, the scam here is an evolution of a "free trial scam" run by the same grifters: the scammers pivoted from the free trial scam (which involved billing through a continuity subscription) to overcharging for a group of bottles all at once in order to avoid enhanced scrutiny from the FTC and payment processors, who had caught on to the subscription billing scam.

35.     While victims of the traditional "free trial scam" are enticed to purchase products through a "risk-free" trial, victims of this "straight sale" scam like Ms. Sihler and Ms. Bavencoff are enticed by the promise of "free bottles." They

are subjected to fake celebrity endorsements as well as promotional offers for "free" bottles of the product. Later, they are shocked to discover that their debit or credit cards have been charged almost $200.

36.     The BBB's investigative report found that "many of these free trial offers are not free."  The report warned consumers: "you can locate and read the fine print on the order page, or the terms and conditions buried by a link, you'll discover that you may have only 14 days to receive, evaluate and return the product to avoid being charged $100 or more." Ex. 1, at p. 1.

37.     The BBB's report recognized that the sellers of these products could not act alone: "The fraud involves a variety of players, from those who obtain the products to advertisers, shippers and credit card processors." Ex. 1 at 1.

38.     At the time they victimized Ms. Sihler and Ms. Bavencoff, the scammers branding and selling the Keto Products were hawking "free bottles" not "free trials."  But the fraudulent techniques they used to perpetrate their illegal scam were virtually identical to those described in the BBB's investigative report. And, just as described in the BBB report, they did not act alone: they relied on the expertise of a third-party (Defendant Chargebacks 911) to help them deceive underwriters and financial companies about the fraudulent nature of their business.

**Plaintiffs Janet Sihler and Charlene Bavencoff are Two of Many Victims of the**

## Keto Scheme

39.    On or about December 11, 2019, Plaintiffs Janet Sihler saw an advertisement for a weight loss product called "InstaKeto" as she was browsing the Internet. The advertisement stated the product was featured on the well-known television show, "Shark Tank." She clicked on the advertisement, which took her to the InstaKeto landing page. The associated checkout page promised that if she bought three bottles, she'd get two free. Ms. Sihler decided to buy.

40.    Ms. Sihler entered her debit card information and expected to be taken to a final review and submit page that would show her the total purchase price. Instead, the next page stated only: "Your order has been submitted." That final page did not show a total price.

41.    The debit card Ms. Sihler used to purchase the Keto Products was a Visa Signature card through Bank of America.

42.    Ms. Sihler later received a charge on her debit card for $198.70. The charge on her debit card statement showed the merchant account as "VYA*KETOBOOST 8889700695 Port Orange FL."

43.    A few days later, she received five bottles branded "Instant Keto" with a packing slip. The packing slip did not show any prices.[7]



44.    Although the five bottles were labeled "Instant Keto," the packing slip described the bottles as "KetoBoost" and identified the shipper as "Ultra Fast Keto Boost" with an office located at 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684.

45.    Ms. Sihler called the Customer Service telephone number to request a refund. The Customer Service representative flatly refused her. The representative told Ms. Sihler that she would have to ship the bottles back at her own expense to obtain even a partial refund. Ms. Sihler was never able to recover her money.

46.    Plaintiff Charlene Bavencoff had a very similar experience. On or

---

[7]    Image redacted to remove Ms. Sihler's address.

about October 14, 2019, she saw an advertisement on Facebook for a weight-loss product called "Ultra Fast Keto Boost." She clicked on the advertisement, which took her to a fake news article claiming the product was featured on "Shark Tank." She clicked on the advertisement, which took her to the Ultra Fast Keto Boost's landing page, where she purchased the bottles using her Visa credit card.

47.    Ms. Bavencoff subsequently received a charge on her card for $198.70. The charge on her credit card showed the merchant account as "UltraFast Keto Boost 8444-7041211NV."

48.    A few days later, she received five bottles branded "Ultra Fast Keto Boost" with a packing slip that did not show any prices.[8]



49.    Ms. Bavencoff tried one bottle for a few weeks; however, she decided the product did not work so she did not use it any further. When she tried

---

[8]    Image redacted to remove Ms. Bavencoff's address.

contacting Customer Service to obtain a refund, the phone number was disconnected. Like Ms. Sihler, Ms. Bavencoff has not been able to recover her money.

50.    Although Ms. Sihler and Ms. Bavencoff purchased different products, the packing slips they received for "InstaKeto" and "Ultra Fast Keto Boost" are virtually identical. Both packing slips have the same layout with the same fields, label size, and font. And the shipper's name and return address is identical on both slips: Ultra Fast Keto Boost, 3201 Hillsborough Avenue 153201-1378, Tampa, Florida, 33684.

51.    Both Ms. Sihler and Ms. Bavencoff were injured by the Keto Rackets' misrepresentations and unfair and unlawful business practices. They suffered a loss of time, inconvenience, and a loss of money. They paid more for the products than they would have had they been aware that the Racket's representations — concerning both the celebrity endorsement and product pricing — were false, and ended up with products that were overpriced, inaccurately marketed, and did not have the characteristics, qualities, or value promised. For these reasons, Ms. Sihler and Ms. Bavencoff suffered injury in fact.

### The Keto Scam: Victimizing Consumers and Keeping up Appearances

52.    Ms. Sihler and Ms. Bavencoff were duped into buying Keto Products by the Keto Racket's lies about the products' endorsements and cost. But these

website misrepresentations — discussed in detail in paragraphs 94-130 of this complaint — are really just the tip of the scam iceberg. The consumer-facing fraud they facilitate is undergirded by a knotty assemblage of shell companies, phony transactions, and "false front" websites. This "back-end" of the fraud — which one Keto Racket co-conspirator acknowledged as the Racket's "secret sauce"[9] — was carefully crafted to deceive banks and credit card companies about what the Keto Racket was up to so that it could continue raking in cash with its Shark Tank-lies and unauthorized overcharges on the front end.

53.     Chargebacks911's role in the Keto Racket was on the back end. It devised and facilitated schemes designed to deceive underwriters about the number of chargebacks the Keto Racket's fraud was generating so that none of the Racket's merchant accounts would incur penalties or scrutiny. The goal of Chargeback 911's work was two-fold. First, to ensure that the Merchant IDs through which the Keto Racket processed transactions could stay "healthy," i.e., unassociated with the Racket's fraudulent activities, such that the Keto Racket could continue victimizing consumers like Plaintiffs for as long as possible without facing penalties, monitoring, auditing costs, or account closure from its

---

[9]     In a Skype chat with one of the Keto Racket's advertising contacts, Mike Campbell, who assisted the Keto Racket with technical work, was asked: "what is your secret sauce man[?]" and "why is your performance so good and so steady[?]."  Campbell responded: "there's a lot of time put into the backend, more than anyone realizes."

acquiring banks or payment processors. And second, to dispute consumer chargebacks such that the Racket could retain more of the proceeds from its fraud.

54.    Chargeback 911's contributions to the Keto Racket were far more sophisticated than an easily-disproven lie about what Shark Tank judge Mark Cuban thought about the Keto Products. As Mike Campbell, who worked on behalf of Flynn, James and the Keto Entities, put it: "the pills and everything else here is easy[;] it's the processing that fucks everyone."[10] It wasn't the "easy" stuff that Beyond Global Inc., David Flynn, Rickie Joe James, Brightree Holdings Corporation, Mike Campbell, Aaron Wilson, and BMOR Global LLC (collectively Chargebacks911's "Keto Associates") needed its help with. It was the processing and, specifically, masking the Keto Racket's high chargeback rate so that it did not impede the scam by inviting scrutiny, penalties, or account closures from the payment processors and financial services companies the Keto Racket so depended on.

**Chargebacks911 and other Member of the Keto Racket Used Dozens of Merchant Identification Numbers to Deceive Processors and Safeguard The Keto Racket's Ability to Continue Ripping Off Consumers**

---

[10]    These messages were sent via the Skype messaging platform. Here, and throughout this complaint, bracketed semicolons are used to represent line breaks in a Skype messaged caused when the sender hits the return key.

55.    Ms. Sihler and Mr. Bavencoff received almost identical packing slips. And the slips came from the same shipper and had the same address. But their bills for the Keto Products were from two different merchant accounts, each with its own Merchant Identification Number ("MID").

56.    A MID is unique identifier assigned to a merchant account by their acquiring financial institution that is used to track payments to and from the merchant account.

57.    The MIDs that billed Plaintiffs Sihler and Bavencoff were two of *dozens* used by the Keto Racket to hide the volume of Keto Products-related consumer disputes and chargebacks from the banks and payment processors the Racket depended on to haul in its booty.[11]

58.    The Keto Racket's myriad MIDs enabled it to spread (or "balance") the sales of Keto Products and, by extension, the fraudulent overcharging for Keto Products, over many MIDs, thus ensuring that the number of disputes or chargebacks associated with any given merchant account would stay low enough, in absolute terms, that the accounts would not attract the attention of processors' fraud departments or charge back monitoring programs even if far more than 1% of a merchant account's transactions were ultimately charged back.

---

[11]    In a May 2020 Skype chat message, another co-conspirator, Aaron Wilson, asked Mike Campbell "[d]o you know what mid 41 is?"  The request suggests that the Keto Racket had, at a minimum, 41 MIDs.

59.     Mike Campbell explained the Racket's rationale for using multiple MIDs in plain terms to Rickie Joe James in a September 2019 Skype chat, writing "the 100 mids thing is because you can be over 1% if the total is less than 100 cb's [chargebacks][;] so you make 100 accounts with 95 each."   When Mr. James responded "don't think you can get approved for that many without spinning up a bunch of corps," Mike Campbell agreed: "yea it needs its own corp for each one."

60.     The MIDs were <u>essential</u> to the Keto Racket's ability to process sales. When an affiliate marketer asked Mr. James whether he wanted to pre-pay for certain sales, he responded "[w]e are rocking pretty steady right now will need more mids online before we can take on more." Reading between the lines: if too many transactions (and by extension, chargebacks) were funneled through too few MIDs, the Keto Racket wouldn't be "rocking steady" anymore. Similarly, when the same marketer asked Mr. Campbell on December 9, 2019, "how is mid health . . . coming along?", Mr. Campbell responded "working on adding more mids in to get these declines down." The affiliate marketer responded "I gotcha[;] just a processing game right now then, I tak eit? [sic]" to which Mr. Campbell wholeheartedly agreed: "100%."

61.     Chargebacks 911 was aware other members of the Keto Racket's use of multiple mids from the outset of its involvement in the Keto scam, and not only because of its heavy involvement in the affiliate marketing industry where

juggling multiple MIDs is a standard practice.[12]  In September 2019, at or around

the time that Chargebacks 911 was doing an introductory call with Mr. Flynn,

Mike Campbell chatted Mr. James: "this cb911 guy is being weird dude[;] lots of

mid questions[;] they're doing an intro call[;] and they went right into mids[.]"

The Chargebacks911 rep, Mr. Campbell complained was "fear mongering," telling

Mr. Flynn that "'this is really high cb rates'" and "'this is high for so early in the

month.'"   When Mr. Campbell reported that Chargebacks911 recommended

getting the chargeback rate "under 1%", Mr. James' only responses was:

"hahahahahahaha." Ostensibly this response reflected Mr. James's disbelief that

---

[12]    The "balancing" of chargeback rates across multiple MIDs in order to dissimulate high chargeback rates is standard practice in the affiliate marketing industry. In a keynote speech given to a roomful of scammers at the 2019 Affiliate Summit West conference in Las Vegas, Neil Patel minced no words in outlining the key contours of the deceit: "[T]he credit card processors where you guys rotate up the chargebacks so then that way, you guys can keep processing the money . . . . You guys, many of you have issues with credit card processing, so you'll do things like, I forgot what the saying is but they rotate up the MIGs or the MIDs, I don't know what the saying is but it's more so they're controlling where the chargebacks are going." See Neil Patel, The Future of Affiliate Marketing: It's Not What You Think, https://www.youtube.com/watch?v=2hUdbztKLY4, at 8:00-8:07, 10:16-10:29 (last visited May 7, 2023). A December 2018 press release states that Defendant Eaton and her team would be participating in the upcoming Affiliate Summit West in Las Vegas, evidencing that both Eaton and Chargebacks911 were knee-deep in an "industry" where blasé references to financial institution fraud were de rigueur in conference keynote speeches. PRWeb, *Chargebacks911: Affiliate Fraud Casts Shadow on Record $7.9B Cyber                                                          Monday*, https://www.prweb.com/releases/chargebacks911_affiliate_fraud_casts_shadow_on_r ecord_7_9b_cyber_monday/prweb15991927.htm (last accessed May 7, 2023).

Chargebacks911 could indeed deliver what the Keto Racket desperately needed: credit card processing without exceeding the chargeback thresholds.

62.     Rotating MIDs was an effective way to keep the volume of chargebacks linked to any given merchant account low. But it was also logistically difficult. As co-conspirator Aaron Wilson put it in May 2020, there was simply "[n]ot enough time in the day especially with all of these MIDS to bounce back and forth through . . . ."

63.     Chargebacks 911's involvement made "bounc[ing] back and forth through" the Racket's MIDs easier for the Keto Defendants. Specifically, Plaintiffs are informed and believe that through entries visible on Chargeback 911's software interface, other members of the Keto Racket could easily track chargebacks and associate them with particular MIDs.

64.     On March 23, 2020, Aaron Wilson asked Mike Campbell: "Do you have a spreadsheet with merchant names on them? Like KETO BOOST DIET, KETOGENIC DIET and KETOBOOST ELECTROLYTE. I will go back through each one and add the merchant name to the mid/login list I have. It's not something I've had to document before until now. I was just wondering if your spreadsheet has the name the MID# is associated with. I'm trying to track down the info for the 13 CB's [chargebacks]." In response, Mr. Campbell said he'd "have to check . . . I have a DBA name for them but there's so many names . . . ." Mr.

Wilson then explained his request: "Those CB's haven't posted to CB911 yet so I can't track the CB's that way." This comment that the chargebacks "haven't posted to CB911" yet suggests that once they did post, the Keto Products' marketers and branders would have a more convenient and user-friendly way to associate specific chargebacks with specific MIDs. Chargebacks911 was streamlining the scam, saving its associates from having to fuss with spreadsheets to keep the jig going.

65.    Crucially, though Chargebacks911's software facilitated the Racket's MID-juggling, the company's involvement went <u>far</u> beyond just providing software to the Keto Associates. Chargebacks911 was a key associate whose contributions were essential to the continued viability of the Racket's many-MIDs approach to masking its fraud and who, as alleged below, directed and conducted key aspects of the fraud.

66.    Chargebacks911 was proactive about reaching out to its associates about the "health" or "safety" of the Keto Racket's MIDs.

