```
                  UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION

JANET SIHLER and
CHARLENE BAVENCOFF,
Individually and
on Behalf of All Others
Similarly Situated,

          Plaintiffs,

v.                              Case No. 8:23-cv-1450-VMC-JSS

GLOBAL E-TRADING, LLC,
d/b/a Chargebacks911,
GARY CARDONE, and
MONICA EATON,

          Defendants.
_____/
```

## ORDER

This matter is before the Court on consideration of Plaintiffs Janet Sihler and Charlene Bavencoff's Sealed Motion for Class Certification (Doc. # 121), filed on May 21, 2024. Defendants Global E-Trading, LLC, Gary Cardone, and Monica Eaton responded on June 14, 2024. (Doc. # 134). Plaintiffs replied on July 5, 2024. (Doc. # 140; Doc. # 147). Defendants filed a surreply on August 1, 2024. (Doc. # 151). For the reasons that follow, the Motion is granted.

**I.   Background**

Plaintiffs initiated this putative class action against Defendants on June 28, 2023. (Doc. # 1). The operative

complaint is the third amended complaint, in which Plaintiffs assert two RICO claims: (1) for violation of 18 U.S.C. § 1962(c) (Count 1) — a substantive RICO claim; and (2) for violation of 18 U.S.C. § 1962(d) (Count 2) — a RICO conspiracy claim. (Doc. # 102). The essence of Plaintiffs' claims is that Defendants conspired with the architects of a Keto diet pill scam ("the Keto Racket"), including Brightree Holdings Corporation, to keep the Keto Racket alive and profitable. The Keto Racket allegedly "made millions of dollars by using false promises of 'free' Keto diet pill bottles to collect consumers' payment card information and then charge them for the 'free' bottles alongside those they'd agreed to pay for." (Doc. # 121 at 2). When a purchase was made by a consumer with a credit or debit card, the payment was processed so that the funds were transferred between the purchaser's bank or credit card company and the Keto Racket's merchant account or "MID." (Doc. # 102 at 3-7).

However, disgruntled purchasers, like the Plaintiffs, would frequently "chargeback" the transactions through their credit card companies in an attempt to receive a refund from the Keto Racket. This is where Defendants, Chargebacks911 and two of its executives, Cardone and Eaton, came in. Defendants worked to dispute the Keto Racket's chargebacks and, thus,

keep the Keto Racket's chargeback percentages low enough that banks and credit card companies would continue handling transactions with the Keto Racket. (Id.). Defendants worked to reduce chargebacks in a variety of ways, including creating additional MIDs for the Keto Racket, handling the Keto Racket's chargeback representments, and orchestrating a huge number of sham microtransactions to artificially reduce the percentage of chargebacks on the Keto Racket's MIDs. (Id. at 3-10). By keeping its chargeback rate down, the Keto Racket could continue having their fraudulent sales of diet pills processed by credit card companies and banks. Such payment processing was the scheme's "lifeblood." (Id. at 3).

Now, Plaintiffs move to certify a nationwide class, defined as follows:

> All consumers in the United States who, within the applicable statute of limitations period until the date notice is disseminated, were billed for shipments of either three bottles or five bottles of Ultrafast Keto Boost, Insta Keto, or InstantKeto.

(Doc. # 121 at 2). Plaintiffs exclude from the class "any consumer who received a full refund for the 'free' products for which they were improperly charged, governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors,

affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff." (Id. at 2 n.1).

Defendants oppose class certification. (Doc. # 134). Plaintiffs have replied (Doc. # 147), and Defendants surreplied. (Doc. # 151). The Motion is ripe for review.

## II.  **Legal Standard**

To certify a class action, the moving party must satisfy a number of prerequisites. First, the named plaintiff must demonstrate standing. Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009). Second, the putative class must meet all four requirements enumerated in Federal Rule of Civil Procedure 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Third, the putative class must fit into at least one of the three class types defined by Rule 23(b). <u>Vega</u>, 564 F.3d at 1265. Relevant to this case, Rule 23(b)(3) permits certification of a class where (1) common questions of law or fact predominate over questions affecting class members individually, and (2) a class action is the superior method for resolving these common questions. <u>Id.</u>

The party moving to certify any class or subclass ultimately bears the burden of proving that all prerequisites are met. <u>Brown v. Electrolux Home Prods., Inc.</u>, 817 F.3d 1225, 1233–34 (11th Cir. 2016).

