IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JANET SIHLER, Individually and On Behalf of All Others Similarly Situated; CHARLENE BAVENCOFF, Individually and On Behalf of All Others Similarly Situated,<br><br>              Plaintiffs,<br><br>v.<br><br>GLOBAL E-TRADING, LLC DBA CHARGEBACKS911, GARY CARDONE, MONICA EATON,<br><br>              Defendants. | Case No. 8:23-cv-01450-VMC-LSG |

## **DECLARATION OF JAMIE BROWN**

I, DECLARANT, declare that:

**Qualifications**

    1.   My name is Jamie A. Brown. I am an attorney and legal consultant, specializing in information law, compliance, and governance issues. I have over 25 years of in-house, government, and law firm experience, which I draw upon to advise clients on legal and compliance risk mitigation strategies associated with information and technology. I presently work for Lighthouse, where I am the Vice President of Strategic Consulting.

    2.   My prior experience includes working for UBS, where, as Executive Director and Global eDiscovery Counsel, I was responsible for designing, implementing, and managing the global e-discovery response program to support the firm's litigation and investigation matters worldwide. I also worked for Barclays, leading and implementing a global program to reduce

1

legal, regulatory, and privacy risk associated with legacy systems and data. Prior to corporate, I spent several years in government service, first as a trial attorney in the Division of Enforcement at the U.S. Commodity Futures Trading Commission in Washington, D.C., and later, as Assistant General Counsel, Head of eDiscovery and Information Governance, where I served as the Agency's resident expert and advisor on legal and regulatory risk associated with information and technology. My career began as a litigation associate at King & Spalding, and later, a partner at Fennemore Craig specializing in information law.

3. Through the aforementioned roles, I have evaluated approximately 250+ in-house e-discovery programs for regulatory compliance, including a review of supporting policies, procedures, and operating models for the retention, preservation, collection, search, and review of data.

**Background**

4. In February 2025, I was engaged by Sidley Austin, LLP (Corey Roush) on behalf of Global e-Trading, LLC, doing business as Chargebacks911 ("CB911") to assist in responding to Plaintiffs' Motion for Terminating Sanctions (Dkt. 221), including all exhibits, which I have reviewed. Plaintiffs' motion involves the deletion of nine Skype messages by a CB911 employee, Ben Scrancher, that Plaintiffs contend are relevant to this matter.[1] In a recent affidavit dated February 25, 2025, Mr. Scrancher acknowledged deleting messages in 2023 – despite having received a legal hold notice instructing him to preserve all relevant information. [*Scrancher Aff.* ¶ 21; *Eaton* ¶¶ 15-17]. He does not recall deleting messages in 2020. [*Scrancher Aff.* ¶ 18]. In his affidavit, he provides an explanation of the personal circumstances that contributed to his decision to delete these messages, and confirms this decision was his alone. [*Id.* ¶ 22-36]

---

[1] Plaintiffs' motion references thirteen deleted messages, however, I understand that four of these messages have been recovered.

5. In connection with this declaration, I have interviewed Monica Eaton of CB911, as well as counsel from Sidley (Corey Roush and Taylor Randleman). I have also reviewed the following materials:

- CB911's Records Retention policy that governs the retention and deletion of company records.

- CB911's Acceptable Use policy that governs the use of approved IT systems for recordkeeping purposes.

- CB911's Mobile Computing Standards

- CB911's Compliance Policy

- CB911's Communications and Security Policy

- CB911's legal hold operating model, which refers to the process for preserving data in connection with litigation and investigation matters.

- CB911's legal hold notices for the FTC matter (*FTC v. Global eTrading, LLC*), as well as the instant litigation, both of which include employees for which data is being preserved.

- Affidavit of Ben Scrancher (February 25, 2025)

- Declaration of Marc Conway (February 23, 2025)

- Transcript of 30(b)(6) Deposition of CB911 (September 23, 2024)

- Declaration of Monica Eaton (February 25, 2025)

- Several Excel Files Analyzing Allegedly Deleted Messages from B. Scrancher

- JSON File for Skype Messages

6. I am familiar with the facts herein and competent to testify to the topics if necessary.

**Overview of CB911 Systems and Recordkeeping Framework**

7. Pursuant to CB911's Acceptable Use policy, CB911 requires all employees to utilize company systems for conducting business related activities. CB911's primary or official communication and collaboration systems include **Google** Mail (for email), Chat (for messaging)

3

and Drive (for documents). These systems are enabled for internal and external use, such as communicating with third-parties.

8. CB911 uses the built-in tools for these systems to manage its information, including data retention, preservation, and collection. Google's tool is called Vault.