67.    In September 2019, for example, shortly after Chargebacks911 joined the Keto Racket, Chargebacks911's employee or executive Nicolas Carroll Skype messaged Mr. Flynn checking in on the Racket's plans to add more MIDs: "Hey David. Seeing that CB Percentage growing each day (over 3% on Friday) I know we'd talked about you guys adding some MIDs. It's getting to a degree that we'd

start worrying about this one getting shut down so I wanted to see what the status was on that . . . ."

68.    A few months later, on November 12 2019, when the Keto Racket introduced new MIDs, Chargebacks911 consulted for David Flynn regarding "whether the fact that you hadn't changed corp names when you switched processors would be a problem from VISA's side of things as they're monitoring the account." Mr. Carroll stated that he'd talked to "our team members who'd been on that side of things in the past for a little more info." Then he explained:

> When it comes to acquiring new MIDs and the initial checks that VISA would perform, this should not impact you. VISA tends to look not at the corp's overall traffic ever, but the corp through the lens of their Acquirer. So provided there has not been an history of problematic traffic from that corp through that acquirer, it shouldn't really hit VISA's radar.

> Where there's a higher likelihood of any past issues factoring in would be if your new Acquirer was reporting MIDs with issues so significant that it got to the card scheme level. This is when VISA would more that likely check in to all traffic for this corp and see any previous issues.

69.    Mr. Carroll's explanation — formulated after consultation with his colleagues at Chargebacks911— reflects an awareness of the fact that the Keto Racket was using the introduction of novel MIDs with acquirers different from those of previous MIDs to circumvent Visa's monitoring and stay off Visa's "radar." Mr. Carroll knew, in other words, that the reason the new MIDs were

"healthy" was that they hadn't been "tainted" by the "issues," *inter alia*, high chargeback rates, that Plaintiffs are informed and believe had caused the downfall of the Keto Racket's earlier MIDs.

70.    After the Keto Racket launched its new MIDs, Mr. Carroll was persistent in pro-actively reaching out to try and preserve the new MIDs' "health." For example, on November 25, 2019, he wrote: "I'm really concerned that if we keep chargeback representations and alerts coverage off for much longer the health of these MIDs long term will be greatly reduced."

71.    On November 27th, Mr. Carrol wrote asking for the new MIDs' gateway and processor credentials. He was very explicit about why Chargebacks911 wanted the MIDs' login info, writing: "I know from my e-mail exchanges with Aaron that it looks like multiple AG complaints have already come in and I just want to work to stay ahead of this for you and keep your MIDs safe." The implication of Carroll's message is clear: without Chargebacks911's efforts to "stay ahead of" the state attorney generals investigating the Keto Racket, the MIDs— the lynchpin that held together the scam and facilitated the torrent of cash from victim's bank accounts to those controlled by the fraudsters — would be imperiled.

72.    Chargeback911's Keto Associates did in fact trust it with login credentials for accounts associated with the Keto Rackets' MIDs.  On May 6, 2020,

when Mike Campbell chatted Aaron Wilson that he didn't "have logins for the new MIDS," Mr. Wilson responded that "Dave said he was making the accounts for that[;] not sure where he ended up there[;] he had to make them for cb911/accountants also."  Mr. Campbell wrote back: "He [Mr. Flynn] said we could wind up with an other 50 MIDs? Holy fuck!"  Mr. Wilson answered: "yea he's going to need them if he wants to run volume through[;] the monthly caps on these get hit on good weekend."

73.    Mr. Wilson's remark that Dave made accounts for "logins for the new MIDS" for "cb911 [Chargebacks 911]" suggests that Chargebacks 911 had supervisory control over some aspects of those MIDs insofar as it was trusted by other members of the Keto Racket with the account information for the Keto Rackets' MIDs.

74.    Mr. Flynn's provision, in May 2020, of MID-login info to Chargebacks911 is reflected in a Skype chat between David Flynn and Brandon Figueroa, a Chargebacks911 employee or officer.  In that chat, David Flynn stated that there was a new MID that was "[g]oing through authorize" (Authorize is a Visa-owned payment processor gateway). David Flynn then provided information identifying the mid (BETTER BOOST KETO 512-2537024) as well as an authorize Login ID ("JaneSmith911boost"). David Flynn said that an Authorize activation

email had been sent to an email with a chargebacks911.com domain (j.smith@chargebacks911.com).

75.    Chargebacks911 *did* knowingly provide Flynn, James, and Brightree Holdings Corporation with convenient software that made defrauding financial institutions through the use of multiple MIDs more convenient and user-friendly. But its contributions to the Keto Racket went far beyond just providing a software product. Chargebacks911 consulted with the Keto Associates about getting new MIDs and then reached out to follow up about "adding some MIDs."  It also proactively reached out to the Keto Racket's ringleaders with suggestions about how to improve the Rackets' MIDs' "health."  And, when it learned the Keto Racket was facing multiple AG complaints, Chargebacks911's response was not to investigate whether it was assisting its client with some unlawful activity (it already knew it was), but rather to try and keep the Racket's MIDs "safe" from those pesky attorney generals.

76.    Plaintiffs are informed and believe that Defendant Cardone actively worked to cement Chargebacks911's role in the Keto Racket by, for example, dining with Rickie Joe James in December 2019 and inviting David Flynn to lunch at the Bellagio in Las Vegas in January 2020.  Plaintiffs are informed and believe that Cardone advised James and Flynn about Chargebacks911's services and maintained social relationships with them at least in part for the purpose of

ensuring Chargebacks911's continued involvement in the Keto Racket and that Cardone undertook these activities notwithstanding his knowledge, or constructive knowledge, of the Keto Racket's unlawful activities.

77.     The Keto Racket's phony, proliferating MIDs were the artifice that kept the cash flowing and Chargebacks911 was *knowingly* on the frontlines of maintaining the Rackets' MIDs' health. Without the many-headed hydra that was the Keto Rackets' myriad MIDs (some of them added after Chargebacks911's followed up expressing concern about the looming closure of an earlier-opened MID) and Chargebacks911's attention to the "health" of those MIDs, the fraud underlying the whole enterprise would have been apparent in a single, sky high chargeback rate, and the scam could have been cut off at the neck (by the Racket's acquiring bank or by credit card processing companies) long before Ms. Bavencoff and Ms. Sihler were injured.[13] Indeed Chargebacks911 began working with the Keto Racket in September 2019, months before Ms. Bavencoff's and Ms. Sihler's purchases. From the start of their association until months after Ms. Bavencoff's and Ms. Sihler's purchases ill-fated purchases from the Keto Racket,

---

[13]     Visa Product and Service Rule 10.4.3.3, for example, provides that "If Visa determines that an Acquirer, its Third Party Agent, or its Merchant changed, modified, or altered the Merchant name or Merchant data in any way to circumvent the Visa Dispute Monitoring Program (VDMP), Visa may . . . Permanently disqualify the Merchant and its principals from participating in the Visa Program."

Chargebacks911 kept the Rackets' many MIDs as "healthy" as possible and those MIDs, in turn, kept the scam going.

## Chargebacks 911 and the Keto Defendants Used Phony e-book Sales to Conceal the Keto Racket's High Chargeback Levels

78.    Plaintiffs are informed and believe that on September 20, 2019, Chargebacks 911 advised the Keto Products' marketers and sellers to move away from relying exclusively on the multiple-MIDs approach to hiding their high chargeback levels from payment processors.

79.    On September 19, 2019, Chargebacks911 employee Ben Scrancher sent the following Skype Messages to David Flynn of Brightree:

> **[Ben Scrancher]:** Anthony and I were looking at your statistics earlier and would like to have a chat sometime soon to suit you

> **[Ben Scrancher]:** Are you around tomorrow morning?

> **[David Flynn]:** Pleasure to meet you. How's 11:00 AM PST. I'm free later as well.

80.    The next day, at 8:39 P.M. David Flynn sent the following message to Chargebacks911:

> **[David Flynn]:** Thanks again for your time this morning. I may have missed it but I don't recall seeing any info on the groups that can help with increasing our transaction number. I think we've got a great fit to launch a stand alone digital keto planner for $1.00 that would work really well with this program. Thanks.

81.     Less than ten minutes after thanking Chargebacks911 for its "time this morning" and asking for "info on the groups that can help with increasing our transaction number," David Flynn told an internal Brightree Holdings Corporation chat that he'd "[h]ad a long talk with our chargeback people today" and that the "[b]est option" is to "increase our total number of transactions." Mr. Flynn explained: "We can either be above 100 chargebacks or above 1%, but not both. Suggestion is to make a product that we can market for $1, mainly to appease Nuvei and/or others mids. I think some type of keto planner, recipe guide, cheat sheet would do the trick. Should be easy to grab something out there and update it. I'll look over the weekend. We set up a simple 1 page website. Tell Nuvei we're targeting our existing partials and customers for the offer, so we can keep in contact with them. **The guys I spoke with have teams that can help with the actual transactions, but essentially we flood our mid with, say 250k $1 transactions. Presto, chargeback ration under 1%.** I'm hoping to talk with them over the weekend to see if there's time this month to get it done or if that's too much volume too fast. Might need to write this month off and start it 10/1." (Emphasis added.)

82.     The next day, September 21, 2019, Ben Scrancher responded to Mr. Flynn's text from the night before writing: "Hey David. See the chat with Johnny De Luca. He's the one that can help with that."

83.    On September 26, 2019, at 1:10 PM, David Flynn wrote to Chargebacks911 expressing some hesitation about engaging with Johnny De Luca:

> **[David Flynn]:** Guys we're getting ready to engage with Johnny. To be honest the whole process seems a little loose considering were getting ready to wire a lot of money to someone we do not know. Anything else you can share about him, his operation, how long you've been working with him? I typically don't wire $400k to strangers. Thanks.

Later that afternoon, CB 911 employees began responding and, citing Chargebacks911's long history of partnering with Mr. De Luca, urged Mr. Flynn to move forward with Johnny De Luca:

> **[Anthony Pugliese:** Hey Ben you around?
> **[Ben Scrancher]:** Hey guys
> **[Ben Scrancher]:** Sorry been at an event all day
> **[Ben Scrancher]:** David we've had clients working with Johnny for over 3 years
> **[Ben Scrancher]:** Never had a complaint so far

Mr. Flynn was convinced; he moved forward with Mr. De Luca:

> **[David Flynn]:** Ok. We just wired $300k so we're off and running
> **[Ben Scrancher]:** It's a big initial batch but you're safe wiring him funds

84.    The scheme got off to a fast start. On September 27, 2019, one day after wiring Mr. De Luca over $300,000, Mike Campbell told Mr. Flynn that there were "19,500 ebooks sold." A week later in early October, 2019, Flynn and Campbell were already impressed by the services the "ebooks coder" was providing. After David Flynn expressed pleasure over how the e-books ploy was progressing, Mike

Campbell responded "yea ebooks coder knows what he's doing[;] not surprising since they're from the dark side."

85.    Plaintiffs are informed and believe that the Keto Racket provided Mr. De Luca with customer information for use in the phony e-book transactions. On October 8, 2019, Mike Campbell asked David Flynn "am I good to give the ebook guys 75k names/addresses? I'll randomize them the best I can," to which Mr. Flynn responded "Yes."

86.    Plaintiffs are informed and believe that Chargebacks 911 advised its associates about how to price the fake transactions. On November 1, 2019, in the context of a conversation about the phony e-book sales, Mike Campbell told Rickie Joe James that "these guys told dave on the original call that 99 cent static transactions throw up flags." Plaintiffs are informed and believe that the "guys" referred to in this message are Chargeback 911's agents or employees.

87.    On October 16, 2019, Nicholas Caroll, a Chargebacks 911 employee or executive, chatted Mike Campbell and David Flynn with an update that Plaintiffs are informed and believe concerned the progress of the phony e-books ploy. Carroll wrote: "Noticing that we're continuing to see the up-tick in transaction volume including those $0.99 Sales. One quick thing I did want to double check, in my notes I thought we were going to be shooting for 15k sales per day at that 0.99 price point. I'm seeing that at this point in the month the average is about

13,500 transactions per day total, across all price points. That's about 7k more than the average trans/day last month."

88.    The next month, in November 2019, Mr. Flynn and Mike Campbell discussed how many transactions they needed from Mr. De Luca. Mr. Flynn asked: "Mike would it be hard to look at the gateway and get an idea of how many transactions we need from Johnny?[;] We'll need to coordinate with him to make sure they up on the right mid." Mike Campbell responded "it's balancing the tx [transaction] equally so I'd assume the ebooks would just need to hit equally as well[;] but he would still need to know totals I guess also[;] it's going to be hard to gauge because the ratios right now are so out of whack[;] if we did x amount per day eventually x will be too much because this existing % should start to drop a lot as the fraud gets further in the rearview."

89.    Chargebacks911 may have had clients working with Johnny De Luca for over three years, but Plaintiffs are informed and believe that that the e-books ploy is a derivative of a scheme-to-defraud developed by Defendants Eaton and Cardone and offered by Chargebacks911, in-house, to some of its clients as early as 2013.

90.    Specifically, Plaintiffs are informed and believe that between 2013 and 2019 Chargebacks911 offered certain clients its Value-Added Promotions ("VAP") service as part of which Chargebacks911 would use prepaid gift cards to run

micro-transactions through its VAP clients' accounts to increase the total number of transactions associated with those accounts and, by extension, decrease their chargeback rates. Plaintiffs are informed and believe that the glossary in Chargebacks911's "Client Relations Manual" stated that the purpose of VAP was "to reduce or dilute the chargeback ratio by increasing the transaction count with supplemental transactions in addition to regular sales."

91.    Though Chargebacks911 referred their associates to Mr. De Luca for help with executing the phony e-book sales rather than handling the logistics in-house, its fingerprints — along with those of Defendants Cardone and Eaton — were, Plaintiffs are informed and believe, still all over the e-Book ploy. Plaintiffs are informed and believe that Chargebacks911, drawing on its years of experience offering its clients the VAP service, masterminded the e-Book ploy. Chargebacks911 introduced the Keto Associates to Johnny De Luca and, when Mr. Flynn was on the fence about engaging with Mr. De Luca, reassured him that moving forward with Mr. De Luca and e-Book ploy was in the Keto Racket's best interest.  Brightree Holdings Corporation may have drawn Chargebacks911 into the Keto scam, but it was Chargebacks911 that was in the driver's seat when it came to using phony e-book transactions to reduce what would otherwise be alarmingly high chargeback rates.

92.    The e-Book ploy helped the Keto Racket reduce the *apparent* chargeback rates associated with its MIDs such that the Keto Racket was less susceptible to the surveillance, penalties, and account closures that banks and other financial services companies impose on merchants with high chargeback rates.