## III. **<u>Analysis</u>**

### A. **<u>Ascertainability of Class</u>**

"Ascertainability is an implied prerequisite of Rule 23." <u>Cherry v. Dometic Corp.</u>, 986 F.3d 1296, 1302 (11th Cir. 2021). "Class representatives bear the burden to establish that their proposed class is 'adequately defined and clearly ascertainable,' and they must satisfy this requirement before the district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a)." <u>Id.</u> (citation omitted).

The Eleventh Circuit has "collapsed class definition and ascertainability into one inquiry. A class is inadequately

defined if it is defined through vague or subjective criteria. And without an adequate definition for a proposed class, a district court will be unable to ascertain who belongs in it." Id. (citations omitted). However, "[b]ecause administrative feasibility has no connection to Rule 23(a), it is not part of the ascertainability inquiry." Id. at 1303.

Plaintiffs argue the class is ascertainable using objective criteria "concerning the consumer's location, purchase, and date of purchase." (Doc. # 121 at 8). They intend to use a spreadsheet "detailing the names, addresses, email addresses, and purchase dates of everyone to whom the Keto Racket's fulfillment company, The Fulfillment Lab, shipped three bottles or five bottles of Ultrafast Keto Boost, Insta Keto, or InstantKeto" to identify members of the class. (Id. at 9; Doc. # 112-2 at ¶¶ 39-44).

Defendants disagree, insisting that the putative class is "not ascertainable, as Plaintiffs lack records of class members' identities or reliable records of which consumers received full refunds." (Doc. # 134 at 2, 20). They insist that no objective criteria exist "for the Court to determine how to parse out those putative class members who were not harmed because they have been made whole through refunds." (Id. at 20). Additionally, Defendants assert that the

6

Fulfillment Labs' spreadsheet "does not include names, email addresses, or mailing addresses." (Id.; Doc. # 134-1 at ¶ 6).

The Court rejects Defendants' arguments. Most importantly, Defendants are incorrect about the contents of the spreadsheet. The spreadsheet contains the names, email addresses, mailing addresses, and phone numbers for hundreds of thousands of putative class members, and is the same spreadsheet used in the related California action. (Doc. # 140-3 at ¶ 12; Doc. # 140-2 at Ex. 19). As for putative class members who may have received full refunds, this argument goes towards administrative feasibility. See Cherry, 986 F.3d at 1304 ("[A]dministrative feasibility is not a requirement for certification under Rule 23."). Regardless, as Plaintiffs point out, Defendants' "business records reflect the status of over 20,000 chargebacks made by putative class members along with their respective names and email addresses as well as information about the identities of more than 6800 refund recipients." (Doc. # 147 at 3).

In short, the Court determines that the putative class is sufficiently ascertainable.

B.   **Rule 23(a) Requirements**

The putative class must meet all four requirements outlined in Rule 23(a): "numerosity, commonality, typicality,

7

and adequacy of representation." Vega, 564 F.3d at 1265 (quoting Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1188 (11th Cir. 2003)).

### 1. Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While "mere allegations of numerosity are insufficient," Rule 23(a)(1) imposes a "generally low hurdle," and "a plaintiff need not show the precise number of members in the class." Manno v. Healthcare Revenue Recovery Grp., LLC, 289 F.R.D. 674, 684 (S.D. Fla. 2013); see Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 930 (11th Cir. 1983) (explaining that the class representative is not required to establish the exact number in the proposed class). "Nevertheless, a plaintiff still bears the burden of making some showing, affording the district court the means to make a supported factual finding that the class actually certified meets the numerosity requirement." Manno, 289 F.R.D. at 684 (quoting Vega, 564 F.3d at 1267).