9. Occasionally, a business need arises for an employee to use an unofficial or "off-channel" system for work purposes, such as communicating with a client where a primary method is unavailable, typically due to a client preference. These preferences include whether to communicate by phone, email, or chat message, and can extend to specific applications, which might not include one of CB911's primary systems. For example, some clients prefer to use third-party mobile device apps or software platforms, such as Skype Instant Messager.

10. The need to accommodate client preferences is especially true for employees in sales roles. In addition, sales representatives often need to communicate using their mobile devices (either by phone or other communication applications), as they are traveling or in transit.

11. Although CB911 has implemented several communication systems to meet its business needs and the needs of its employees, it cannot do so for every conceivable circumstance (or client). In the event a client indicates a preference to use a non-primary system, CB911 will permit this use. However, employees are instructed to transfer such information to a company-approved system (where it can be centrally managed) if it rises to the level of a record, as defined by the Records policy. Employees are expressly prohibited by policy from using third party systems to transfer non-public information, absent written permission from a person with authorization (Plaintiffs' Motion for Terminating Sanctions, Exh. 18, Asset Management Third-Party Data Transfer Policy).

12. It is important to note that CB911 is a moderately sized organization with only 350 employees; although it has certain regulatory obligations, it is not considered a highly regulated company with, for example, duties and obligations to retain *all* communications with clients. As a result, its recordkeeping practices are less formal than those that might be common in larger, heavily regulated organizations, such as broker-dealer, which are required to retain all messages for a specific period of time by the SEC and FINRA.

13. Notwithstanding, CB911 does have policies and procedures to retain certain records consistent with its records retention policy (and corresponding schedule) and IT systems that support these efforts (including specific systems of record). It also has policies that govern the Acceptable Use of company systems and data, as well as the use of Mobile Devices when accessing this information. Employees are required to participate in training on these policies at the time they are onboarded. [*Eaton Aff.* ¶ 13] This training is administered through a series of online training modules, relevant to the employee's role, which is administered through CB911's learning management system. These policies are audited annually for compliance. [*Id.* ¶ 11].

**Overview of CB911's Legal Hold Framework**

14. CB911's management of legal holds was informal given the infrequency of litigation.[2] For example, the company's legal hold practices involved an iterative process that involved internal IT and outside counsel and included (a) the issuance of a legal hold notice by email; (b) the use of Vault to technically preserve data residing in Google Workplace, the effect of which is to suspend the deletion of data that might occur (either by IT or by an employee); (c) reliance on the instructions contained in the legal hold notice coupled with the company's retention policy (which was indefinite for company systems); and (d) custodian interviews.

---

[2] At the time of this declaration, CB911 has had only two matters for which a legal hold was needed in the history of the company – the FTC matter and the instant litigation.

5

15. Given that there were only two matters for which a legal hold was warranted – the FTC matter and the instant litigation – I confirmed the steps taken to preserve data in these matters.

**Opinions**

16. Having reviewed the policies and procedures involving the use of company systems, which encourage the use of company systems for all client communications (and provisions for when that cannot occur due to client preferences), I believe CB911 acted reasonably and in a way that is consistent with industry standards for a company of this size and regulatory profile. The policies were documented and reflective of the way in which employees conducted business. CB911 required that all employees be trained on the policies at the time they joined the company. And, CB911 leveraged technology to monitor compliance with policies and procedures, particularly those involving communications.

17. Notably, CB911 addressed off-channel communications by acknowledging the special circumstances that might arise with such communications and providing specific instructions on how to bring this information "back" to the company if needed (and to the extent it constitutes a company record). In that sense, CB911 did more than what many companies do today to manage off-channel communications.

18. Having reviewed the company's legal hold practices in connection with its two litigation matters – including the instant litigation – I believe CB911's preservation efforts met industry standards. For both matters, it issued a legal hold notice, which included a description of the matter, categories of relevant information and specific instructions to employees on their preservation obligations (including for data that might reside on *third party applications, and with specific reference to Skype*). It also included efforts by IT to technically preserve data "in-place" using native Google tools, which prevent the deletion of data (by IT or an employee)

residing in these systems.  Finally, it included efforts by legal to follow-up with custodians to ensure they comply with the legal hold notice – including inquiry into off-channel communications.  Collectively, these efforts are based upon the existing policies and procedures that govern the retention of data on company systems.

19. Here, both the recordkeeping policies and the legal hold practices accounted for the potential use of off-channel communications, which is noteworthy.  The fact they could not account for a lone employee deleting data on his personal device or application is not indicative of any company wrongdoing.

20. I reserve the right to supplement this declaration if information is provided to me.

I declare that the foregoing is true and correct.

Executed on February 25 2025.

*Jamie Brown*
DECLARANT