93.    Plaintiffs Sihler and Bavencoff were injured by the e-Book ploy insofar as it enabled the Keto Racket to evade detection by the chargeback-monitoring systems of credit card companies and acquiring banks. These systems — and the surveillance, monetary penalties and account closures they can and do impose on merchants with high chargeback rates — are designed to protect consumers like Ms. Sihler and Ms. Bavencoff. But Chargebacks911 designed and helped its associates execute the e-Book scheme to ensure that these protections systems would not work and that the Keto Racket could continue ripping off consumers like Ms. Sihler and Ms. Bavencoff notwithstanding the conspicuously high chargeback rates of the Racket's MIDs.

**Misrepresentations in the Keto Products' "Sales Funnels" Contributed to the Racket's High Rates of Chargebacks — and Chargebacks911 Knew It**

94.    The Keto Racket's persistent problems with high chargeback rates make sense when one considers the misrepresentations consumer-victims

encounter at each point in the Keto Products' "sales funnel," i.e., the series of websites which leads a victim to sign up for a fraudulent purchase.

95.    Victims initially encounter an advertisement for the product through a third-party site, such as Facebook, which takes the victim to one of the product's landing pages. Both Ms. Sihler and Ms. Bavencoff viewed online advertisements <u>falsely</u> claiming that the "InstaKeto" and "Ultra Fast Keto Boost" products were unanimously endorsed by all six celebrity "sharks" on Shark Tank.

96.    On February 17, 2023, the FTC published a "consumer alert" titled "Did your favorite Shark Tank celebrity really endorse THAT? Probably not." Authored by Karen Hobbs, Assistant Director of the Division of Commerce & Business Education, the alert warned began: "Before you spend money on that 'Shark-approved' miracle invention, weight loss product, or keto diet pill, are you sure it's really been through the *Tank*? Really sure? Scammers are using fake *Shark Tank* celebrity testimonials and endorsements — complete with doctored photos and videos — to generate buzz and profits."[14]

97.    One Ultra Fast Keto Boost affiliate page known to Plaintiffs depicts "before and after" photos of celebrity entertainers Drew Carey and Jennifer

---

[14]    Karen Hobbs, Federal Trade Commission consumer alert, *Did your favorite Shark Tank celebrity really endorse THAT? Probably not* (Feb. 17, 2023) https://consumer.ftc.gov/consumer-alerts/2023/02/did-your-favorite-shark-tank-celebrity-really-endorse-probably-not (last accessed June 23, 2023).

Hudson along with bogus quotes from both praising Insta Keto for its weight-loss effects.

98.    These false and misleading advertisement pages link to a consumer-facing Keto Products' landing page operated and controlled by, among others, David Flynn, Rickie Joe James, and Brightree Holdings Corporation.

### The Ultra Fast Keto Boost Landing and Checkout Pages

99.    A partial image of one of the landing pages for "Ultra Fast Keto Boost"



appears below.

100.    There were no terms of service or disclaimers visible at all on the landing page. Instead, victims were bombarded by false claims about the

beneficial effects of the product, including that it is a "Revolutionary Break-Through" that has "Scientists, Doctors and Celebrities Buzzing" and has helped "thousands who are already losing up to 1 lb. per day."

101.    On the landing page, victims were repeatedly told they should rush their order because the supply of Ultra Fast Keto Boost is limited. A pop-up banner at the top warns: "WARNING: Due to extremely high social media demand for our offers with free bottles, there is limited supply of Ultra Fast Keto Boost in stock as of September 24th! Offer expires in . . . ." Plaintiffs are informed and believe the timer displayed on the landing page was not tied to the existence of any real timed offer; it is just a countdown that resets for each user when they visit the page.

102.    At the very bottom of the page, there is a "Terms" hyperlink, which a consumer must click and scroll through in order to access a lengthy disclaimer. This disclaimer is only visible to customers who click on the hyperlink at the bottom of the shipping page. The websites do not require the customer to read or acknowledge the Terms to complete a checkout.

103.    Buried in the lengthy disclaimer is a section entitled "Refund/Return Policy," which provides the disclosure that, in order to obtain a full refund, the consumer must contact Customer Service by telephone (not email!) and obtain an RMA ("Return Merchandise Authorization") number to place on the package, then must ship the product back at the consumer's own expense within 30 days of

the date the consumer ordered the product. The disclaimer also states the product "must NOT be opened or used" and that the consumer must pay a $5.00 restocking fee. The disclaimer instructs the consumer to send the returned product to Ultra Fast Keto Boost, 9205 W. Russell Road, Suite 240, Las Vegas, Nevada 89148.

104.    The so-called Refund/Return Policy is impossible to follow because it requires the consumer to call—not email—the Customer Service department to obtain the RMA number, but the Customer Service number was not always a working number, as it was not working in Ms. Bavencoff's case. The return policy also requires the consumer to return the item — unopened and unused — within 30 days of purchase. This makes no sense: the consumer cannot even try it for one day before the refund policy is void. There is nothing "risk free" about that.

105.    At the bottom of the landing page, there also is a "Refund" hyperlink, which a consumer must click to read a shorter, conflicting policy that all orders are "secured with a 30-day Money Back Guarantee" and that a customer may request a refund by "simply" contacting support@ultrafastketoboost.com or 888-970-0686

Refund/Return Policy
In order to obtain your full refund, contact customer service by phone and obtain an RMA (Return Merchandise Authorization) number to place on your package. Write this number on the outside of the shipping package and send the product back to our warehouse at the address provided to you, and within thirty (30) days of the date you originally ordered the product. In order for your full refund to be processed the product must arrive at our fulfillment facility within thirty (30) days of the original purchase date and NOT be opened or used. You pay for return shipping. There is a $5.00 restocking fee per unit you are returning. This fee will be taken out of the refund issued. Once our warehouse has received the returned package, you will be issued a refund. Your refund will be credited back to the same credit card used to make the purchase. Refunds are issues within 48 hours and may take up to 3-5 business days to show in your statement, depending on the speed of the processing bank.
You may request a refund by calling 1-888-970-0686 (Support Line) Monday to Friday 8AM to 5PM PST.
Returns must be sent with your RMA number written on the packaging to:

RMA Returns
Ultra Fast Keto Boost
9205 W. Russell Road, Suite 240
Las Vegas, NV 89148

The Refund will show on your Credit Card statement as KETO BOOST, and you will receive a confirmation email from our warehouse at the time when your refund has been issued.

to obtain an RMA number.

106.    After the victims entered their personal information on the landing page, including their full name, email address, telephone number, and shipping address, they clicked "Rush My Order" and were taken to a check-out page. An image of the top of Ultra Fast Keto Boost's check-out page appears below.







107.    Notably, there is no requirement that users click a box or take any other action to agree to any terms of service. The link to the "Terms" is located at the very bottom of the screen next to several other links, in small text, and it requires users to scroll down to locate it. On the phone or tablet, the design for this page similarly requires no assent to the terms of service in any way, and again requires scrolling to a small link at the bottom to even view the terms.

108.    The check-out page presents victims with a graphic supposedly describing the product's current availability as "Low Stock" and urging them to "HURRY!" because the "Special Discount" will expire in only a few minutes. On information and belief, the graphic purporting to be a representation of "Current Availability" is simply a static image that does not reflect the current supply of Ultra Fast Keto Boost at all. And these representations were constant for the duration of the scam, during which time there was, on information and belief no shortage of Ultra Fast Keto Boost.

109.    The check-out page provides graphics for three different purchase options: (1) "Buy 3, Get 2 Free" for $39.74 each bottle; (2) "Buy 2, Get 1 Free" for $49.97 each bottle; and (3) "Buy 1 Bottle" for $69.99. The first option is pre-checked so victims need to deselect that option if they do not want to purchase three bottles. The victims then enter their credit card information and click "Complete Order."

110.    Victims who choose to "Buy 3, Get 2 Free" of the Ultra Fast Keto Boost bottles through this landing page are subjected to a number of false or misleading representations. Most reprehensible is the fact victims are never told they will be charged for a total price of $198.70.

111.    Victims who choose to "Buy 2, Get 1 Free" of the Ultra Fast Keto Boost bottles through this landing page are mislead insofar as they are never told they will be charged nearly $150.00 for the three bottles, rather than paying $49.97 for each of two bottles and receiving a third for free.

112.    With respect to both "free bottle(s)" offers the check-out page unambiguously suggests the opposite: that the consumer will not pay for some of the bottles ordered. Victims are also, on information and belief, subject to sense-of-urgency-inducing misrepresentations about the Keto Products' inventory levels.

113.    A few days later, victims who expected to be charged the advertised amount for their bottles are understandably shocked to see their debit or credit card billed for nearly $200, to which they did not agree. (Or, in some cases, for nearly $150.00 if they opted to buy 2, get 1 free.)  Even if they were lucky enough to get through to Customer Service by telephone, they were told they cannot obtain a full refund.

114.    This is nothing more than credit card fraud: lying to customers about

what they will pay, taking their credit card information, and billing them for something to which they never agreed.

### *The Insta Keto Landing and Checkout Pages*

115.    Like the consumers who purchased the Ultra Fast Keto Boost product, the consumers who purchased "InstaKeto" bottles were subjected to similar misrepresentations throughout the purchasing process.

116.    The landing page for Insta Keto, https://instaketo.com, was identical to that for Ultra Fast Keto Boost, except that the brand name on the depicted bottle shows "Instant Keto" instead of "Ultra Fast Keto Boost."







117.   At the check-out page, the victims were presented with the same three purchase options, including the option to receive two "free" bottles with the purchase of three bottles.



118.    Again, there are no disclaimers on any of the webpages for the "InstaKeto" product (or "Instant Keto" as it is also referred to in the sales process). The same disclaimer regarding the so-called "Refund/Return Policy" is only visible to customers who scroll to the bottom of the landing page, click on the "Terms" hyperlink in the footer of the page, and scroll through the lengthy disclaimer.

119.    Once again, consumers purchasing bottles of the "InstaKeto" product with the understanding they will pay a certain price for the bottles through this landing page are subjected to a number of false or misleading representations, including that they will pay a lower price, when, in truth, their debit or credit cards are charged for bottles that they never agreed to purchase.

*Misrepresentations Concerning the Actual Prices Consumers Are Charged*

120.    The checkout pages for both Ultra Fast Keto and Insta Keto deceive consumers about the actual prices they will be charged for the advertised diet pills.

121.    When a victim views the final check-out page on either https://ultrafastketoboost.com  or  https://instaketo.com/  (both  websites controlled by Chargebacks911's Keto Associates), the victim is presented with several offers, including promotional offers such as "Buy 3 Bottles, Get 2 Free" for $39.74 per bottle, which should result in a total price of $119.22. Consumers who purchased this offer were billed for all five bottles, in an amount of nearly $200.00.

Consumers who purchased the "Buy 2, Get 1 Free" offer for $49.97 per bottle, which should result in a total price of $99.94 were billed for all three bottles in an amount of nearly $150.00.

122.   On information and belief and based on the sales funnel structure, every consumer who purchased Keto Products was exposed to these misrepresentations about the actual prices of the bottles.

123.   Chargebacks911's Keto Associates made material omissions regarding the actual prices of the bottles in the "free bottle[s]" offers on their websites by omitting material information, which they were under a duty to disclose relating to the actual prices of the bottles. The Keto Associates failed to disclose to consumers who viewed the landing pages that the actual prices charged would be significantly higher than the advertised prices, and, in fact, that the consumers would be billed for all bottles of Keto Products, even though they never agreed to pay for all five or all three bottles.

124.   Chargebacks911's Keto Associates had a duty to Plaintiffs and the Class Members because they made partial representations — that consumers would pay the advertised price of the promotional offers —but also suppressed, concealed, or did not disclose material facts that qualify those representations, namely, that they would be charged for all five or three bottles delivered to them,

in an amount totaling almost $200.00 or $150.00, depending on the offer selected, and that none of the bottles were actually "free."

125.    Chargebacks911's Keto Associates knew, or by the exercise of reasonable care should have known, that their omissions were untrue and misleading, and deliberately made the aforementioned omissions in order to deceive reasonable consumers like Plaintiffs and other Class Members.

126.    This knowledge is evidenced by a November 2019 Skype conversation between Mike Campbell and David Flynn where the former asked: "if a 198.7 attempt [i.e., an attempt to bill a consumer's card for $198.70] fails for insufficient funds should I try to capture it at some lower price point instead?"  He explained: "like if 5 bottles at 198.70 fails -> attempt it at 39.74 x 3 bottles with 2 free for 119.22[?]"  This question reflects a subjective awareness that a consumer who bought three bottles at $39.74 and received two free would have  a total bill of $119.22, not $198.70.

127.    Chargebacks911's Keto Associates omissions concerning the pricing of the Keto Products could have been corrected by including the true total price of the Keto Products on the check-out page and in any other place where references to "free" bottles occurred.

128.    Ms. Sihler and Ms. Bavencoff were damaged by these misrepresentations and omissions as described herein and they relied on them in

that they would not have signed up for the offers had they been informed of those offers' actual terms.

129.    Chargebacks911 knew that its Keto Associates were selling to consumers via websites that misrepresented price of their wares. On October 3, 2019, Nicolas Carroll offered an explanation of the volume of chargebacks "coming through due to 'incorrect Transactions Amounts,'" stating it could be "due to the way the pricing for the offer is displayed on the website as we've talked about (customers misinterpreting the "X dollars per bottle" and "Buy X Bottles, Get X bottles Free" Statements)."  This observation reflects Chargebacks911's awareness of the fact that the Keto Products' pricing on the customer-facing landing pages was materially misleading.

130.    The next month, November 2019, Nicolas Carroll told David Flynn that "[t]he primary MasterCard Chargeback reason code since inception with our services was 4837 - Unauthorized Transaction. This accounted for about 50% of incoming MasterCard Chargebacks."

***The Keto Racket used "False Front" Websites to Deceive***

***Banks and Credit Card Companies When a Victim Complains; Chargebacks911***

***was in on it***

131.    Online merchants seeking to get credit card processing services must provide their banks with a variety of information, including their website's URLs.

Rather than pointing their banks to the landing pages Plaintiffs and other victims encountered, the Keto Racket pointed them to "decoy websites." The decoy website for the Ultra Fast Keto Boost product was https://thesuperbooster.com. On information and belief, the InstaKeto product maintained a similar or identical false front.[15]

132.    During much if not all of the time period at issue in this complaint, if a user typed in the URL, www.thesuperbooster.com, a website entirely different from that viewed by consumer-victims appeared — a "false front" that is designed to be shown to banks if a victim complains. A partial image of this website appears below:

---

[15]    For Instant Keto, the URL for the "false front" website is unknown. The Instant Keto bottle references http://www.instantketoboost.com/; however, that website is not accessible.



133.    Unlike the check-out page shown to consumers, the check-out page on the "false front" website provided the actual purchase prices for each offer. Specifically, the first option to "Buy 3 Bottles, Get 2 Free" listed the actual purchase price of $198.70, instead of $39.74 for each bottle, and the second option to "Buy 2 Bottles, Get 3 Free" listed the actual purchase price of $149.97, instead of $49.97 for each bottle.[16] These actual prices were never shown to consumers on the landing

---

[16]    The third option - to purchase one bottle for $69.99 – is the same price shown to consumers.

pages; they only discover the inflated charges when they review their debit and credit cards.