Notably, Defendants do not challenge the numerosity requirement here. And the Court agrees with Plaintiffs that the numerosity requirement is met. The class far exceeds the

general minimum of forty members. See Cox v. Am. Cast Iron
Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986) ("[T]he trial
court's decertification of the 47-member class for lack of
numerosity was by no means compelled by Rule 23 or the case
law. As the trial judge who originally certified the class
pointed out, citing 3B Moore's Federal Practice ¶ 23.05[1] at
n. 7 (1978), while there is no fixed numerosity rule,
'generally less than twenty-one is inadequate, more than
forty adequate, with numbers between varying according to
other factors.'"). Shipping data from the Keto Racket's
fulfillment company indicates that the "InstaKeto/Instant
Keto product was shipped to 121,059 individuals in the United
States, 94,494 of which were shipped either 3 or 5 bottles."
(Doc. # 121 at 10; Kneupper Decl. at ¶ 43).

### 2.   Commonality

Federal Rule of Civil Procedure 23(a)(2) requires that
there be "questions of law or fact common to the class." Fed.
R. Civ. P. 23(a)(2). Commonality pertains to the
characteristics of the group or class as a whole, unlike
typicality which refers to the individual characteristics of
the class representative as compared to those of the class
members. Piazza v. Ebsco Indus. Inc., 273 F.3d 1341, 1346

(11th Cir. 2001) (citing Prado-Steiman v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000)).

Commonality "does not require complete identity of legal claims." Johnson v. Am. Credit Co. of Ga., 581 F.2d 526, 532 (5th Cir. 1978).[1] In fact, commonality can be satisfied even with some factual variations among class members. Armstead v. Pingree, 629 F. Supp. 273, 280 (M.D. Fla. 1986).

In Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), the Supreme Court clarified the commonality requirement for class certification by specifically rejecting the use of generalized questions to establish commonality. Noting that "any competently crafted class complaint literally raises common questions," the Court focused the required discussion:

> What matters to class certification . . . is not the raising of common 'questions' — even in droves — but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Id. at 350 (internal citation omitted) (emphasis in original). The Court explained that the "common contention"

---

[1] The Eleventh Circuit, in an en banc decision, Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

underpinning a finding of commonality "must be of such a nature that it is capable of class wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

"[T]o establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," as well as an "injury" to "business or property" that was "by reason of" the RICO violation. Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282-83 (11th Cir. 2006) (citation and internal quotation marks omitted). As for the conspiracy claim, "[a] plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 (11th Cir. 2010) (citation omitted).

According to Plaintiffs, their "RICO claims readily satisfy the commonality requirement because these claims focus on Defendants' fraudulent scheme and 'derive from a single course of conduct.'" (Doc. # 121 at 11) (quoting Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 756 (7th Cir.

2014)). Plaintiffs claim that many of the issues they must prove for their RICO claims can be answered in one fell swoop for the class with common evidence, including "the existence of the Keto Racket as an associated-in-fact enterprise or [Chargebacks911's] role in conducting the Keto Racket's affairs are questions can be answered 'in one stroke' with common evidence." (Id. at 11-12). "Whether or not Defendants conspired to violate 1962(c) by masterminding the microtransactions scheme the Keto Racket used to conceal its Keto pills scam is likewise a question that can be resolved with evidence common to the Class." (Id. at 12).

Notably, a district court in the Southern District of California has granted class certification in Plaintiffs' RICO action against other members of the Keto Racket. See Sihler v. Fulfillment Lab, Inc., No. 20CV1528-LL-DDL, 2023 WL 4335735 (S.D. Cal. June 23, 2023). The court there found that the commonality requirement was met "because whether there are RICO violations raises common questions that are capable of classwide resolution." Id. at *6. The court highlighted that "Plaintiffs have sufficiently shown that the pricing information is likely to deceive class members." Id.

Indeed, other courts have noted that the "issues of law and fact in making out a RICO violation will generally be

12

common to all Plaintiffs' claims, because Plaintiffs are asserting a single fraudulent scheme by the defendants which injured each plaintiff." In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.., 122 F.R.D. 251, 255 (C.D. Cal. 1988); see also Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1356 (11th Cir. 2009) ("[C]laims under RICO, in contrast with claims under Title VII, are often susceptible to common proof."); Belin v. Health Ins. Innovations, Inc., 337 F.R.D. 544, 557 (S.D. Fla. 2021) ("In addition to raising common questions that focus on a scheme, RICO claims likewise raise questions of a standardized course of conduct.").