134.   The   URL   of   Ultra   Fast   Keto   Boost's   false   front   website (www.thesuperbooster.com) was carefully selected by Chargebacks911's Keto Associates. In July 2019, Rickie Joe James, Mike Campbell, and David Flynn were chatting about changes they intended to make to a site David Flynn described as "just for the underwriters for the processing account on the decoy website." Mr.

Flynn asked the others: "Should we give the underwriters a different url? Or give the affiliates a different one?"  Mike Campbell replied: "underwriters can see whatever domain, they cant tell the origin of the purchases at all."  Then Rickie Joe James chimed in: "just register a domain for underwriters[;] and leave this one alone."  Chargebacks911's Keto Associates debated what the false front's URL should be. While "MyUltraFastKetoBoost.com" was an early favorite, Mr. Flynn ultimately rejected it as too similar to the landing page URL accessed by the scam's consumer-victims: "You think with that one they may try typing it in without the 'my'. Maybe it's better to use one of the ones we already have like the thesuperbooster.com."  Mike Campbell was happy to go along with using thesuperbooster.com as the false-front site's URL: "sure, I don't think it matters at all[;] just need to get them to review a page and sign off on it."

135.   The next month, in August 2019, Mr. Flynn asked "Kol," who Plaintiffs believe worked as a designer for the Keto Racket, to "update" the Ultra Fast Keto Boost labels with a new URL, explaining that they "[n]eed[ed] to change website to thesuperbooster.com."  When "Kol" asked if that was the "new name" or "just the website," Mr. Flynn responded that thesuperbooster.com was "just a main site, for processors."

136.   In October of 2019, Mr. Flynn once again turned to "Kol" telling him "we need to make a toned down version of the ufkb [Ultra Fast Keto Boost] site.

This is urgent sand needed by Monday for our processor. I'll send over changes but basically anything good they want removed." Mr. Flynn explained: "Basically need to make a version of ultrafastketoboost.com closer to thesuperbooster.com and then even from there remove some more stuff. Countdown timer needs to go. Anything where they are quantifying results needs to go, unless they have links to specific 3rd party studies. Eg: 225% more energy [or] 1lb of fat per day . . . Refund policy needs to change – they can't call it a 30-day money back guarantee in one place, and then state that refunds will only be given on unopened bottles in another."

137.    In addition to providing the false front websites to acquiring banks when opening merchant accounts, Chargebacks911's Keto Associates also, on information and belief, used depictions from the "false front" websites to combat chargebacks by fraudulently convincing bank and credit card representatives that victims had purchased the Keto Products from those websites — which clearly spelled out the prices consumers would be charged — as opposed to the landing pages to which affiliates and advertisers actually directed the Keto Racket's consumer-victims.

138.    The maintenance of these "false front" websites is itself an act of deception, intended not just to hide from law enforcement, but to prevent consumers from exercising their lawful right to a chargeback by their bank or

credit card company for charges to which they never agreed. Presented only with the false front, banks and credit card companies cannot know that there is fraud being conducted behind it.

139.    The FTC has recognized this tactic as a common one used by this kind of scammer: "The defendants sometimes hosted multiple versions of the same promotion. If consumers navigated from an embedded link on another site – the much more likely way people would learn about a product – they were taken to pages where products were offered for sale with what the FTC says were undisclosed automatic shipment programs. But a funny thing happened if you just typed in the URL – for example, rippedmusclex.com. That took you to an entirely different site that included more visible disclosures of the trial offer. Why would a company create those different versions? The complaint suggests that it could have been done in an attempt to have a 'clean' version for banks, payment processors, and law enforcers."[17]

140.    In August 2019, David Flynn and Mike Campbell discussed which URL they should be using for the "chargeback company."    Campbell had no qualms about sharing customer-facing landing page with Chargebacks911,

---

[17]     Lesley Fair, *Fauxmats, false claims, phony celebrity endorsements, and unauthorized charges*, Federal    Trade    Commission    Business    Blog    (2017), https://www.ftc.gov/business-guidance/blog/2017/11/fauxmats-false-claims-phony-celebrity-endorsements-and-unauthorized-charges
(last visited May 7, 2023).

writing "oh, ufkb for them."  But David Flynn then asked "what about sending info in for fighting chargebacks[?]" Mr. Campbell proposed: "if the communication is between them and the merchant then yes [use thesuperbooster.com][;] if its for them to know what theyre dealing with, ufkb." With the matter of which URL to give Chargebacks911 settled — Chargebacks911 would be told about both the "false front" (thesuperbooster.com) and the customer-facing landing page (ultrafastketoboost.com) so it could most effectively deceive both the Racket's consumer-victims and the banks — Flynn and Campbell turned to discussing other matters, namely updating the Keto Products' pill bottles with the false front URL and, more broadly, a bottle-rebrand that left "no identifiable information anywhere to get back to you" on the bottles.

141.   In May 2020 Nick Carroll told David Flynn that Chargebacks911 needed the Keto Rackets sales URLs (plural) to finish Chargebacks911's MID integration, and Plaintiffs are informed and believe that Chargebacks911 knew the customer-facing landing page URLs through which customers like Ms. Bavencoff and Ms. Sihler purchased Keto Products because they were provided to Chargebacks911 during the onboarding process.

142.   Plaintiffs are also informed and believe that Chargebacks911 deliberately omitted the landing-page URLs consumer-victims used to purchase Keto Products from documentation they submitted to acquiring banks on behalf

of their clients, including Brightree Holding Corporation. Plaintiffs are informed and believe that the purpose of this omission was to lead the banks to believe that images from the "false front" website represented the sites that consumer-victims purchased from. Plaintiffs are informed and believe that this omission was made pursuant to a policy they believe Defendant Monica Eaton articulated in January 2016 when she instructed the Chargebacks911 employees involved in disputing chargebacks that Chargebacks911's policy was that "we never show any website address or URL on a screenshot. The reason for this is that if we show the bank a [URL] that is not registered to the [merchant account] related to a chargeback, the merchant will be liable for a fine of up to $250K and must prove that he is not making sales on this URL. I understand that sometimes merchants will give us incorrect URLs, but the only information we need to supply for the banks is an illustration to represent how the site operated (it is never our place to provide the [URL])."

<u>**CLASS ACTION ALLEGATIONS**</u>

143.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference as if set forth fully herein.

144.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure Rule 23, seeking certification of Plaintiffs' claims and certain issues in this action on the Class, consisting of:

**Nationwide Class:** All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for shipments of either three bottles or five bottles of Ultrafast Keto Boost, Insta Keto, or InstantKeto.

145.　"Keto Products" means "Instant Keto," "InstaKeto," and "Ultra Fast Keto Boost."

146.　Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

147.　Plaintiffs reserve the right to amend or modify the class descriptions by making it more specific or dividing the class members into subclasses or limiting the issues.

148.　NUMEROSITY: Plaintiffs are informed and believe, and on that basis allege, that the Class is so numerous that individual joinder of all members would be impracticable. It is apparent that the number of consumers of injured by their purchase of the Keto Products would be so large as to make joinder impracticable

as the Class (or Classes) and would be comprised of thousands of consumers geographically dispersed throughout the United States.

149.    <u>COMMONALITY</u>: Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Classes were and are similarly affected by having purchased and used the Keto Products, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

150.    <u>PREDOMINANCE</u>: Questions of law and fact common to the Class exist that predominate over questions affecting only individual members, including but not limited to:

    a) whether Defendants' alleged conduct is unlawful;

    b) whether the alleged conduct constitutes violations of the laws asserted;

    c) whether the Defendants' wrongful conduct was intentional or knowing;

    d) whether Plaintiffs and Class members are entitled to appropriate remedies, including restitution, damages, and injunctive relief.

151.    <u>TYPICALITY</u>: The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise from the same

course of conduct by Defendants, all members of the Class have been similarly affected by Defendants' course of conduct, and the relief sought is common.

152. <u>ADEQUACY</u>: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the other Class members. Plaintiffs have retained competent counsel with substantial experience in complex litigation and litigation involving financial and consumer issues, who are committed to vigorously prosecuting this action on behalf of the Class.

153. <u>SUPERIORITY</u>: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, far outweigh any difficulties that it might be argued could arise in connection with the management of this class action. These benefits make class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action, it would be highly unlikely that the representative Plaintiffs

or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

154.    Certification of this class action is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of potentially injured consumers, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Certification of Plaintiffs' claims for class-wide treatment is also appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

155.    Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class members. Class notice can likely be directly sent to individual members of the Class.

## FIRST CAUSE OF ACTION

## Violation of the Racketeer Influenced and

## Corrupt Organizations Act ("RICO")

## 18 U.S.C. § 1961(c)

### *Against Chargebacks911*

156.    Plaintiffs bring this claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961(c) on behalf of themselves and the Class and against Defendant Chargebacks911.

157.    18 U.S.C. section 1962(c) provides that "[i]t shall be unlawful for [1] any person [2] employed by or associated with any enterprise [3] engaged in, or the activities of which affect, interstate or foreign commerce, [4] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [5] through a pattern of racketeering activity . . . ."

158.    **Chargebacks911 is a "person."** Defendant Chargebacks911 is a "person" as that term is defined in 18 U.S.C. section 1961(3) because it is an "entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

159.    **Chargebacks911 was associated with the Keto Enterprise.** The Keto Racket constitutes an "enterprise" (the "Keto Enterprise") within the meaning of 18 U.S.C. § 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

160.   "An associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.' *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981). While the very concept of an association in fact is expansive, the Supreme Court has nevertheless found that an association-in-fact enterprise must have three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (cleaned up).

161.   As described herein, the Keto Enterprise consists of individuals and legal entities who associated together with each other for a common purpose of engaging in a course of conduct.  Specifically, **the individuals and entities who associated together** to form the Keto Enterprise are: Chargebacks911, the Fulfillment Lab Inc., Richard Nelson, David Flynn, Rickie Joe James, Beyond Global Inc., Brightree Holdings Corporation, Mike Campbell, Aaron Wilson, and BMOR Global LLC as well as currently unknown John Does.  **The course of conduct these individuals associated to pursue** was defrauding consumers like Plaintiffs by selling inaccurately marketed diet pills online and deceiving banks and payment processing companies about the nature of their activities.

162.   The Keto Enterprise's **purpose** was enriching its members through the financial victimization of consumers like Plaintiffs Sihler and Bavencoff.

Specifically, the enterprise's purpose was to build a sustainable scam capturing consumers' credit card information and using it to overcharge them for diet pills. Maintaining multiple MID accounts and preserving their apparent "health" by artificially diluting their chargeback rates furthered this end by ensuring the scam's continued access to payment processing services and keeping the scam's overhead as low as possible so that its principals could retain more profits for themselves.

163.    Chargebacks911's participation in the Keto Enterprise was structured as a vendor/vendee **relationship**, with the David Flynn, Rickie Joe James, and Brightree Holdings Corporation as the owners of the Keto Products hiring Defendant Chargebacks 911 as a vendor to assist in the fraud. Defendant Chargebacks911 regularly conducted chat conversations and phone calls with the Keto Associates to coordinate their activities, and to advise them and consult for them. The Keto Associates also used a software interface provided by Chargebacks911 to monitor data about chargebacks and, on information and belief, to correlate chargebacks with specific MIDs. Employees of Chargebacks911 were in regular contact with the Keto Associates regarding issues which reflected Chargebacks911's knowledge of the scam, including customer complaints about pricing transparency and state attorney general investigations. Chargebacks911 was paid a portion of the scam's proceeds in exchange for its services and accepted

these payments knowing that it was assisting in a scam. For example, Plaintiffs are informed and believe that on or around October 7, 2019, Chargebacks911 received an ACH payment of $105,024.00 from its Keto Associates.  Plaintiffs are also informed and believe that Defendant Gary Cardone was actively involved in facilitating the relationship between Chargebacks911 and the Keto Entities and that he dined with Rickie Joe James in December 2019 and invited David Flynn to lunch at the Bellagio in Las Vegas in January 2020.

164.   Each of the members of the Keto Enterprise knew about the general nature of the enterprise and knew that the enterprise extended beyond their individual role. The nature and structure of these scams was widely known across the industry.

165.   The Keto Enterprise had **longevity** sufficient to permit Chargebacks911 and its associates to pursue the enterprise's purpose. The Keto Enterprise was in existence at least as of February 20, 2018, when the first "false front" was registered for Ultrafast Keto Boost. Defendant Chargebacks911 joined the operation in or around late August 2019 and was involved in it at least through July 2020.

166.   The Keto Enterprise qualifies as a closed-ended enterprise because the predicate acts occurred over a period exceeding two years (from February 20, 2018 to at least July 2020). The Keto Enterprise also qualifies as an open-ended

enterprise because the Keto Entities and The Fulfillment Lab's businesses have historically been structured around fraudulently billing customers and providing minimal "services" or "products" to provide the illusion of a legitimate business to law enforcement. Committing these predicate acts has become a regular way of doing business among these entities and individuals. This is exemplified by the fact that the Keto Enterprise persisted in committing predicate acts for, at a minimum, almost a year after the filing of *Sihler et al. v. The Fulfillment Lab, Inc. et al.*, 3:20-cv-01528-LL-MSB. Because the predicate acts alleged herein are a way of doing business that Keto Enterprise members have engaged in for years, they are highly likely to reoccur and may even be ongoing at the time of this Complaint's filing. Plaintiffs are informed and believe that Chargebacks911's business, likewise, has historically (since at least 2013) involved the use of fraudulent and deceptive tactics to help e-commerce merchants and others reduce their chargeback rate and dispute chargebacks; committing and aiding and abetting the predicate acts herein alleged is thus also a regular way of doing business for Chargebacks911 and, by extension, likely to persist in the future.

167. ***The Keto Enterprise was engaged in interstate commerce.*** The Keto Racket was selling the Keto Products to consumers across the United States and consisted of members in more than one state who routinely communicated with each other across state lines.

168.    ***Chargebacks911 Conducted in and Participated in the Affairs of the Keto Racket.***  RICO "liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise*'s affairs, not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (cleaned up).  Through the commission of myriad predicate acts, discussed below, Chargebacks911 was not merely conducting its own affairs through a pattern of racketeering activity. It was, rather, engaging with the Keto Enterprise through this pattern of racketeering activity. The racketeering activity was, in other words, a modality though which Chargebacks911 interfaced with other members of the Keto Enterprise which were legally distinct from Chargebacks911, for example, David Flynn, Rickie Joe James, and Brightree Holding Corporation.

169.    Chargeback911's participation in the Keto Enterprise was also not mere passive observation. Within its vertical - maintaining the Rackets' MIDs' health by keeping chargeback rates low - Chargebacks911 *conducted* the affairs of the Keto Enterprise in every sense of the word.