Defendants do not challenge commonality, although they raise arguments as to the more demanding predominance requirement that will be addressed later. See Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997) ("The predominance inquiry . . . is 'far more demanding' than Rule 23(a)'s commonality requirement." (citation omitted)).

Considering the common course of conduct and nature of the RICO claims here, the Court determines that the commonality requirement is met.

### 3. **Typicality**

The focus of Rule 23(a)(3) typicality is whether the class representative's interests are so aligned with the

proposed class that she may stand in the class's shoes for the purposes of the litigation and bind it in a judgment on the merits. See Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1322–23 (11th Cir. 2008) ("[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large.").

To establish typicality, "there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332, 1337 (11th Cir. 1984). When the class representative's injury is different from that of the rest of the class, her claim is not typical and she cannot serve as the class representative. Murray v. Auslander, 244 F.3d 807, 811 (11th Cir. 2001). Moreover, when proof of the class representative's claim would not necessarily prove the claims of the proposed class members, the class representative does not satisfy the typicality requirement. Brooks v. S. Bell Tel. & Tel. Co., 133 F.R.D. 54, 58 (S.D. Fla. 1990). "Typicality, however, does not require identical claims or defenses." Kornberg, 741 F.2d at 1337. "A factual variation will not render a class representative's claim atypical unless the factual position

of the representative markedly differs from that of other members of the class." Id.

According to Plaintiffs, typicality is satisfied: "Plaintiffs, like the prospective class members, were overcharged as part of a scheme that: (1) misrepresented the price of the Keto products and then overcharged each consumer; (2) was aided, abetted, and enacted by CB911; and (3) concealed as part of a conspiracy agreed to by all three Defendants. Any one of these elements is enough." (Doc. # 121 at 13); see also Sihler, 2023 WL 4335735, at *7 (holding that "Plaintiffs have shown that each member's claim arises from the same course of conduct, each class member has the same injury, and each member makes similar legal arguments, thus satisfying typicality" and noting that "Plaintiff Sihler's claim is reasonably coextensive with those of absent class members" even though it was unclear whether Sihler had viewed the exact same "Buy 3, Get 2 Free" advertisement as some putative class members).

Yet, Defendants argue that both Plaintiff Sihler and Plaintiff Bavencoff are atypical of the class. (Doc. # 134 at 21-24). According to Defendants, Bavencoff is atypical of the class because she "is subject to the unique defense of reliance that threatens to become the focus of the

litigation." (Id. at 22). Defendants reason that Bavencoff "is unable to testify that the advertising at issue in this case (the Buy X Get Y Free claim) is what she relied on — as opposed to the weight loss claims — when she made her purchasing decision." (Id. at 22).

The Court disagrees. Despite Defendants' efforts to cast Bavencoff's deposition testimony as problematic, her testimony does not undermine Plaintiffs' typicality. Indeed, Bavencoff testified that she probably would not have made the purchase of the keto diet pills if she knew she would be charged $198.70, the total she was charged for all five bottles. (Doc. # 134-6 at 42:24-43:18). She testified that she thought she would only have to pay for three bottles. (Id. at 43:9-11). Although she decided to get a refund after the diet pills failed to work for her (Id. at 47:14-24), her testimony nevertheless reflects that she was a victim of the Keto Racket's pricing misrepresentations. That is, she was injured by the pricing misrepresentations just like the other members of the putative class. Bavencoff's additional declaration also supports this conclusion. See (Doc. # 112-6 at ¶ 5) ("I understood that I would be receiving additional bottles of 'Ultra Fast Keto Boost' at no extra cost given the number that I had purchased. However, I was shipped five

bottles of 'Ultra Fast Keto Boost' and was charged $39.74 for each of the five bottles for a total price of $198.70. The charges for the additional bottles of 'Ultra Fast Keto Boost' were without my knowledge or authorization.").

As to Plaintiff Sihler, Defendants maintain she is atypical of the putative class because she "will face a strong unique defense on the issue of causation." (Doc. # 134 at 23). True, Sihler equivocated during her deposition testimony about the name of the keto diet pills she purchased and could not recall what advertisement she saw online. (Doc. # 134-7 at 67:2-69:24, 77:3-14, 79:22-80:25). Sihler also changed her testimony during her deposition over whether she saw pricing information on the website when she made her purchase of the product and how she discovered the overcharge. (Id. at 47:20-25, 53:15-54:10, 56:13-58:1, 100:20-25).