170.    Chargebacks911's control over refunds illustrates this point. Chargebacks911's Keto Associates used call centers to interface with customers (though, as in Ms. Bavencoff's experience, these call centers' representatives were not always actually reachable by customers). The call centers' representatives were directly beholden to the Keto Associates.  As Mike Campbell put it: "the call

centers are puppets[;] they just follow our orders." And yet, despite their controllability, these "puppets" were not given the discretion to issue full refunds to customers. When Aaron Wilson asked Mike Campbell "You took away the call centers ability to do Full Refunds, right?"  Mike Campbell replied that the call center is able to, a "handful" of times a day contact him and ask him to run refunds "where people were supposed to get refunds and didn't for whatever reason." But, Mike Campbell noted, Chargebacks911 - unlike the "puppets" in the call center -  had "full refund access still for chargebacks." Chargebacks911, in other words, was given full discretion to conduct the affairs of the Keto Racket vis-a-vis refunds, a discretion that was denied to the "puppets" in the call centers.

171.   Chargebacks911's power over David Flynn's thinking was so significant that it alienated other members of the Keto Racket. In a September 2019 Skype chat, Rickie Joe James and Mike Campbell discussed Chargebacks911's telling Flynn that international sales might be "the answer" to the Racket's high chargeback rates and then Rickie Joe James griped about the fact that Flynn would "question us" [James and Campbell] while also listening to Chargebacks911.

172.   **Chargebacks911 Participated in and Conducted the Affairs of the Keto Racket through a Pattern of Racketeering Activity.**

173.   Eighteen U.S.C. section 1961(1) defines a pattern of racketeering activity as "at least two acts of racketeering activity, one of which occurred after

the effective date of this chapter and the last of which occurred within ten years . . . ."

174.    Eighteen U.S.C. section 1961(1) defines racketeering activity to include "any act which is indictable under" specified provisions of the U.S. Code. Among the specified provisions are:  (1) 18 U.S.C. section 1343 (relating to wire fraud); (2) section 1344 (relating to financial institution fraud); and (3) 18 U.S.C. section 1956 (relating to the laundering of monetary instruments).

175.    Pursuant to Federal Rules of Civil Procedure Rule 8(d)(2), Plaintiffs set forth two coincident and parallel statements of *how* Chargebacks911 participated in and conducted the affairs of the Keto Enterprise: (1) by aiding and abetting the commission of at least two predicate acts; and (2) by directly committing at least two predicate acts.

### *Chargebacks911 violated 18 U.S.C. section 1962(c) by aiding and abetting the commission of at least two predicate acts*

176.    Chargebacks911, as part of the Keto Enterprise, violated 18 U.S.C. section 1962(c) by aiding and abetting the commission of at least two predicate acts.

177.    "One who aids and abets two predicate acts can be civilly liable under RICO.  *Petro-Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356 (3d Cir.1987). To establish civil liability for aiding and abetting, the plaintiffs must

show: (1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation." *Cox v. Adm'r United States Steel & Carnegie*, 17 F.3d 1386, 1410 (11th Cir. 1994).[18]

178.    The sale of Keto Products to Ms. Sihler involved two predicate acts of wire fraud committed by members of the Keto Enterprise.

179.    On or around December 11, 2019, Ms. Sihler was shown advertising claiming that InstaKeto had been endorsed by the six celebrity "Sharks" from Shark Tank and well-known magazines. This advertising was transmitted via the Internet through interstate commerce into California. The advertisement was false because InstaKeto had not actually been endorsed by any celebrities or well-known magazines. Ms. Sihler was then taken to the InstaKeto landing page, where she was falsely told she would be billed for only three bottles, as described *supra*. The InstaKeto landing page was also transmitted via the Internet through interstate commerce into California. Both of these websites (the initial Shark Tank

---

[18]      *Petro-Tech, Inc.*, 824 F.2d 1349, the Third Circuit case cited by the Eleventh Circuit in *Cox* has been overturned, but courts in the 11th Circuit continue to rely on *Cox* as good law. *See, e.g., RJSG Props., LLC v. Marbella Condo. Developers, LLC*, No. 3:08cv302/MCR/EMT, 2010 U.S. Dist. LEXIS 73460, at *37 (N.D. Fla. June 11, 2010)  (citing *Cox* and stating that "[o]ne who aids and abets two predicate acts can be civilly liable under RICO."); *Factor Grp. v. Ayotte Trailer Rentals*, No. 08-20383-CIV-COOKE/B, 2009 U.S. Dist. LEXIS 151221, at *7 (S.D. Fla. Sep. 23, 2009) ("Mr. Lavire claims that Factor Group has failed to state a viable cause of action against Lavire under RICO because a private plaintiff may not maintain a suit for 'aiding and abetting' under RICO. This is simply not true in the Eleventh Circuit.").

page and the InstaKeto landing page) were caused to be transmitted by Beyond Global Inc., David Flynn and Rickie Joe James. They knew that Shark Tank cast members and magazines had not endorsed their product, because if true this would have been highly publicized and would have involved contracts and contact with journalists. They further knew that they intended to ship five bottles and not three, and knew they intended to charge Ms. Sihler a significantly higher price than what they had represented they would.

180. Previously, Beyond Global Inc. and Chargebacks911's Keto Associates had run free trial scams. At the advice of Nelson and The Fulfilment Lab Inc. they chose to structure the scam as a single shipment containing bottles falsely advertised as "free" as opposed to as a "free trial" where consumers would provide their credit card information and then receive (and be billed for) subsequent shipments of diet pills. Nelson and The Fulfilment Lab Inc. advised that this "straight sale" approach would help the Keto Enterprise evade heightened FTC scrutiny of subscription charges and Mastercard brand rules that went into place on April 12, 2019. Those Mastercard rules introduced stricter payment processing rules for subscription billing, but they did not apply to single shipments containing multiple bottles. The Keto Enterprise's Buy 3, Get 2 Free and Buy 2, Get 1 Free schemes thus enabled them to overcharge consumers without billing under MCC 5968 (Direct Marketing—Continuity/Subscription Merchants),

the subscription code subject to the new rule.

181.    These transmissions of the Shark Tank website and the InstaKeto website to Ms. Sihler constitute two separate predicate acts of wire fraud, which Beyond Global Inc., BMOR Global LLC, David Flynn, Rickie Joe James, and Brightree Holdings Corporation directly committed.

182.    The sale of Keto Products to Ms. Bavencoff also involved two predicate acts of wire fraud.

183.    On or around October 14, 2019, Ms. Bavencoff was shown advertising on Facebook claiming that Ultrafast Keto Boost had been endorsed by the six celebrity "Sharks" from Shark Tank and well-known magazines. This advertising was transmitted via the Internet through interstate commerce into California. The advertisement was false because Ultrafast Keto Boost had not actually been endorsed by any celebrities or well-known magazines. Ms. Bavencoff was then taken to the Ultrafast Keto Boost landing page, where she selected an option thinking she would not be billed for "free" bottles, as described *supra*. Instead she was billed for all five bottles. The Ultrafast Keto Boost landing page was also transmitted via the Internet through interstate commerce into California. Both of these websites (the initial Shark Tank page and the Ultrafast Keto Boost landing page) were caused to be transmitted by BMOR Global LLC, David Flynn, Rickie Joe James, and Brightree Holdings Corporation. They knew that Shark Tank cast

members and magazines had not endorsed their product, because if true this would have been highly publicized and would have involved contracts and contact with journalists.  They also, on information and belief, knew that there was no shortage of Ultra Fast Keto Boost. They further knew that they intended to ship five bottles and that none of the bottles were "free," and knew they intended to charge Ms. Bavencoff a significantly higher price than what they had represented they would. Just as with Ms. Sihler, Beyond Global Inc. and the Keto Entities shipped all the unordered bottles structured as a single shipment to avoid Mastercard rules and FTC scrutiny.

184.    These transmissions of the Shark Tank website and the Ultrafast Keto Boost website to Ms. Bavencoff constitute two separate predicate acts of wire fraud, which Beyond Global Inc., David Flynn, Rickie Joe James and the Keto Entities directly committed. Each participant had a specific intent to deceive or defraud. Flynn and James knew about the deceptions and had supervised the creation of the websites at issue and purchased the advertising on behalf of Beyond Global Inc., Brightree Holdings Corp., and BMOR Global LLC, which they used as shell companies to sell the products. The place of origination of the websites is unknown, but the merchant account lists "NV"; Beyond Global Inc. is incorporated in Wyoming but listed a Nevada address on the bottle.

185.    The sale to Ms. Sihler also involved one predicate act of mail fraud

committed by Chargebacks911's Keto Associates. TFL used United States mails to send the shipment, under the supervision, direction, and control of Nelson (who caused the shipment), and directed by Beyond Global Inc. and the Keto Entities (who caused the shipment because they had hired TFL to ship their products). Shortly after December 11, 2019, TFL shipped five bottles of a product labeled "Instant Keto" to Ms. Sihler. That shipment came from Tampa, Florida and was sent to Ms. Sihler in Coronado, California. As stated above, on the advice of Nelson and TFL, those shipments were structured as a single five-bottle bundle, rather than the fake "free trial" subscription which Beyond Global Inc. and the other Keto Entities had previously used for other products. All of the Keto Associates specifically intended to continue committing fraud despite FTC and Mastercard crackdowns on subscription fraud by restructuring the shipments to avoid a subscription.

186.    The sale of Keto Products to Ms. Bavencoff also involved one predicate act of mail fraud committed by Chargebacks911's Keto Associates

187.    TFL used the mails to send the shipment, under the supervision, direction, and control of the Keto Entities (who caused the shipment because they had hired TFL to ship their products). Shortly after October 14, 2019, TFL shipped five bottles of Ultrafast Keto Boost to Ms. Bavencoff. That shipment came from Tampa, Florida and was sent to Ms. Bavencoff in Santee, California. As stated

above, on the advice of Nelson and TFL, those shipments were structured as a single five-bottle bundle, rather than the fake "free trial" subscription which Beyond Global Inc. and the other Keto Entities had previously used for other products. All of the Keto Associates specifically intended to continue committing fraud despite FTC and Mastercard crackdowns on subscription fraud by restructuring the shipments to avoid a subscription.

188.    These sales and shipments of Ultrafast Keto Boost and Instant Keto were not isolated, but were part of a pattern of related shipments and predicate acts that occurred over a long period of time. The sales and shipments of these two products were occurring from at least 2018. The Keto Entities and/or Beyond Global Inc. registered the "false front" website for Ultrafast Keto Boost used to defraud the banks and credit card companies on or about February 20, 2018.  The Keto Defendants first registered the Ultra Fast Keto Boost website - https://ultrafastketoboost.com - on July 3, 2019, and first registered Instant Keto's website - https://instaketo.com/ - on August 8, 2018.   The examples below are representative and show that the predicate acts committed against Plaintiffs were part of a long-running pattern.

189.    On October 24, 2019, the Florida Attorney General's Office received a complaint against "ultrafastketoboost" from a consumer named John Wilkins. Mr. Wilkins wrote: "This was supposed to be 39.74 per bottle if you bought 3 and get

2 additional bottles free. Instead of billing me 119.22 they billed me 198.70 charging me for each bottle. When I contacted them by phone their office ends up being in Tampa,Fl and they refuse to refund the 79.48 additional they charged for the so called free bottles."  Mr. Wilkins indicated that the date of the transaction he was complaining about was October 11, 2019.

190.    On information and belief, and based on the process required to file a complaint with the Florida Attorney General that requires the consumer to provide numerous details, this shipment occurred as described by the customer, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Bavencoff (the transmission of the Ultra Fast Keto Boost landing page via the Internet to Mr. Wilkins in Florida). That act occurred on October 11, 2019. The shipment of Keto Products to Mr. Wilkins constituted mail fraud, as the product was shipped by TFL (under the direction, control, and supervision of Nelson) from Tampa or Utah via United States mails to a consumer in Cape Coral, Florida. The shipment occurred in or around October 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

191.    On November 22, 2019, a consumer named Gisela Reis from New Jersey submitted a fraud complaint to the Attorney General of Nevada against "Ultra Fast Keto Boost." Ms. Reis complained that "advertisement said $39.00 for 5" but that on October 15, 2019, she was charged $198.70 by Ultra Fast Keto Boost.

192.    On information and belief, and based on the process required to file a complaint with the Nevada Attorney General that requires the consumer to provide numerous details, this transaction occurred as described by the Ms. Reis, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Bavencoff (the transmission of the Ultra Fast Keto Boost landing page via the Internet to Ms. Reis). That act occurred on or around October 15, 2019.   The purpose of this transmission was to obtain money from the consumer, and the transmission was made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to this predicate act are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

193.    On October 17, 2019, a New York consumer named Wendy D'Andrea submitted a complaint to the Florida Attorney General's office about "Ultra Fast Keto Boost." Ms. Andrea wrote about a transaction that occurred on October 7, 2019: "AD was for Buy 3 bottles get 2 bottles free for 39.74 with free shipping. Credit card was charged 198.74[.] Have not been ablw [sic] to get through on

phone."

194.    On information and belief, and based on the process required to file a complaint with the Florida Attorney General that requires the consumer to provide numerous details, this shipment occurred as described by Ms. D'Andrea, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Bavencoff (the transmission of the Ultra Fast Keto Boost landing page via the Internet to Ms. Andrea). That act occurred on or around October 7, 2019.  The purpose of this transmission was to obtain money from the consumer, and the transmission was made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to this predicate act are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

195.    On September 20, 2019, a Florida consumer named James Gasaway submitted a complaint to the Florida Attorney General's office against Ultra Fast Keto Boost about a transaction that occurred on September 16, 2019.  Mr. Gasaway wrote, in relevant part: "Ultra Fast Keto Boost charged me 39.74 for 5 bottles when they advertised 3 bottles at 39.74 each and then get 2 additional bottles FREE. I called their customer service (888-970-0686); spoke with Mitch (a girl who gave '506' as her ID number) at approximately 4PM EDT 9/16/2019. I was informed

that I would be reimbursed for the overcharge.   On Tuesday, 9/17/2019 I sent a follow-up email providing the information from the phone call on 9/16/2019. I did not receive any reply. On Wednesday, 9/18/2019 I emailed them again still no reply. I finally received a response from them with the email ID of 'Ultra Fast Keto Boost Order Receipt (876443-5317090924)' stating 'Your account was already refunded when you called in on 09/16/2019.' That statement is untrue.  I emailed back stating that I have not had any refund reimbursed to my Bank Account. Since that email I have not received any response from my additional emails to them asking to please provide a date that the refund would be made.  The refund I am asking for is the overcharge for the two (2) free bottles, which is: $79.48. The actual cost for the product, according to their website is: Buy 3 at $39.74 per bottle and get 2 bottles FREE. The cost should have been 3 x $39.74 = $119.22[.] What I was charged: 5 x 39.74 = 198.70."