These minor issues with Sihler's deposition testimony do not convince the Court that Sihler's claim is atypical of the putative class. Despite some inconsistencies, Sihler remained consistent in her deposition that she purchased keto diet pills based on misrepresentations in the advertising about the number of bottles for which she would be charged (a 'Buy 3, Get 2 free' advertisement). (Id. at 96:8-97:4). Just as with Bavencoff, Sihler's sworn declaration further supports

17

that her claims are typical. See (Doc. # 112-4 at ¶¶ 5-6)
("The website promoted a 'Buy 3 bottles, Get 2 free' promotion
for the 'Instant Keto' product, and I decided to purchase the
'Instant Keto' product with the expectation that I would be
billed for three bottles at the price of $39.74 for each
bottle, and that I would receive two more bottles for no
additional cost such that the total purchase price would be
$119.12. Despite the advertisements for the 'Instant Keto'
product, my debit card was charged $198.70, which was $39.74
for each bottle. Several days after ordering the product, I
received five bottles that were labeled 'Instant Keto.'").
Thus, there does not appear to be a strong causation argument
unique to Sihler. Nor does the Court consider Sihler atypical
because she purchased the product at a time when Defendants
were allegedly not providing services to the Keto Racket or
has a "rage" about her purchase of the product.

In short, the typicality requirement is met for both
Plaintiffs Bavencoff and Sihler.

### 4.   **Adequacy**

Rule 23(a) requires that "the representative parties
will fairly and adequately protect the interests of the
class." Fed. R. Civ. P. 23(a)(4). The adequacy of
representation analysis involves two inquiries: "(1) whether

any substantial conflicts of interest exist between the representatives and the class, and (2) whether the representatives will adequately prosecute the action." Valley Drug Co., 350 F.3d at 1189 (quoting In re HealthSouth Corp. Sec. Litig., 213 F.R.D. 447, 460–61 (N.D. Ala. 2003)). "The existence of minor conflicts alone will not defeat a party's claim to class certification." Id. Rather, "the conflict must be a fundamental one going to the specific issues in controversy." Id.

Defendants argue that both Plaintiffs Sihler and Bavencoff are inadequate class representatives. (Doc. # 134 at 21-25). As for Bavencoff, Defendants argue she is inadequate because the discrepancies between her deposition testimony and declaration render her not credible, and due to her alleged "lack of knowledge about the underlying case." (Id. at 22-23). Similarly, Defendants contend Sihler is inadequate because of her "contradicting discovery responses and deposition testimony" and "given her lack of knowledge about this case." (Id. at 24).

The Court disagrees. These issues with Bavencoff and Sihler do not establish that they are inadequate class representatives. Neither Sihler nor Bavencoff have any conflicts of interest with the putative class. And, while

19

Defendants take issue with the extent of their knowledge of the litigation, Bavencoff and Sihler are sufficiently knowledgeable to adequately prosecute the action. See Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) ("The lack of knowledge contention is particularly meritless. It is hornbook law, as the district court recognized, that '[i]n a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'" (citation omitted)); Dujanovic v. MortgageAmerica, Inc., 185 F.R.D. 660, 668 (N.D. Ala. 1999) (noting that "lack of specific knowledge about the claims generally is not grounds for denying certification where the representative's counsel is capable of handling the litigation").

As Plaintiffs highlight, both Bavencoff and Sihler have participated in discovery and have met with counsel. (Doc. # 147 at 9-10). They understand their roles as representatives of a class of injured individuals. See (Doc. # 140-2 at Ex. 20 at 122:25-123:6) (Bavencoff explaining her duty as class representative "[t]o represent the best interest of everyone

20

in the class action, and to be involved and informed of the class action"); (Doc. # 140-2 at Ex. 10 at 28:11-19) (Sihler explaining that she is a plaintiff in this case on behalf of other people like her, that is, "people that were deceived, [and] people who were robbed of monies"). This is sufficient.