196.    On information and belief, and based on the process required to file a complaint with the Florida Attorney General that requires the consumer to provide numerous details, this shipment occurred as described by the Mr. Gasaway, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Bavencoff (the transmission of the Ultra Fast Keto Boost landing page via the Internet to Mr. Gasaway). That act occurred on or around

September 16, 2019.  The purpose of this transmission was to obtain money from the consumer, and the transmission was made in furtherance of the scheme to defraud.  Otherwise, the facts and allegations as to this predicate act are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

197.   A BBB complaint posted on February 28, 2020 reported the following regarding Ultra Fast Keto Boost:

> Returned product as info given me. No money returned. They signed for the product via usps. On Dec 1, 2019 I purchased 1 bottle of Ultra Fast Keto Boost for 69.00(or close). When I got the pkg it was 5 btls and they charged my account 198.60(or )I called the LV office and was given the address of PO Box 3011-145 Salt lake City Ut. I sent the product back on 12/11/2019 and they signed for it as recd on 12/17/2019. I have not been able to contact them as the numbers are all no longer avail. I want my money back. Also they want to charge me 5.00 for restock on each bottle. I told then I would pay that for the bottle I had ordered but not for the 4 bottles they sent and i had not authorized. I want my money back. I am a Sr Citizen and they put me in a very hard place by charging my account the astronomical amount from my account and causing me financial hardship. I have tried to locate them and work with them but to no avail so I need your help to get ALL my money back. I have my bank statement, I even filed a complaint with my bank because they took out so much money and I didnt know who had done it. I also have the Certified mail receipt with the tracking number showing when they rec'd the product back.

198.   On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, this shipment occurred as described by the customer, and involved at least one predicate act of

wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Bavencoff (the transmission of the website via the Internet to an unknown location within the United States). That act occurred on December 1, 2019. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Salt Lake City, Utah to Ohio. TFL is registered to do business in Utah at 1232 S GLADIOLA ST #200 Salt Lake City, UT 84104, and it operates a fulfillment center in Utah.65 The shipment occurred between December 1, 2019 and December 11, 2019. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Bavencoff, which are incorporated here by reference.

199.    A BBB complaint posted on June 11, 2020 reported the following regarding "Insta Keto:"

> Price of total order was deceiving. Not returnable by Post Office. Located package and returned. Did not receive a full refund. I purchased Insta Keto supplements thinking I was paying $39.95. What I ended up being charged was $198.70. When I saw this pending on my account, I immediately called the customer service number to cancel. I was told to call back because it had already been shipped.

200.    The customer went on to state that the Insta Keto product was

shipped from Salt Lake City, Utah, and that the customer lived in Ohio. "Ultra Fast Keto Boost Response" replied acknowledging that a refund had been requested and stating it had been delayed due to COVID.

201.    On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, as well as the response, this shipment occurred as described by the customer, and involved at least one predicate act of wire fraud directly committed by Beyond Global Inc. and the Keto Entities substantially identical to those committed against Ms. Sihler (the transmission of the website via the Internet to an unknown location within the United States). That act occurred in mid-2020 based on the response stating that delays had occurred because of COVID. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Salt Lake City, Utah to Ohio. The shipment occurred in mid-2020. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

202.    A BBB complaint posted on October 13, 2020 reported the following

regarding Instant Keto:[19]

> Unfortunately, I got caught up in this scam!! I saw an ad on Facebook for Instant Keto, buy 3 bottles at $39.70 each and get 2 bottles free. When they sent me my bill, they charged me for all 5 bottles. I insisted on getting compensated for the OVERCHARGE! Nothing was mentioned at the time that if I get that refund for an OVERCHARGE, it forfeits the money back guarantee! This was on August 22nd. In mid September, I called to tell them the pills were not working and wanted to return unused pills for a refund. The guy told me to wait un the end of September (he said September 28th) and then if the pills still did not work, I would get a refund. I did that and since then all **** broke loose. I sent them an email in detail and asked for my refund. They don't do that through email. I had to all and put me through all the stress. I called twice since then and this is when they try to tell me I cannot get a refund because I gave up that right with the warranty when I accepted a refund for an OVERCHARGE!! That is absurd!! Plus, they said I was past the warranty period of the 22nd of September, when the guy CLEARLY told me to call back on the 28th!! Was that a tactic on his part to ensure I would not get the refund'?? They not only scammed me but the pills DO NOT WORK!!! And if we do not do anything, they are going to continue to take advantage of so many other people, especially poor seniors like myself!! Product_Or_Service: Instant Keto Order_Number: XXXXXX Account_Number: none

203.    On information and belief, and based on the lengthy process required to file a BBB complaint that requires numerous consumer details, this shipment occurred as described by the customer, and involved two predicate acts of wire fraud directly committed by Beyond Global Inc. and the Keto Entities and substantially identical to those committed against Ms. Sihler (the transmission of

---

[19] https://www.bbb.org/us/fl/tampa/profile/not-elsewhere-classified/ultra-fast-keto-boost-0653-90369793/complaints

the Facebook ad and the website via the Internet to an unknown location within the United States); those two acts occurred on August 22, 2020. Beyond Global Inc. and the Keto Entities directly committed a third act of wire fraud against this unknown consumer by falsely promising the consumer a refund in mid September 2020, with the sole intent of stalling to avoid paying a refund. That act was via wire (telephone) from an unknown location to an unknown location within the United States. The shipment constituted mail fraud, as the product was shipped by TFL via United States mails (under the direction, control, and supervision of Nelson) from Tampa, Florida or Utah to an unknown location within the United States. The shipment occurred in late August 2020. The purpose of these transmissions and shipments was to obtain money from the consumer, and the transmissions and shipments were made in furtherance of the scheme to defraud. Otherwise, the facts and allegations as to these predicate acts are substantially identical to those involving Ms. Sihler, which are incorporated here by reference.

204.    Defendant Chargebacks911, as part of its participation in the Keto Enterprise, aided and abetted the predicate acts it is herein alleged were committed by Chargebacks911's Keto Associates because Chargebacks911: (1) "was generally aware of [its] role as part of an overall improper activity at the time [it provided] the assistance" to its Keto Enterprise associates; and (2) knowingly and substantially assisted in the principal violations committed by its Keto

Associates.

205.    Regarding Chargebacks911's **general awareness of its role as part of an overall improper activity:** On October 3, 2019 — two weeks before the wire fraud involved in the sale of Keto Products to Ms. Bavencoff and months before the wire fraud involved in the sale of Keto Products to Ms. Sihler —Nick Carroll of Chargebacks911 sent a Skype message to Chargebacks911's Keto Associates noting that the volume of chargebacks "coming through due to 'incorrect Transactions Amounts," could be attributable to "the way the pricing for the offer is displayed on the website as we've talked about (customers misinterpreting the "X dollars per bottle" and "Buy X Bottles, Get X bottles Free" Statements)." These statements reflect that as of October 3, 2019, Chargebacks911 was "generally aware of [its] role as part of an overall improper activity," specifically, the overcharging of consumers for Keto Products they reasonably believed, based on misleading representations on the Keto Products' websites, they would receive for "free."

206.    Further evidence of Chargebacks911's general awareness of its role as part of an overall improper activity is found in a November 27, 2019 message from a Chargebacks911 employee to the Keto Associates stating that he knew "from [his] e-mail exchanges with Aaron that it looks like multiple AG complaints have already come in and I just want to work to stay ahead of this for you and keep your MIDs safe." This message reflects Chargebacks911's awareness that it was

involved in an improper activity that was attracting scrutiny from state law enforcement and its willingness, notwithstanding that awareness, to aid its Keto Associates by helping them avoid scrutiny and accountability for their improper actions.

207.    Notwithstanding its knowledge of its role as part of the Keto Enterprise's "straight sale" scheme-to-defraud, Chargebacks911 **knowingly and substantially assisted** the Keto Associates in that scheme-to-defraud by proactively working to maintain the "health" of the MIDs used in defrauding consumers like Ms. Sihler and Ms. Bavencoff. This assistance was not only "knowing" but also "substantial."  This is because of how critical the MIDs and the payment processing they facilitated were to the scam's long-term sustainability and financial viability. If the chargeback rate on any one MID ticked up too high, it could cost the Keto Racket thousand in fees or even MID closure. Chargebacks911 made sure that didn't happen so that other members of the Keto Enterprise could, through acts of wire fraud directed at consumers like Ms. Sihler and Ms. Bavencoff, continue raking in the Keto Racket's ill-gotten gains.

208.    Because Chargebacks911 aided and abetted more than two predicate acts it is civilly liable under RICO for violating 18 U.S.C. section 1962(c). *See id.*

### Chargebacks911 violated 18 U.S.C. section 1962(c) by itself committing at least two predicate acts.

209.    Chargebacks911, as part of the Keto Enterprise, violated 18 U.S.C. section 1962(c) by itself committing at least two predicate acts.

### Predicate Acts Committed by Chargebacks 911

210.    It is a violation of 18 U.S. Code section 1956 to "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity - with the intent to promote the carrying on of specified unlawful activity . . . ."

211.    The term "specified unlawful activity" means "any act or activity constituting an offense listed in section 1961(1) of [title 18 of the U.S. Code] except an act which is indictable under subchapter II of chapter 53 of title 31." 18 USC § 1956(c)(7).

212.    Wire fraud under 18 U.S.C. 1343 is one of the offenses listed in 18 U.S.C. section 1961(1).

213.    Much of the money obtained by Chargebacks911's Keto Associates through writings transmitted on the https://ultrafastketoboost.com and https://instaketo.com/ websites was obtained fraudulently. As described in this Complaint, Chargebacks911's Keto Associates intentionally used checkout pages that misrepresented the prices of the Keto Products in order to obtain consumers'

debit and credit card numbers for the purpose of fraudulently billing them for additional bottles of the Keto Products, which they had not agreed to purchase.

214.   In or around early October 2019, the Keto Associates caused a checkout webpage that misrepresented the prices of Keto Products to be transmitted through interstate commerce to an unknown consumer.  Based on Skype messages between the Keto Products' marketers and sellers, Plaintiffs are informed and believe that after viewing the deceptive checkout page, the consumer purchased the Keto Associates' "Buy3Get2Free" offer and was "charged 200.69, they only got one bottle which was $71.89 and they received a partial refund of $71.89."  On October 12, 2019 at 1:11 p.m., Plaintiffs are informed and believe, the unknown consumer charged back the charge on their account; the consumer also filed an inquiry with the attorney general of an unknown state.

215.   On November 7, 2019, Aaron Wilson wrote to Mike Campbell about the attorney general inquiry filed by this consumer: "I'm working on a response to an Attorney General inquiry. I found the issue however the CB company has intervened I['m] not sure if I should make the cust whole or do nothing because the CB company is involved already."  After some back and forth, Mr. Wilson stated: "I found the CB refund and its onmly for 71 which means the cust wasn't made whole."

216.   Plaintiffs are informed and believe that in or around late October or early November 2019, Chargebacks911 issued a partial refund of approximately $71.98 to one of the Keto Enterprise's consumer-victims. The funds that Chargebacks911 caused to be refunded on or around November 2019 were the "proceeds of specified unlawful activity" because, as alleged above, they derived from Chargebacks911's Keto Associates' wire fraud: the $71.98 Chargebacks911 was refunding to the consumer was money that had been taken from the consumer through wire fraud insofar as the customer provided his or her payment card information to the Keto Associates while acting in reliance on fraudulent misrepresentations on the Keto Products checkout page made as part of a scheme-to-defraud and transmitted in interstate commerce. As alleged above in paragraphs 205-206 of this complaint, Chargebacks911 had full knowledge of the scheme-to-defraud advanced by its associates' wire fraud.

217.   Plaintiffs are informed and believe that the purpose of the refund transaction caused by Chargebacks911 was to "promote the carrying on of specified unlawful activity" by protecting the health of the Keto Racket's MIDs from the effects of a chargeback or attorney general complaint that might be filed by this "high risk" customer so that the Keto Racket could more profitably and sustainably continue engaging in mail and wire fraud.  Plaintiffs' belief that the $71.89 refund issued by Chargebacks911 to the customer who charged back

$200.69 on October 12, 2019 at 1:11 p.m. was intended to "promote the carrying on" of the Keto Racket's mail and wire fraud is informed by a statement Nick Carroll made to the David Flynn over Skype. In October 2019, Nick Carroll explained to the Keto Associates that Chargebacks911's refund "system is going to consider a large number of factors to determine the risk level of the customer and find the minimum [refund] amount necessary to avoid a chargeback. In the instance of a high risk customer, we're going to go for a full refund to maximize the likelihood of preventing this chargeback."

218.    Chargebacks911 violated 18 U.S. Code section 1956 when it "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" conducted a financial transaction [the refund of $71.89 to the complaining consumer] with the "intent to promote the carrying on" of its Keto Associates' mail and wire fraud by deterring the consumer from initiating a chargeback or taking other action in response to the overcharge.

***

219.    Under 18 U.S.C. section 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

220.   The Keto Racket wanted (and its financial viability depended upon) sustainable, long-term, and unfettered access to the financial services offered by its acquiring banks and payment services providers. But the Racket did not want to be subject to the consumer-protection mechanisms those banks have in place to protect consumers like Ms. Sihler and Ms. Bavencoff, which include financial penalties, account reviews, and account termination. Chargebacks911 enacted a scheme to, through the use of fraud, get the Keto Enterprise what it wanted (banking and financial services) without what it didn't want (fees associated with monitoring imposed on merchants with high chargeback rates, account closure). Specifically, Chargebacks911's scheme-to-defraud involved using thousands of micro-transactions to dilute and obscure the too-high chargeback rate associated with the Racket's sales of Keto Products to consumers like Ms. Sihler and Ms. Bavencoff.

221.   At or around 11:00 A.M. PST on September 20, 2019, Chargebacks911, through its agent Ben Scrancher (based in London), called David Flynn (located in California) and recommended to him that he engage Johnny De Luca to run micro-transactions on behalf of the Keto Racket. See *supra* paragraphs 79-81. Chargebacks911 made this recommendation for the purpose of executing the

scheme to defraud banks and payment processors that, as alleged *infra*, it had conspired towards together with Defendants Eaton and Cardone as well as with Johnny De Luca. This recommendation—transmitted via telephone call from Ben Scrancher in London to David Flynn in California on September 20, 2019—and made for the purpose of executing a scheme to defraud devised by Chargebacks911, was a violation of 18 U.S.C. section 1343 and, by extension, a predicate act.