Regarding proposed class counsel, "[t]he Court finds Plaintiffs' counsel are experienced, able to fairly and adequately protect the interests of the class, and capable of prosecuting this consumer class action." Sihler, 2023 WL 4335735, at *8 (finding the same Plaintiffs' counsel adequate class representation). Plaintiffs' counsel are experienced in class action litigation and have advocated zealously in this case on behalf of the putative class.

The adequacy requirement is met here.

## C. **Rule 23(b)**

In addition to the requirements of Rule 23(a), the class must satisfy at least one of the three requirements of Rule 23(b). Plaintiffs rely on Rule 23(b)(3), which requires a finding that (1) common questions of law or fact predominate over questions affecting class members individually, and (2) a class action is the superior method for resolving these common questions. Vega, 564 F.3d at 1265. Defendants challenge both requirements. (Doc. # 134 at 8-20).

### 1. __Predominance__

"Rule 23(b)(3)'s predominance requirement is far more demanding than Rule 23(a)'s commonality requirement." <u>Sellers v. Rushmore Loan Mgmt. Servs., LLC</u>, 941 F.3d 1031, 1039 (11th Cir. 2019). "Rule 23(b)(3) requires us to consider whether 'the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" <u>Id.</u> at 1040 (quoting <u>Kerr v. City of West Palm Beach</u>, 875 F.2d 1546, 1557-58 (11th Cir. 1989)).

"To determine whether common issues predominate, a district court first must 'identify the parties' claims and defenses and their elements' and 'then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial.'" <u>Id.</u> (quoting <u>Brown</u>, 817 F.3d at 1234). "Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will vary from member to member." <u>Brown</u>, 817 F.3d at 1234 (internal quotation marks omitted). The Court then must "determine whether the common questions predominate over the individual ones." <u>Id.</u> at 1234-35.

The Eleventh Circuit has "explained that certification is inappropriate when after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." Sellers, 941 F.3d at 1040 (citation and internal quotation marks omitted). "But this exercise is not 'bean counting' — the relative importance of the questions matters too." Benson v. Enter. Leasing Co. of Orlando, LLC, No. 6:20-cv-891-RBD-LRH, 2021 WL 2138781, at *8 (M.D. Fla. May 11, 2021) (citing Brown, 817 F.3d at 1235). Importantly, Rule 23(b)(3) "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'" Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 469 (2013) (citation omitted). Also, "individual damages do not always defeat predominance." Brown, 817 F.3d at 1239.

The heart of the parties' dispute over class certification lies with the predominance inquiry. Defendants urge that individual questions on standing and causation predominate over the common questions in this case.

**(i)  Standing**

The Court disagrees with Defendants as to standing. True, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1276 (11th Cir. 2019) (citation omitted).

But Defendants have not convinced the Court that any class members lack standing. The fact that Chargebacks911 did not provide services to the Keto Racket for the entirety of the class period and had "pauses" in service does not undermine the standing of putative class members who were injured during a time during which Chargebacks911 was not providing services to the Keto Racket. Because Defendants were co-conspirators in a RICO conspiracy, they can be held liable for all acts of the conspiracy, including acts that occurred before they joined the conspiracy. See United States v. Westbo, 746 F.2d 1022, 1025 (5th Cir. 1984) ("Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication which subsequently takes place or which previously took place in connection with the scheme."); Scholes v. Moore, 150 F.R.D. 133, 135 (N.D. Ill. 1993) (stating, in ruling on a motion for class certification in a RICO case, "we assume here that Moore

24

would be liable for all damages caused by any acts in furtherance of the conspiracy, even those committed before he joined"); United States v. Philip Morris USA, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) ("Every circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations.").

Also, the alleged pauses in Chargebacks911's service to the Keto Racket, based on the Keto Racket's late payments to Defendants, do not appear to constitute a withdrawal from the conspiracy. See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 838 (11th Cir. 1999) ("The defense of withdrawal is not available to one who merely ceases to participate and does not *affirmatively* withdraw."), amended in part, 211 F.3d 1224 (11th Cir. 2000). Thus, the existence of times during the conspiracy in which Defendants were not actively providing services to the Keto Racket does not suggest that class members who purchased the diet pills during these times lack standing in this action.