222.   Additionally, Chargebacks911's September 26, 2019 Skype messages to Mr. Flynn assuaging his concerns about wiring hundreds of thousands of dollars to Johnny De Luca to execute the e-Books scheme-to-defraud, *see supra* paragraph 83, were "writings . . . for the purpose of executing" the e-Books scheme to defraud: if Flynn did not feel comfortable wiring the money to Johnny De Luca, the scheme might not come to fruition, so Chargebacks911 referenced, in its writing, its long working history with Mr. De Luca for the purpose of executing the scheme. Mr. Flynn, his trust in Mr. De Luca buoyed by what he'd learned from Mr. Scrancher, relied on Mr. Scrancher's representations and sent $300,000 to Mr. De Luca only days after learning of Mr. De Luca's existence.

223.   Plaintiffs are informed and believe that Chargebacks911 sent its September 26, 2019 Skype messages from London (where Chargebacks911's Mr. Scrancher was based) to California (where Mr. Flynn was based) and that therefore

when Chargebacks911 caused its writings to be transmitted by wire it did so in foreign commerce. Each of these Skype messages is a predicate act because they were a violation of 18 U.S.C. section 1343 (relating to wire fraud) made for the purpose of executing a scheme to defraud devised by Chargebacks911.

224.    Chargebacks911 employee Ben Scrancher was operating within the scope of his employment when he made the September 20, 2019 call and sent these September 26, 2019 messages to David Flynn. Scrancher was not a "rogue actor" who had infiltrated Chargebacks911; he was, rather, drawing on years of experience at Chargebacks911 helping Chargebacks911 clients do exactly what he urged David Flynn and the Keto Associates to do: disguise their MIDs' high chargeback rates by paying Johnny De Luca to flood the accounts with micro-transactions.

225.    On November 12 2019, Chargebacks911's employee or executive Nick Carroll sent David Flynn a Skype message stating that the fact that the Keto Racket's new MIDs were associated with the same corporate entity as earlier MIDs with significant issues was unlikely to "be a problem from VISA's side of things" because "VISA tends to look not at the corp's overall traffic ever, but the corp through the lens of their Acquirer. So provided that there has not been an history of problematic history from that corp through that acquirer, it shouldn't really hit VISA's radar." This message, which Plaintiffs are informed and believe was sent

from Florida to California at around 9:43 a.m. Pacific time on November 12, 2019, was sent for the purpose of executing the Keto Racket's multiple-MIDs artifice which, as alleged above, was designed to make the chargeback rates associated with the Keto Racket's accounts appear lower than they actually were by "balancing" the chargebacks across multiple accounts. The purpose of the artifice was to deceive financial institutions into providing services to the Keto Racket on terms more favorable than they otherwise would. This November 12, 2019 Skype message was thus a violation of 18 U.S.C. section 1343 (relating to wire fraud).

\*\*\*

226.    Under 18 U.S.C. section 1344, "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice — (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

227.    Chargebacks911 knowingly executed a scheme to defraud a financial institution when it connected Johnny De Luca and its Keto Associates and directed and encouraged the latter to pay the former to flood its MIDs with thousands of micro-transactions. This scheme's purpose was defrauding the acquiring banks (financial institutions) with which the Keto Racket had merchant accounts. Those

acquiring banks would not have done business with the Keto Racket, or would have done business with the Keto Racket on far less favorable terms, if they knew the true chargeback rates associated with the Keto Racket's MIDs. The scheme sought to defraud the banks by inducing them to provide the Keto Racket with banking and payment processing services on the favorable terms usually reserved for "low-risk" merchants and merchant accounts, *inter alia*, those with chargeback rates of less than 1%. The Keto Racket's MIDs did not, in fact, have chargeback rates below 1%, but Chargebacks911 intended: (1) that the thousands of micro-transactions conducted by Mr. De Luca would create data, e.g. a chargeback ratio, that gave the false impression that the accounts were "low-risk;" and (2) that the Keto Racket's acquiring banks and/or payment processing service providers would rely on this (false) data in continuing to offer the Keto Racket bank and processing services on favorable terms.

228.    Specifically, Plaintiffs are informed and believe that Chargebacks911 executed its scheme to defraud financial institutions through the following actions:

      a.    On September 20, 2019, Ben Scrancher called David Flynn in California from London and recommended that Flynn and the Keto Associates work with Johnny De Luca to artificially reduce the chargeback rates associated with the Keto Rackets' MIDs.

    b. On September 26, 2016, Ben Scrancher (located in London) sent
Skype messages to David Flynn (located in California) urging
Flynn to move forward with hiring De Luca.

    c. On October 16, 2019, Nicholas Caroll, a Chargebacks 911
employee or executive wrote via Skype to the Keto Associates:
"Noticing that we're continuing to see the up-tick in
transaction volume including those $0.99 Sales. One quick
thing I did want to double check, in my notes I thought we
were going to be shooting for 15k sales per day at that 0.99
price point. I'm seeing that at this point in the month the
average is about 13,500 transactions per day total, across all
price points. That's about 7k more than the average trans/day
last month."

229.  Plaintiffs are informed and believe that on or around September 27,
2019, Chargebacks911's scheme-to-defraud came to fruition when Johnny De Luca
or his agents used phony virtual or prepaid cards generated by Mswipe Americas
to "purchase" 19,500 ebooks from accounts controlled by Chargebacks911's Keto
Associates.

230.  Plaintiffs are informed and believe that Chargebacks911's scheme to
defraud a financial institution was further enacted on October 8, 2019, when Mike

Campbell, in Florida, sent 75,000 customer names and addresses to Johnny De Luca, in Montreal. Plaintiffs are informed and believe that this transmission of information facilitated Chargebacks911's scheme-to-defraud financial institutions because Mr. De Luca or his associates used the customer data provided by Mike Campbell to generate the virtual or prepaid credit cards linked to the identities of the Keto Racket's consumer-victims that were then used to "purchase" thousands of e-books from the Keto Associates.

231. Chargebacks911's execution of the microtransactions scheme-to-defraud financial institutions is a violation of U.S.C. section 1344 and a predicate act.

***

232. Chargebacks911 also committed a separate and discrete violation of 18 U.S.C. section 1344 when it knowingly executed a scheme to "obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

233. Specifically, Plaintiffs are informed and believe that Chargebacks911 knowingly made misrepresentations in the representments it submitted to the Keto Rackets' acquiring banks on behalf of the Keto Associates. ("Representment"

is the name for the documentation a merchant submits to its acquiring bank when it wants to dispute a chargeback and effectively cancel the consumer's refund.)

234.    In November 2019, Nicolas Carrol told his Keto Associates that, in August and September of 2019, Chargbacks911 generated "an average of $4800 every day in won representments." $4800 represents the proceeds from approximately 24 transactions of $198.70.

235.    That same month, Mr. Carroll told his Keto Associates: "The primary MasterCard Chargeback reason code since inception with our services was 4837 – Unauthorized Transaction."

236.    Plaintiffs are informed and believe that Chargebacks911 knew that *many* of the "unauthorized transactions" (and other) chargebacks it was disputing were generated by consumers who had relied on the Keto Racket's misleading "Buy 3, Get 2 Free" or "Buy 2, Get 1 Free" representations and then been overcharged. Plaintiffs are further informed and believe that Chargebacks911 knowingly and falsely represented to the Keto Racket's acquiring banks that these chargebacks were invalid because the consumers had been apprised of the full transaction amount at the time of the transaction.

237.    Plaintiffs are further informed and believe that in representments submitted on behalf of the Keto Racket Chargebacks911 presented images depicting the checkout pages from the "false front" websites created by the Keto

Associates to the Keto Racket's acquiring banks and, with knowledge of their statements' falsity, stated that the images depicted the checkout pages encountered by the consumer who had initiated the chargeback at issue in any given representment.

238.   One reason that Chargebacks911's representment representations were false and misleading, Plaintiffs believe, is that they knowingly omitted the sales URLs Plaintiffs used to purchase Keto Products. Chargebacks911 collected this information from its Keto Associates during the MID integration process but, Plaintiffs believe, at the direction of Defendant Eaton, Chargebacks911 deliberately omitted this information from the representments it submitted to the Keto Racket's acquiring banks.

239.   The Keto Racket's acquiring banks did, in fact, rely on Chargebacks911's false representations, as is evidenced by the fact that (as stated by Chargebacks911's Nicolas Carroll) Chargebacks911 generated "an average of $4800 every day in won representments" for the Keto Racket in August and September of 2019. Plaintiffs are informed and believe that Chargebacks911 assisted the Keto Racket with handling representments at least into summer of 2020.

240.   Based on the foregoing, Plaintiffs are informed and believe that on or around September 23, 2019 Chargebacks911 knowingly made false

representations to the Keto Racket's acquiring banks that were made to obtain for the Keto Racket money "under the custody or control of, a financial institution," specifically the amounts in dispute because of a customer chargeback of the amount $198.70. By convincing the acquiring banks that a consumer's chargeback was invalid, Chargebacks911 sought to secure the funds at issue for the Keto Racket.

241.    Plaintiffs are informed and believe that Chargebacks911 gave the other members of the Keto Racket a performance-based Return on Investment guarantee promising that Chargebacks911 would generate more economic value for the Keto Racket than it took from it.[20]  Because of this guarantee, Plaintiffs are informed and believe that Chargebacks911 itself had a concrete pecuniary interest in the success of the representments it submitted to the Keto Racket's acquiring banks as part of the Keto Enterprise.

242.    The false representations made by Chargebacks911 to financial institutions on behalf of the Keto Associates on or around September 23, 2019 constitute the execution of a scheme to "obtain any of the moneys . . . under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." For this reason, these false

---

[20]    Chargebacks911's website states that it "is the only service provider on the market today offering a performance-based ROI guarantee." Chargebacks911, *Frequently Asked Questions*, https://chargebacks911.com/faq/ (last accessed June 25, 2023).

representations collectively constitution a violation of 18 U.S.C. section 1344 and, by extension, a predicate act directly committed by Chargebacks911.

\*\*\*

243.   To show a *pattern* of racketeering activity, a Plaintiff must prove that the predicate acts are related to each other.  "[P]redicate acts are related to each other if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *United States v. Godwin*, 765 F.3d 1306, 1321 (11th Cir. 2014) (quoting *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995)).

244.   The predicate acts Plaintiffs herein allege Chargebacks911 aided and abetted and directly committed as part of the Keto Enterprise all have similar, purposes, results, participants, victims, and methods.

245.   The violations of 18 U.S.C. section 1343 (wire fraud) and 18 U.S.C. section 1341 (mail fraud) that Chargebacks911 aided and abetted are related to each other and all of the predicate acts directly committed by Chargebacks911 because they also concern efforts to increase the Keto Racket's profits through the use of fraud, whether that be misrepresentations about the pricing of diet pills or a scheme-to-defraud the financial institutions and payment processors the Keto Racket used to channel and hold funds obtained through the Keto scam.

246.    The purposes of Chargebacks911's violations as a principal of 18 U.S.C. sections 1343 (wire fraud), 1344 (financial institution fraud), and 1956 (money laundering) were all the same: ensuring that the "backend" of the Keto scam was as sustainable and "healthy" as possible so that the Keto Racket could continue victimizing consumers like Ms. Sihler and Ms. Bavencoff for as long as possible with the lowest overhead possible. These predicate acts all involved efforts to mask, distort, or prevent indicators or evidence that might alert the Keto Racket's acquiring banks or payment processors (like Visa, the company that issued the card Ms. Bavencoff used to purchase Keto Products) to the fact that the Keto Racket was using their services to carry out a fraud.

247.    The victims of Chargebacks911's predicate acts are the financial institutions and payment processing companies that were duped into facilitating the Keto Racket's fraud as well as consumers like Ms. Sihler and Ms. Bavencoff who, because of predicate acts committed by Chargebacks911 and its Keto Associates were: (1) overcharged for not-actually-endorsed-by-celebrities diet pills without their authorization or consent; and (2) deprived of the consumer protections afforded by chargeback monitoring programs that impose penalties, enhanced surveillance, and account termination on merchants who have excessively high chargeback rates or who fraudulently open novel account with new merchant names in order to dissimulate those accounts' connection to

previous accounts ultimately controlled by the same principals which were
shuttered due to fraud or excessive chargebacks.

248.    There is significant overlap in the people who participated in
Chargebacks911's predicate acts: the actors were all employees of Chargebacks911
or Chargebacks911's associates in the Keto Racket. These individuals were unified
by their shared interest in the success of the Keto Racket.

***

249.    A civil RICO plaintiff must show "(1) the requisite injury to 'business
or property,' and (2) that such injury was 'by reason of' the substantive RICO
violation." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) (cleaned
up).

250.    Chargebacks911's violation of 18 U.S.C. section 1962(c) has caused
concrete financial loss to Plaintiffs. In particular, as described above, money was
paid by Plaintiffs and members of the Classes to Beyond Global Inc. and the Keto
Entities in reliance on their misrepresentations and omissions. Plaintiffs and the
Class Members were overcharged for Keto Products relative to their actual value,
and the value was substantially inflated by the various misrepresentations and
omissions.

251.    The RICO violation herein alleged was the but-for and proximate
cause of injuries to Plaintiffs and the Class.  But-for the acts of mail fraud by Nelson

and TFL, the scam could not have existed because it would have had no "fig leaf" to bill consumers for unordered products. But-for structuring the shipments to evade subscription rules, the scam would have been flagged by the card brands and their merchant processing cut off. But-for the acts of wire fraud by Beyond Global Inc. and the Keto Entities, consumers would not have been injured because they would have known the truth about the products and would have known the real number of products they were ordering and would be billed for. But-for and as a proximate result of Chargebacks911's efforts to fraudulently reduce the Keto Racket's chargeback rate and keep its myriad MIDs appearing "healthy" the Keto Racket would have been precluded from hurting consumers like Plaintiff by the consumer-protection systems of card brands and financial institutions.

252.    These predicate acts were a proximate cause of the injuries to Plaintiffs and the Class because the injuries were direct and reasonably foreseeable results of the conduct, in that Chargebacks911 knew how the scam worked and knew about the misrepresentations made on the Keto Racket's websites, and it was reasonably foreseeable that the Keto Enterprise's racketeering activities as well as the predicate acts Chargebacks911 aided and abetted and directly committed, in particular, would result in injury to Plaintiffs.  Chargebacks911 was also aware that—as it stated on its own website—that for merchants, a too high chargeback

rate could mean "losing [their] bank account and [their] right to process payment cards."

253.    Because of its violation of 18 U.S.C. section 1961(c) and pursuant to 18 U.S.C. section 1964(c) Defendant Chargebacks911 is liable to Plaintiffs and the Class Members for three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

<u>**SECOND CAUSE OF ACTION**</u>

**Violation of the Racketeer Influenced and**

**Corrupt Organizations Act ("RICO")**

**18 U.S.C. § 1961(d)**

*Against Chargebacks911, Monica Eaton, and Gary Cardone*

254.    Plaintiffs bring this claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(d), on behalf of themselves and the Class and against Defendants Chargebacks911 and Gary Cardone and Monica Eaton.