Likewise, the inclusion in the putative class of members who potentially received some sort of refund does not create a standing issue that predominates over other issues. Again,

Plaintiffs have explicitly excluded individuals "who received a full refund for the 'free' products" from the putative class. (Doc. # 121 at 2 n.1). Given this, Defendants' concern over individuals who received full refunds is best understood as an administrative feasibility argument, rather than a standing argument.

Furthermore, it is unlikely that large numbers of individuals who received full refunds will need to be sorted out from the actual class members. As Plaintiffs point out, "the number of consumers who got full refunds for the 'free bottles' directly from the Keto Associates is likely negligible since the Keto Associates made it difficult for customers to get refunds and charged a $5.00 per-bottle restocking fee." (Doc. # 147 at 4). Even for the 6,800 individuals who are recorded as receiving some form of refund, affidavits can be provided to establish which individuals received full refunds and which received a partial refund that does not exclude them from the class. (Id. at 3-4).

### (ii) Causation

Defendants' argument regarding causation fares no better. Defendants maintain that "the question of whether [Chargebacks911's] conduct enabled Brightree's MIDs to continue to allegedly 'victimize[]' consumers varies from

26

consumer to consumer based on the timing of their purchases and the specific MID that their purchase was processed through." (Doc. # 134 at 12-13).

The Court agrees with Plaintiffs that "Defendants' concern with divvying up fault MID by MID and bank by bank is academic." (Doc. # 147 at 4). Rather, "[w]hat matters for causation is not this MID or that MID, but [Chargebacks911's] conspiracy and engagement in racketeering activity that injured Plaintiffs." (Id.). Importantly, "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." Philip Morris USA, 316 F. Supp. 2d at 27; see also Gov't Emps. Ins. Co. v. KJ Chiropractic Ctr. LLC, No. 6:12-cv-1138-PGB-DCI, 2017 WL 9939048, at *3 (M.D. Fla. Aug. 22, 2017) ("While the Eleventh Circuit has not specifically addressed the issue of joint and several liability in civil RICO cases, it has allowed joint and several liability in a criminal RICO case. Moreover, several other circuit courts of appeal have found defendants jointly and severally liable in relation to civil RICO claims." (citations omitted)).

Thus, the fact that certain MIDs were not serviced by Chargebacks911 at various times or at all, or that different MIDs had different cut-off percentages for chargebacks does not diminish Defendants' liability. Defendants would still be liable as to all the MIDs used by the Keto Racket such that individual inquiries into which MID is associated with each class member's purchase are unnecessary. See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig., 609 F. Supp. 3d 942, 978 (N.D. Cal. 2022) ("The five schemes identified by plaintiffs, interrelated and *together*, establish the overall pattern of racketeering activity alleged. That Altria was only directly involved in *some* of the racketeering activity is not significant. Under Ninth Circuit precedent, all defendants who participated in the RICO enterprise are liable for the entire injury caused by the enterprise's illegal conduct, regardless of whether they personally participated in every aspect of the conspiracy."); Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n, 298 F.3d 768, 775 (9th Cir. 2002) ("Holding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy 'is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" (citation omitted)).

The cause of each class member's injury is the overall conduct of the enterprise, in which Defendants took part.

Nor are Defendants correct regarding reliance. The issue of reliance will not predominate over the common issues in this RICO case. Reliance is not an element of the RICO claims. See Williams, 465 F.3d at 1282-83 (explaining that "to establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," as well as an "injury" to "business or property" that was "by reason of" the RICO violation (citation and internal quotation marks omitted)); Am. Dental Ass'n, 605 F.3d at 1293 ("A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." (citation omitted)). "The common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no place in the [mail, wire, and bank] fraud statutes." Neder v. United States, 527 U.S. 1, 24–25 (1999). Thus, "no showing of reliance is required to establish that a person has violated § 1962(c) [of RICO] by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts

29

of mail [or wire] fraud." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649 (2008). "RICO's text provides no basis for imposing a first-party reliance requirement." Id. at 660.