255.    18 U.S.C. § 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

256.    *Culpable Person.* Defendant Chargebacks911, Monica Eaton, and Gary Cardone are each a "person" as that term is defined in 18 U.S.C. section 1961(3) because they are each an "individual or entity capable of holding a legal

or beneficial interest in property." 18 U.S.C. § 1961(3).

257. *The Enterprise.* Chargebacks911, Monica Eaton, Gary Cardone, and Johnny De Luca constituted an "enterprise" (the "Micro-Transactions Enterprise") within the meaning of 18 U.S.C. section 1961(4), which defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

258. Plaintiffs are informed and believe that starting in or around 2016, Chargebacks911, Monica Eaton, and Gary Cardone **associated together** with each other and with Johnny De Luca for a common **purpose** of engaging in a fraudulent course of conduct. The fraudulent course of conduct pursued by this association-in-fact ("the Micro-Transactions Enterprise"), was a scheme whereby Chargebacks911-under the direction and control of Defendants Eaton and Cardone-would refer its clients to Johnny De Luca so that he could conduct thousands of sham micro-transactions on those clients' accounts.

259. Plaintiffs are informed and believe that Chargebacks911, under the direction of Defendants Eaton and Cardone, offered its customers a similar service in-house between 2013 and 2019. Through its Value Added Promotions service, service, Plaintiffs believe, Chargebacks911 ran a high volume of microtransactions through Chargebacks911's clients' accounts with the aim of defrauding their banks and payment processors by making it seem as if the accounts' chargeback rates

were lower than they actually were. This offering was known as the Value Added

Promotions service.

260.    The Micro-Transactions Enterprise's purpose was to defraud the

banks and payment processors that worked with Chargebacks911's customers by

using thousands of microtransactions (run by Mr. De Luca and/or his agents and

associates) to artificially reduce the chargeback rates of Chargebacks911's

customers while also, Plaintiffs are informed and believe, sparing Chargebacks911

from the logistical difficulties and/or exposure to liability that came with running

the microtransactions itself in-house. Put plainly: Plaintiffs are informed and

believe that Defendants Eaton, Cardone, and Chargebacks911 associated with De

Luca so that he could do their dirty (or "dark side") work for them, allowing them

to disclaim any responsibility even though they knew what Mr. De Luca was

doing and helped him coordinate it.

261.    The Micro-Transactions Enterprise's ability to fulfil its purpose

depended on Chargebacks911 cultivating trust with its clients such that they

would agree to engage Mr. DeLuca to run fraudulent microtransactions for them.

Plaintiffs are informed and believe Defendant Cardone was actively involved in

the recruitment and retention of the clients Chargebacks911 ultimately referred to

Mr. DeLuca.  For example, Plaintiffs are informed and believe that Defendant

Cardone dined with Rickie Joe James in December 2019 and invited David Flynn

to lunch at the Bellagio in Las Vegas in January 2020.

262. There were professional and personal **relationships between and among the members of the Micro-Transactions Enterprise**. Defendants Cardone and Eaton had, at the time the Micro-Transaction Enterprise was formed, executive positions at Chargebacks911. They were also at one time married to each other. Chargebacks911, plaintiffs are informed and believe, regularly referred clients to Mr. De Luca. Plaintiffs are also informed and believe that both Defendant Eaton and Cardone had a professional relationship with Mr. De Luca; Plaintiffs believe this because they are informed and believe that the VAP program was financially beneficially for Chargebacks911 and that the company would not have shifted away from running the program in-house towards outsourcing the work if its founding executives (Defendants Eaton and Cardone) did not have a positive professional relationship with the individual to whom Chargebacks911 referred its clients.

263. The Micro-Transactions Enterprise had **longevity** sufficient to permit Defendants Eaton and Cardone as well as Chargebacks911 and Mr. De Luca to pursue the enterprise's purpose. Plaintiffs are informed and believe that the Micro-Transactions Enterprise was in existence at least as of 2016, when according to Chargebacks911 employee Ben Scrancher, Chargebacks911's clients began working with Mr. De Luca, and persisted into 2020, when Skype messages sent by

Chargebacks911's Keto Associates reveal that they were still working with Mr. De Luca. Additionally, Plaintiffs are informed and believe that the Micro-Transactions Enterprise's activities were an evolution of the VAP service which Defendants Eaton and Cardone had developed and offered to Chargebacks911's customers in-house years earlier, starting in 2013.

264.   The Micro-Transactions Enterprise qualifies as a closed-ended enterprise because the predicate acts occurred over a period of more than three years, between 2016 and 2020.

265.   The Micro-Transactions Enterprise also qualifies as an open-ended enterprise because Chargebacks911, Gary Cardone, and Monica Eaton, Plaintiffs are informed and believe, have each individually been conspiring to commit predicate acts or directing the commission of predicate acts even before the formation of the Micro-Transactions Enterprise (Plaintiffs believe since the initiation of the VAP program in 2013) and thus committing these predicate acts has become a regular way of doing business among Defendants Eaton, Cardone, and Chargebacks911 and is thus likely to recur.

266.   The Micro-Transactions Enterprise was **involved in interstate commerce** because the violation of 18 U.S.C. section 1962(c) its members conspired to commit involved financial institutions and corporations from throughout the United States.

267. **Defendants Gary Cardone, Monica Eaton, and Chargebacks911 each conspired to have Chargebacks911 and Johnny De Luca conduct the affairs of the Micro-Transactions Enterprise through a pattern of racketeering activity.**

268. The conspiracy between Defendants Cardone, Eaton, Chargebacks911 and Johnny DeLuca is, Plaintiffs believe, the evolution of a grift that Defendants executed themselves for Chargebacks911's customers starting in 2013: Value Added Promotions.

269. On information and belief:

a. The VAP offering was designed to lower the apparent chargeback rate associated with Chargebacks911's clients' accounts by boosting the total transaction number with sham low-value transactions.

b. Between 2013 and 2019 Chargebacks911 offered this service to its clients and handled the logistics of running the transactions, which it did with prepaid gift cards.

c. In Chargebacks911's "Client Relations Manual," VAP's purpose was identified as: "to reduce or dilute the chargeback ratio by increasing the transaction count with supplemental transactions in addition to the regular sales."

d. Defendants Eaton and Cardone knew about and were actively

involved in the implementation of VAP. For example, in April 2017, Gary Cardone wrote to a Chargebacks911 employee warning that a VAP client was running VAP too late each month and that the concertation of their VAP transactions at the end of the month could be a red flag for their acquirers. And, in September 2016, Monica Eaton wrote to Gary Cardone directing him to help a client with VAP since the service would help keep the client's merchant accounts open.

270.    Plaintiffs are informed and believe that in or around 2016 Defendants Chargebacks911, Gary Cardone and Monica Eaton, and each of them, conspired with Johnny De Luca (as part of the Micro-Transactions Enterprise) to have Chargebacks911 refer customers to Johnny De Luca for services that were substantively similar to those Chargebacks911 previously provided its customers through the VAP program.

271.    Plaintiffs are informed and believe that Johnny De Luca is based in Montreal, Canada and is the CEO of Mswipe Americas, a company that offers "customizable prepaid card solutions" including "virtual prepaid cards" that can be issued remotely.

272.    As of September 2019, the objects of the conspiracy were ongoing and neither Chargebacks911, nor Defendant Cardone, nor Defendant Eaton had

withdrawn from the conspiracy.

273.    The pattern of racketeering activity to which Gary Cardone, Monica

Eaton, Chargebacks911 and Johnny De Luca conspired involved the use of wire

fraud in violation of 18 U.S.C. section 1343 as well as financial institution fraud in

violation of 18 U.S.C. section 1344.

274.    Defendant Cardone **agreed to the overall objective of the conspiracy**.

Defendant Eaton also **agreed to the overall objective of the conspiracy**.  Their

agreement is evidenced by the fact Chargebacks911—despite, Plaintiff believe,

making millions of dollars from its VAP program—shifted away from offer in VAP

in-house and towards association with Mr. De Luca in the Micro-Transactions

Enterprise.  Eaton and Cardone exercised control over the company as its CEO and

COO respectively; Chargebacks911's shift away from VAP and towards

associating with Mr. De Luca, then, thus suggests strategic decisions made by Mr.

Cardone and Ms. Eaton.  Chargebacks911 also **agreed to the overall objective of**

**the conspiracy** insofar as it, Plaintiffs are informed and believe, stopped its in-

house VAP program in 2019 and referred clients to Johnny De Luca (to whom it

had been referring clients since around 2016) to have him execute fraudulent

microtransactions on their behalf.

275.    The "button man" is a low-level member of a mob family who does

the mob bosses' dirty work form them. Plaintiffs are informed and believe that

Defendants Cardone and Eaton, and each of them, associated and conspired with Mr. De Luca because they wanted a "button man" for themselves and their company, Chargebacks911. One of the Keto Products' marketers and branders described "the ebooks coder" as "from the dark side" and Plaintiffs are informed and believe that Defendants Eaton and Cardone each wanted to outsource Chargebacks911's profitable microtransactions work to Mr. De Luca in order to distance themselves from the violations of 18 U.S.C. section 1343 and 18 U.S.C. section 1344 (as well as other violations of state and federal law) that they conspired to have Mr. De Luca commit on behalf of their customers.

276. The Micro-Transactions Enterprise was structured as a referral relationship: Johnny De Luca and Chargebacks911 had an "I'll scratch your back if you scratch mine" deal going where the former would commit fraudulent microtransactions that advanced the business interests of the latter's clients. Chargebacks911 conducted the Micro-Transactions Enterprise's affairs insofar as it handled the referral legwork necessary to make the Enterprise's activities profitable for both parties. This involved, as in this case, not only making a standalone business connection, but also encouraging Chargebacks911's clients to close business deals with Mr. DeLuca, as Ben Scrancher did when he told David Flynn that Chargebacks911 had had clients working with Mr. DeLuca for over three years. It also involved liaising with the Chargeabcks911 client regarding De

Luca's work, as for example Chargebacks911 employee Nick Carroll did when he wrote to the Keto Products' marketers and branders on October 16, 2019: "Noticing that we're continuing to see the up-tick in transaction volume including those $0.99 Sales. One quick thing I did want to double check, in my notes I thought we were going to be shooting for 15k sales per day at that 0.99 price point. I'm seeing that at this point in the month the average is about 13,500 transactions per day total, across all price points."

277.    Plaintiffs are informed and believe that Defendants Eaton and Cardone conducted the affairs of the Micro-Transactions Racket insofar as the referral relationship between Chargebacks911 and Johnny De Luca existed at their discretion; either Defendant Eaton or Defendants Cardone could have caused the dissolution of the Micro-Transactions Enterprise at any time by directing that Chargebacks911 employees (over whom Cardone and  Eaton as executive officers had authority and control) should no longer refer Chargebacks911's customers to Johnny De Luca.  Plaintiffs are informed and believe that neither Defendant Eaton nor Defendant Cardone so directed at any point before July 2020.  This failure on both their parts is further evidence that each of them agreed to the overall objective of the conspiracy.

278.    "A civil RICO conspiracy claim requires a showing of the existence of a conspiracy, and the commission of an overt act in furtherance of the conspiracy

that causes injury to the plaintiff." *Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir. 1998).

279.   Johnny De Luca and Chargebacks911 did in fact commit multiple violations of 18 U.S.C. section 1343 and 18 U.S.C. section 1344 while conducting the affairs of the Micro-Transactions Enterprise and in furtherance of the conspiracy herein alleged and these **overt acts** were, injurious to Plaintiffs and, Plaintiffs believe, acts in which <u>all</u> Defendants conspired in the commission of.

280.   As alleged *supra*, at or around 11:00 A.M. PST on September 20, 2019, Chargebacks911, through its agent Ben Scrancher (based in London), called David Flynn (located in California) and recommended to him that he engage Johnny De Luca to run micro-transactions on behalf of the Keto Racket.  As alleged above, because this call was made with the aim of furthering a scheme to defraud, it was a violation of 18 U.S.C. section 1343 (relating to wire fraud).

281.   Plaintiffs are also informed and believe that on or around September 27, 2019, one day after David Flynn wired Mr. De Luca over $300,000, Mr. De Luca or his agents used Mswipe Americas virtual card technology and the funds provided by Mr. Flynn to generate 19,500 ninety-nine cent transactions with bank accounts owned and controlled by the Keto Racket.   These 19,500 transactions constituted the execution of a scheme to defraud financial institutions by artificially reducing the chargeback rate associated with MIDs controlled by the

Keto Racket.  Mr. De Luca's execution of these phony e-book transactions thus constituted financial institution fraud in violation of 18 U.S.C. section 1344.

282.    The overt acts committed by Johnny De Luca and Chargebacks911 in furtherance of a conspiracy agreed to by Chargebacks911, Gary Cardone, Monica Eaton, and Johnny De Luca, **caused injury** to Plaintiffs and the putative Class.  As alleged herein, Plaintiffs lost property (the money they spent purchasing falsely advertised diet pills) as a result of the fact that Chargebacks911's client was able to hide its fraud from payment processors and financial institutions by fraudulently reducing its apparent chargeback rate. The predicate acts committed against Plaintiffs as detailed herein further caused them injury. If the Keto Racket had been subject to the full range of penalties, account terminations, and account review fees imposed on merchants by card processors like Visa, it would have been cut short or abandoned as financially non-viable.

***

283.    Because of their violation of 18 U.S.C. § 1961(d) and pursuant to 18 U.S.C. section 1964(c) Defendants Chargebacks911, Gary Cardone, and Monica Eaton are liable to Plaintiffs and the Class Members for three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs demand judgment as follows:

A.      An order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying this case as a class action, appointing Plaintiffs as representative of the Class, and designating their attorneys as Class Counsel;

B.      For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendants' practices, along with punitive damages;

C.      For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained from as a result of their unlawful, unfair, and deceptive business practices described herein;

D.      For damages of three times the damages Plaintiffs and the Class Members have sustained, plus the cost of this suit, including reasonable attorney's fees pursuant to 18 U.S.C. section 1964(c);

E.      An award of attorney's fees and costs;

F.      For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

G.      Such other and further relief as is necessary and appropriate.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs demand a trial by jury on all issues so triable.

DATED: June 28, 2023.                    Respectfully submitted,

/s/ Kevin M. Kneupper
Kevin Kneupper

**KIBBEY WAGNER PLLC**
Jordan Wagner, Esq.
Florida Bar No. 14852
73 SW Flagler Ave
Stuart, FL 34994-2140
Office: 772-444-7000
Fax: 772-872-5185
jwagner@kibbeylaw.com

**KNEUPPER & COVEY, PC**
Kevin M. Kneupper, Esq., *Motion for Special Admission Pending* (lead counsel)
A. Cyclone Covey, Esq.,  *Motion for Special Admission Pending*
*Attorneys for Plaintiffs Janet Sihler and Charlene Bavencoff and the putative Class*