The fact that some evidence of reliance *may* be provided by Plaintiffs to prove causation for the class does not alter this conclusion. As the Second Circuit has acknowledged, "plaintiffs may be able to prove class-wide causation based on first-party reliance *without* an individualized inquiry into whether each class member relied on the defendant's misrepresentation if 'circumstantial evidence' generates a sufficiently strong inference that all class members did, in fact, rely." Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP, 806 F.3d 71, 88 (2d Cir. 2015). Here, "[i]t does not strain credulity to conclude that each plaintiff . . . relied upon the [Keto Racket's advertising] representations and assumed they would be" charged the advertised price for the two or three bottles chosen, and then receive additional free bottles. Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004). In short, the issue of reliance is not an individualized question that will predominate over common questions here. See Sihler, 2023 WL 4335735, at *11 ("The Court finds individual proof of reliance is not required in this case to establish proximate cause.

Proximate cause under RICO may be established without a showing of reliance when the plaintiff's injury is the direct result — 'a foreseeable and natural consequence' — of the defendant's fraud. . . . Because Plaintiffs were the immediate victims of Defendants' fraudulent scheme to sell more Keto Products at a higher price, the alleged RICO violation (mail and wire fraud and conspiracy to commit mail and wire fraud) has a direct relation to Plaintiffs' alleged harm and satisfies proximate cause." (citations omitted)).

Rather, Plaintiffs are correct that the main issues in this case are subject to generalized proof. Even setting aside causation, the same generalized proof will be used to establish the other elements of the RICO claims, including conduct of an enterprise through a pattern of racketeering activity being exactly the same for all class members. (Doc. # 121 at 17); see also Williams, 568 F.3d at 1356 ("[C]laims under RICO . . . are often susceptible to common proof."). As the Court in the related Sihler class action held, "Plaintiffs will be able to show on a classwide basis whether Defendants participated in the conduct at issue; whether Defendants' participation in the conduct was part of an enterprise and was performed through a pattern of racketeering activity; whether it caused injury to Plaintiffs; or whether Defendants

knew about and agreed to facilitate the scheme." Sihler, 2023 WL 4335735, at *11.

The predominance requirement is met.

### 2. Superiority

Additionally, a class action is a superior method of resolving the common issues. "The focus of [the superiority] analysis is on 'the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs.'" Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1183–84 (11th Cir. 2010).

Here, where each of the class members' individual damages are small, the class action mechanism is superior to a "multiplicity of small individual suits for damages." See Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). As the court in the related Sihler case explained, "[e]ach class member's injury is a small sum — no more than $200 — and the costs of litigation would far exceed an individual's recovery, so they would be

unlikely to pursue individual lawsuits. In this situation, a class action may be the only way to resolve the dispute fairly and efficiently." Sihler, 2023 WL 4335735, at *12 (citations omitted). "Furthermore, Plaintiffs allege a single common fraudulent scheme, so it is more efficient and cost effective to pursue this matter as a class action rather than as many individual lawsuits with duplicate discovery." Id.

The Court has already rejected Defendants' predominance arguments and, thus, those arguments do not undermine the superiority requirement. See Sacred Heart Health Sys., Inc., 601 F.3d at 1184 ("[T]he predominance analysis has a 'tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims,' both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability." (citations omitted)).

## IV.  Conclusion

Plaintiffs have satisfied all of Rule 23's requirements. The Court will certify the nationwide class as defined in the Motion.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiffs Janet Sihler and Charlene Bavencoff's Sealed Motion for Class Certification (Doc. # 121) is **GRANTED.**

(2) Plaintiffs Janet Sihler and Charlene Bavencoff are appointed as lead plaintiffs and class representatives.

(3) Jordan Wagner of Kibbey Wagner and Kevin Kneupper, A. Cyclone Covey, A. Lorraine Weekes, and Anthony Sampson of Kneupper & Covey, PC, are appointed as class counsel.

(4) Within 14 days from the date of this Order, the parties shall file a joint notice that (1) describes the identification of class members and their contact information; (2) describes the method of disseminating class notice; and (3) proposes a notice to be disseminated to the class.

(5) Prior to filing the joint notice, the parties are directed to meet and confer and agree to the extent possible on these issues. To the extent the parties cannot agree, their disagreement should be described, along with short legal briefing, in the joint notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

<u>13th</u> day of August, 2024.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE