UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JANET SIHLER and
CHARLENE BAVENCOFF,
Individually and
on Behalf of All Others
Similarly Situated,

       Plaintiffs,

v.                     Case No. 8:23-cv-1450-VMC-LSG

GLOBAL E-TRADING, LLC,
d/b/a Chargebacks911,
GARY CARDONE, and
MONICA EATON,

       Defendants.

_____/

## ORDER

    This matter is before the Court on consideration of Plaintiffs Janet Sihler and Charlene Bavencoff's Motion for Partial Summary Judgment (Doc. # 225), Defendant Monica Eaton's Motion for Summary Judgment (Doc. # 220), Defendant Gary Cardone's Motion for Summary Judgment (Doc. # 227), and Defendant Global e-Trading, LLC's Motion for Summary Judgment (Doc. # 226), all filed on February 5, 2025. For the reasons that follow, Ms. Eaton and Mr. Cardone's Motions are granted, Global e-Trading's Motion is granted in part and denied in part, and Plaintiffs' Motion is granted in part and denied in part. Count Two is dismissed for lack of RICO standing, but

the case will proceed to trial on Count One and most of Global e-Trading's affirmative defenses.

## I.  __Background__

Plaintiffs initiated this class action against Defendants on June 28, 2023. (Doc. # 1). The operative complaint is the third amended complaint, in which Plaintiffs assert two RICO claims: (1) for violation of 18 U.S.C. § 1962(c) (Count One) — a substantive RICO claim; and (2) for violation of 18 U.S.C. § 1962(d) (Count Two) — a RICO conspiracy claim. (Doc. # 102). Count One is asserted against Global e-Trading and is premised on the actions of the Keto Enterprise, which includes Global e-Trading, Brightree Holdings Corporation, David Flynn, Mike Campbell, and others. (Id. at 64-66). Count Two is asserted against Global e-Trading, Mr. Cardone, and Ms. Eaton. Count Two relates to the actions of a separate enterprise, the Microtransactions Enterprise, which includes Global e-Trading, Mr. Cardone, Ms. Eaton, and Johnny De Luca. (Id. at 123-124).

The Court granted in part and denied in part Defendants' motion to dismiss the third amended complaint. (Doc. # 128). The Court dismissed only the claims based on predicate acts of financial institution fraud because Plaintiffs "lack[ed] statutory standing to assert" such claims. (Id.). Defendants

filed their answer and affirmative defenses on June 17, 2024, asserting twenty-three affirmative defenses. (Doc. # 135). Relevant here, the fourth affirmative defense is that Plaintiffs' claims are barred by laches; the seventh affirmative defense is based on release of claims; the ninth affirmative defense asserts absence of due diligence; the twentieth affirmative defense seeks to reduce any damages award to prevent a duplicative recovery; the twenty-first affirmative defense seeks an apportionment of any damages award based on responsibility; and the twenty-third affirmative defense asserts that Plaintiffs are not entitled to prejudgment interest. (Id. at 79-84). On August 13, 2024, the Court certified a nationwide class. (Doc. # 156).

Defendants move for summary judgment on both Counts. (Doc. ## 220, 226, 227). Plaintiffs move for partial summary judgment as to six of Defendants' affirmative defenses. (Doc. # 225). Each party responded and replied. (Doc. ## 272, 274, 275, 276, 286, 287, 288, 289). At the Court's request, Plaintiffs filed a supplemental memorandum (Doc. # 311), to which Global e-Trading responded. (Doc. # 316). The Motions are ripe for review.

The Court and the parties are familiar with the allegations and evidence in this case. The Court will not

outline here all the admitted and disputed facts included in the parties' Motions, although the Court has reviewed all record evidence. Rather, the Court will address relevant record evidence within its analysis. For now, suffice it to say that Brightree, run by Mr. Flynn and others, sold keto diet pills on its website. See (Doc. # 274-38 at 47) (Brightree members describing the business as "selling $10 bottles of keto pills for $195 to dumbasses"). That website made misrepresentations to induce purchases by customers like Plaintiffs Sihler and Bavencoff, including misrepresentations about price under a "Buy X bottles, Get Y bottles free" advertisement. (Doc. # 274-8 at 64; Doc. # 274-51; Bavencoff Depo. at 40:23-43:11, 108:17-21). As a result of the pricing misrepresentation on the website, Plaintiffs were overcharged for the diet pills. (Bavencoff Depo. at 40:23-43:11, 108:17-21; Sihler Depo. at 32:11-33:4).

Global e-Trading — of which Mr. Cardone was previously the CEO and Ms. Eaton was previously COO and is currently CEO — did not sell the diet pills to Plaintiffs. Rather, Global e-Trading provided chargeback and representment services to merchants including Brightree. (Doc. # 259-1 at 1-2, 6). Merchants maintain merchant accounts (each of which has a unique "MID" number to identify it) through which they process

4

debit and credit card transactions. (Id. at 2; Doc. # 274-36 at 5). If a customer is upset with a transaction, they can challenge the charge with the bank that issued their credit card and the bank may initiate a chargeback with the credit card company (Visa or Mastercard) to reverse the payment. (Doc. # 274-36 at 6). Ultimately, the chargeback is presented to the merchant who "may refute the chargeback [through paperwork called a representment] or accept it." (Id.).

Count One alleges that Global e-Trading joined the association-in-fact Keto Enterprise, committed predicate acts of wire fraud and money laundering, and aided and abetted the acts of mail and wire fraud committed by other members of the Keto Enterprise. (Doc. # 102; Doc. # 311). The predicate acts and aiding and abetting took numerous forms, such as issuing refunds to prevent chargebacks or investigations by government authorities, submitting decoy websites as part of representments, helping Brightree acquire additional MIDs through shell corporations, and referring Brightree to Mr. De Luca for sham microtransactions to lower Brightree's chargeback ratios. See, e.g., (Doc. # 274-36 at 1, 39; Doc. # 274-44 at 149; Doc. # 274-43 at 10-11; Doc. # 266-7 at 3; Doc. # 274-49 at 19; Doc. # 274-50; Doc. # 274-37 at 611-612). Count Two against Global e-Trading, Mr. Cardone, and

Ms. Eaton asserts that they joined the association-in-fact Microtransactions Enterprise with Mr. De Luca. As alluded to above, Global e-Trading's clients, including Brightree, were referred to Mr. De Luca for sham microtransactions to reduce the clients' chargeback ratios. (Doc. # 274-49 at 19; Doc. # 274-50; Christensen Depo. at 179:1-24). By keeping its chargeback ratio artificially low, Brightree was able to continue accepting credit card payments for its keto diet pills.

The parties' dispute at summary judgment largely revolves around the extent to which Defendants — whether under the Keto Enterprise for Count One or the Microtransactions Enterprise for Count Two — can be held liable under RICO for the harm Plaintiffs suffered when they were overcharged.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the

non-moving party's favor. Shotz v. City of Plantation, 344
F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder
evaluating the evidence could draw more than one inference
from the facts, and if that inference introduces a genuine
issue of material fact, the court should not grant summary
judgment. Samples ex rel. Samples v. City of Atlanta, 846
F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's
response consists of nothing "more than a repetition of his
conclusional allegations," summary judgment is not only
proper, but required. Morris v. Ross, 663 F.2d 1032, 1034
(11th Cir. 1981).

## III. **Analysis**

### A.    **Count One**

Count One, a civil RICO claim under 18 U.S.C. § 1962(c),
is based on the conduct of the Keto Enterprise, which includes
Global e-Trading, Brightree, Mr. Flynn, and others. (Doc. #
102 at 64-66). "The course of conduct these individuals
associated to pursue was defrauding consumers like Plaintiffs
by selling inaccurately marketed diet pills online and
deceiving banks and payment processing companies about the
nature of their activities." (Id. at 66).

Section 1962(c) provides: "It shall be unlawful for any
person employed by or associated with any enterprise engaged

in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Thus, "[a] private plaintiff suing under the civil provisions of RICO must [establish] six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." Cisneros v. Petland, Inc., 972 F.3d 1204, 1211 (11th Cir. 2020).

Global e-Trading argues that Plaintiffs have failed to demonstrate a genuine dispute of material fact on any element of their substantive RICO claim. (Doc. # 226 at 7-9, 10-25). The Court disagrees.

### 1. Enterprise

"A RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1264 (11th Cir. 2004) (citation and internal quotation marks omitted). Here, Plaintiffs maintain the Keto Enterprise was an "association-

9

in-fact" enterprise. "An association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Cisneros, 972 F.3d at 1211 (citation and internal quotation marks omitted). An association-in-fact enterprise has three features: "(1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. (citation and internal quotation marks omitted).

Global e-Trading primarily challenges the purpose element of an association-in-fact enterprise in its Motion, but also mentions the relationship element. (Doc. # 226 at 11-14). "The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants." Cisneros, 972 F.3d at 1211 (citation omitted). "An abstract common purpose, such as a generally shared interest in making money, will not suffice." Id.

Here, taking the evidence in the light most favorable to Plaintiffs, there is sufficient evidence of a common purpose among the Keto Enterprise's participants and a relationship between Global e-Trading and the Keto Enterprise beyond a standard commercial relationship. A reasonable jury could conclude that Global e-Trading had more than a typical vendor-

vendee relationship with Brightree, and that Global e-Trading shared a common purpose of enriching itself and the other members of the Keto Enterprise through illegal conduct. See Al-Rayes v. Willingham, 914 F.3d 1302, 1308 (11th Cir. 2019) ("We can see, then, that the relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in illegal activity — not the purpose for which they initially became acquainted.").

Notably, before it worked with Brightree, Global e-Trading ran a program called "Value Added Promotion" ("VAP") as an in-house service it provided clients. (Eaton Depo. 1 at 76:11-77:8). Under VAP, Global e-Trading would perform numerous small-dollar transactions on prepaid cards for a client-merchant to "reduce" or "dilute" that client's chargeback ratio with the credit card companies. See (Doc. # 274-52 at 1; Doc. # 274-53 at 20; Doc. # 274-54 at 24). These transactions were shams; they did not involve "real customers." (Doc. # 274-52 at 1) (stating that VAP involves "transactions meant to assist with decreasing the [chargeback] ratio, so they are not real customers").

Reducing the chargeback ratio on a merchant's merchant accounts (called "MIDs") was a valuable service to a client because credit card companies like Visa and Mastercard set

limits (or thresholds) on the chargeback ratios for merchant accounts to "evaluate and predict risk" and assess "compliance issues." (Eaton Depo. 2 at 413:16-414:25; Doc. # 274-39 at 1; Doc. # 274-36 at 6). A merchant's chargeback ratio is calculated by dividing the monthly number of chargebacks for an MID by either that month's or the previous month's number of transactions for the MID. (Doc. # 274-36 at 6). The threshold is "1.5% for Mastercard and 0.90% for Visa." (Id.). "Excessive [c]hargebacks" — resulting in a higher chargeback ratio — "can be an indicator of fraudulent activity and is one reason why Acquirers monitor [c]hargebacks." (Id.). A high chargeback ratio could lead to a merchant losing its MID and so being unable to accept payments through the credit card processors. As Global e-Trading wrote in a blog post, "excessive chargeback levels can — and *have* — put many merchants out of business completely." (Doc. # 274-40 at 1); see also (Id.) ("Excessive chargeback levels, however, can send your costs through the roof, threatening both card-processing privileges and your ability to even function in the eCommerce environment."). Plaintiffs' expert, Kenneth Musante, opined that VAP "is a ruse designed to do nothing more than increase the number of transactions" to dilute a merchant's chargeback ratio and violated the credit card

companies' rules that applied to Global e-Trading. (Doc. # 274-36 at 1, 8-9, 18).

There is evidence that Global e-Trading knew VAP was improper. While Global e-Trading was running VAP, a Global e-Trading internal document maintained that it was "unacceptable" to disclose "[a]ny transaction directly indicating VAP activity," because that could "jeopard[ize] the [merchant]'s standing with the processor." (Doc. # 274-67; Doc. # 274-68 at 1; Eaton Depo. 1 at 181:1-10). In November 2018, Mr. Cardone and Ms. Eaton agreed that Global e-Trading should "stop any VAP" and "get this out of our area ASAP" because it was "not worth the risk right now." (Doc. # 274-71 at 1).

Realizing the risk associated with VAP, Global e-Trading began referring its clients to Johnny De Luca for microtransactions to dilute their chargeback ratios. (Christensen Depo. at 179:1-24). For a time, Global e-Trading openly received referral fees from Mr. De Luca's business for any clients it referred. (Id.). But Global e-Trading was concerned that these referral fees showed its association with Mr. De Luca's microtransactions business. In 2016, Global e-Trading employee Kendall Christensen emailed another Global e-Trading employee, Mr. Scrancher, regarding the

corporate name under which Global e-Trading would accept the
referral fees, stating that Global e-Trading "need[ed] to be
aware how the funds come to insulate this service [the VAP
microtransactions] from our other services." (Doc. # 274-72
at 1). Later, in September 2019, Global e-Trading, through
Mr. Scrancher, referred Mr. Flynn of Brightree to Mr. De Luca
for this microtransactions service and assured Mr. Flynn that
his money was safe with Mr. De Luca. (Doc. # 274-49 at 19;
Doc. # 274-50). There is a factual dispute regarding whether
Global e-Trading received a financial benefit for referring
Brightree to Mr. De Luca that may have been paid "off the
books." See (Christensen Depo. at 232:10-236:2, 237:3-9)
(discussing email written by Global e-Trading employee, Mr.
Christensen, stating that Global e-Trading's then-CEO, Mr.
Cardone, "requested [Mr. De Luca] not send any more fees to
the business, that he would work a deal with Chad to take
those funds another way" so there would be "no accounting
after that date" of any referral fees Mr. De Luca paid Global
e-Trading).

Mr. Scrancher of Global e-Trading was on a Skype group
chat with Mr. Flynn of Brightree and Mr. De Luca in which Mr.
De Luca explained that the sham microtransactions "to
increase transaction count" must be billed at $1.95 because

14

the lower price of $0.95 would raise "red flags" with the credit card companies. (Doc. # 274-62 at 1-2, 6). Mr. De Luca had previously — in 2016 — emailed Mr. Christensen and Mr. Scrancher of Global e-Trading to explain that Mr. De Luca only ran sham transactions at $1.49 or more because "Visa and [Mastercard]" and "some of the processors" were "on the lookout for anything [at $0.99]." (Doc. # 274-63). By referring Brightree to Mr. De Luca for the sham microtransactions, Global e-Trading knew it was assisting Brightree to evade the detection of its fraudulent practices by the credit card companies, thus enabling the fraudulent practices to continue at the expense of customers but to the enrichment of Global e-Trading and other members of the Keto Enterprise.

Additionally, a reasonable jury could find that Brightree provided Global e-Trading the URL for both its real website and its "bank page" — or decoy website with "safer language" that did "not push[] the envelope as much" that was given to banks and credit card processing companies — so that Global e-Trading could include the decoy website in the representments for credit card companies. (Flynn Depo. 1 at 85:13-86:18; Campbell Depo. 1 at 127:8-129:6); see also (Doc. # 274-37 at 611-612) (Skype chat between Mr. Flynn, Mr.

Campbell, and others in which Mr. Flynn stated that Global e-Trading should be given the decoy website to use in communications between Global e-Trading "and the merchant" regarding chargebacks but should be given the real website customers saw "for [Global e-Trading] to know what [it's] dealing with"). Defendants' expert, Troy Carrothers, could not identify a "legitimate reason" to provide a decoy website as part of a representment. (Carrothers Depo. at 43:6-44:5, 56:6-14). Plaintiffs' expert, Mr. Musante, opined that Global e-Trading "either disregarded the actual check out pages or turned a blind eye to what the fraudulent merchants were presenting to cardholders. Instead, regardless of what the customer reviewed at the time of checkout, [Global e-Trading] utilized 'Bank Pages' or 'Bank Sites' to represent cardholder disputes." (Doc. # 274-36 at 35).[1]

Beyond the decoy website, Global e-Trading had another reason to know that Brightree was making misrepresentations

---

[1] For purposes of trial, the Court has prohibited Mr. Musante from using the words "fraud" or "fraudulent" during his testimony. (Doc. # 308 at 13). The Court did so because these words have a legal meaning that could confuse the jury. (Id.). The Court nevertheless believes that Mr. Musante was merely using these words in the colloquial — rather than legal — sense within his report. (Id.). Thus, in quoting Mr. Musante's report for purposes of summary judgment, the Court has not removed the words "fraud" or "fraudulent."

to its customers. Global e-Trading employee Nicholas Carroll
told Brightree that "almost 13% of these chargebacks are
coming through due to 'incorrect Transaction Amounts'" and
speculated that the cause was "the way the pricing for the
offer is displayed on the website as we've talked about
(customers misinterpreting the 'X dollars per bottle' and
'Buy X Bottles, Get X bottles Free' statements)." (Carroll
Depo. at 226:1–227:11, 230:3–231:3; Doc. # 274-8 at 64; Doc.
# 274-51). This evidence suggests that Global e-Trading knew
that Brightree committed fraud in its pricing, but continued
working with Brightree and knowingly submitted the decoy
website in its representments. A reasonable jury could infer
from Global e-Trading's knowledge of Brightree's criminal
activity that Global e-Trading shared that criminal purpose.

Finally, the Skype messages that Global e-Trading
employee Mr. Scrancher deleted after Global e-Trading
received notice of this action also suggest a shared criminal
purpose. In one message, Mr. Scrancher introduces Mr. Flynn
of Brightree to a company that forms shell corporations: "I
have a large US merchant that needs 20 corps ASAP. Can you
guys help?" (Doc. # 266-7 at 3). In another message, Mr.
Scrancher sent to Mr. Flynn: "Nick updated me and I understand
you need signers. I can help. When can you talk?" (Doc. #

301-1 at 10). Signers appear to be the straw owners of shell corporations used to obtain additional MIDs for Brightree that the credit card processing companies would not be able to associate with Brightree itself. Mr. Scrancher, as an agent of Global e-Trading, was offering Brightree help in obtaining these signers — likely not a typical chargeback management service. A reasonable jury could conclude that Global e-Trading's aiding the creation of multiple shell corporations owned by straw owners reflects a purpose to engage in the Keto Enterprise's criminal activity, rather than to provide standard chargeback services to a client.

Taking all this evidence together and making all reasonable inferences in Plaintiffs' favor, a reasonable jury could conclude that Global e-Trading had relationships with the other members of the alleged Keto Enterprise and shared the purpose to engage in illegal conduct. Indeed, a reasonable jury could reject Global e-Trading's assertion that it merely provided standard chargeback and representment services to Brightree to enrich itself. Because a reasonable jury could conclude that the Keto Enterprise was an association-in-fact, the Motion is denied as to this element.

## 2. **Operated or Managed**

"The critical inquiry in determining whether a RICO-defendant was involved in the 'operation or management' of the enterprise is whether the defendant 'conducted or participated in the conduct of the "enterprise's affairs," not just [his or her] own affairs.'" Coquina Invs. v. Rothstein, No. 10-60786-CIV, 2011 WL 197241, at *3 (S.D. Fla. Jan. 20, 2011) (quoting Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)). "Of course, 'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise and participate in the conduct of its affairs — that is, participate in the operation or management of the enterprise itself." Reves, 507 U.S. at 185. "[T]he civil RICO defendant must exercise some degree of direction of the enterprise as well as an element of control." Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co., 534 F. Supp. 2d 1326, 1338 (S.D. Fla. 2008) (citation and internal quotation marks omitted). "[O]ne may be liable under the operation or management test by knowingly implementing decisions, as well as by making them." United States v. Starrett, 55 F.3d 1525, 1548 (11th Cir. 1995) (citation and internal quotation marks omitted).

A reasonable jury could conclude that Global e-Trading was involved in the operation and management of the Keto

Enterprise. Taking the evidence in the light most favorable to Plaintiffs, Global e-Trading planned the microtransactions scheme — that is, using small-dollar transactions to dilute Brightree's chargeback ratio so its MIDs would not be shut down. (Flynn Depo. 1 at 141:4-142:3, 149:25-151:3). Indeed, Global e-Trading employee Mr. Scrancher introduced Mr. Flynn of Brightree to Mr. De Luca, who went on to run hundreds of thousands of dollars in microtransactions for the Keto Enterprise. (Doc. # 274-49 at 19; Doc. # 274-50). Global e-Trading also supplied data to Brightree about the number of "transactions needed" to dilute the chargeback ratio below the credit card companies' threshold percentage (usually a 1% chargeback ratio). (Doc. # 274-36 at 21-22, 25-26; Eaton Depo. 1 at 242:24-245:22; Eaton Depo. 2 at 351:21-352:22). According to Plaintiffs' expert Mr. Musante, the provision of this "transactions needed" amount to Brightree was "solely to assist fraudulent merchants [to] evade the chargeback monitoring programs." (Doc. # 274-36 at 21).

There is also evidence suggesting that Global e-Trading could act on its own for the benefit of the Keto Enterprise. Global e-Trading possessed "admin" credentials within Brightree's system from which Global e-Trading could independently monitor Brightree's transactions and

chargebacks. (Doc. # 274-43 at 7). Global e-Trading also maintained a "proprietary" risk-based algorithm to determine "the minimum amount necessary [as a refund] to avoid a chargeback." (Id. at 11). Global e-Trading maintained the ability to refund Brightree customers on its own. Global e-Trading issued a full refund to a Brightree customer without "any direction" from Brightree. See (Id. at 10-11) (conversation between Global e-Trading employee Mr. Carroll and members of Brightree discussing an "auto refund[]" done by Global e-Trading for a "high risk customer"); (Carroll Depo. at 234:9-15). Mr. Carroll of Global e-Trading acknowledged in his Skype chat with Brightree employees that Global e-Trading performed the "decisioning regarding that amount to refund" using its risk-based system. (Doc. # 274-43 at 10); see also Starrett, 55 F.3d at 1548 ("[O]ne may be liable under the operation or management test by knowingly implementing decisions, as well as by making them." (citation and internal quotation marks omitted)). Another time, Global e-Trading issued a partial refund to an aggrieved consumer who had complained to a state attorney general. (Doc. # 274-44 at 149).

Again, the Skype messages Global e-Trading employee Mr. Scrancher deleted after Global e-Trading received notice of

this action are instructive. These messages support that
Global e-Trading was an active participant in the Keto
Enterprise. For example, the recently recovered Skype
messages Mr. Scrancher sent to Mr. Flynn of Brightree include:
"Hi David. Nick told me about your MID closure. Give me a
call ASAP, I can help." (Doc. # 301-1 at 10). He also sent to
Mr. Flynn: "Nick updated me and I understand you need signers.
I can help. When can you talk?" (Id.). As noted above, signers
appear to be the straw owners of the shell corporations used
to obtain additional MIDs. Mr. Scrancher, as an agent of
Global e-Trading, was offering Brightree help in obtaining
these signers. Yet another message from Mr. Scrancher, in
which he introduces Mr. Flynn of Brightree to a company that
forms shell corporations, reads: "I have a large US merchant
that needs 20 corps ASAP. Can you guys help?" (Doc. # 266-7
at 3). These messages suggest that Global e-Trading assisted
Brightree and Mr. Flynn to keep the fraudulent enterprise
afloat by helping create multiple shell companies owned by
straw "signers" that could form new MIDs for the Keto
Enterprise. A reasonable jury could conclude that Global e-
Trading provided more than mere "introductions" to other
service providers on Global e-Trading's behalf.

A reasonable jury could conclude that Global e-Trading was far more involved with the Keto Enterprise than Global e-Trading claims, and that Global e-Trading participated in the conduct of the Keto Enterprise's affairs. The jury could believe that Global e-Trading was more than an innocent third-party company providing legitimate "back end" chargeback management services for Brightree, as Global e-Trading contends. Summary judgment is inappropriate because of the genuine disputes as to this element.

### 3. **Pattern of Racketeering Activity**

"To successfully [establish] a pattern of racketeering activity, plaintiffs must [prove] that: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a continuing nature." Jackson, 372 F.3d at 1264. "An act of racketeering activity, commonly known as a 'predicate act,' includes any of a long list of state and federal crimes." Cisneros, 972 F.3d at 1215. As for continuity, to establish open-ended continuity requires "either that the alleged acts were part of the defendants' 'regular way of doing business,' or that the illegal acts threatened repetition in the future." Jackson, 372 F.3d at 1267 (citation omitted).

"One who aids and abets two predicate acts can be civilly liable under RICO." Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1410 (11th Cir.), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994). "To establish civil liability for aiding and abetting, the plaintiffs must show: (1) that the defendant was generally aware of the defendant's role as part of an overall improper activity at the time that he provides the assistance; and (2) that the defendant knowingly and substantially assisted the principal violation." Id. "The defendant's '[k]nowledge may be shown by circumstantial evidence, or by reckless conduct.'" Id. (citation omitted).

Here, there is a genuine dispute whether Global e-Trading committed two or more related acts of wire fraud and money laundering, as well as aiding and abetting two or more related predicate acts of wire and mail fraud. "Racketeering activity includes mail and wire fraud." Omnipol, a.S. v. Worrell, 421 F. Supp. 3d 1321, 1350 (M.D. Fla. 2019), aff'd sub nom. Omnipol, A.S. v. Multinational Def. Servs., LLC, 32 F.4th 1298 (11th Cir. 2022). "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010). "The first

element, a scheme or artifice to defraud, 'requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property.'" <u>Omnipol, a.S.</u>, 421 F. Supp. 3d at 1350 (citation omitted). "A misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." <u>Id.</u> (citation omitted). Additionally, "a claim for money laundering under RICO requires allegations that a person conducted a financial transaction with money he knew to be the proceeds of unlawful activity, with the intent to promote the carrying on of specified unlawful activity." <u>Id.</u> at 1352.

First, there is evidence that Global e-Trading aided and abetted the Keto Enterprise's predicate acts of wire fraud and mail fraud. Again, the Keto Enterprise conducted numerous transactions via the internet in which customers, including Sihler and Bavencoff, were overcharged for diet pills because of pricing misrepresentations on Brightree's website. Employees of Brightree discussed the "Buy X, Get Y" advertising for per bottle pricing, knowing that customers would believe the total price was higher than advertised. Mike Campbell stated in a Skype chat with Mr. Flynn that the policy was to "never show the totals" that would be charged.

See (Campbell Depo. 1 at 48:6-49:8) (discussing chats in which Mr. Campbell advised Mr. Flynn "you display it as price per bottle so it looks cheap [—] never show the totals"). The purchased bottles were shipped to customers, including to Sihler in October 2019 and to Bavencoff in December 2019. (Bavencoff Depo. at 40:23-43:11, 108:17-21; Sihler Depo. at 32:11-33:4); see Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008) ("The gravamen of the offense [of mail fraud] is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contain[s] no false information." (citations and internal quotation marks omitted)). A reasonable jury could conclude that predicate acts of wire fraud and mail fraud occurred.

Taking the evidence in the light most favorable to Plaintiffs, Global e-Trading "was generally aware of [its] role as part of an overall improper activity at the time that [it] provide[d] the assistance" to Brightree and the other members of the Keto Enterprise. Cox, 17 F.3d at 1410. The evidence discussed previously in relation to other elements establishes Global e-Trading's awareness of its role in the improper activity. Among other things, Global e-Trading was aware of the false nature of the "Buy X bottles, Get Y bottles

free" pricing model on Brightree's website and the fact that many chargebacks were based on customers being charged the wrong amount. (Carroll Depo. at 226:1–227:11, 230:3–231:3; Doc. # 274-8 at 64; Doc. # 274-51). Likewise, Mr. Scrancher of Global e-Trading in messages to Mr. Flynn of Brightree volunteered to assist Brightree in forming multiple shell corporations to establish additional MIDs, obtaining straw owners or "signers" for those shell corporations, and assuring Brightree that it should spend hundreds of thousands of dollars with Mr. De Luca on sham microtransactions to dilute Brightree's chargeback ratios. (Doc. # 266-7 at 3; Doc. # 301-1 at 10; Doc. # 274-49 at 19; Doc. # 274-50). Global e-Trading continued to encourage customers like Brightree with high chargeback ratios indicating fraud to engage in microtransactions schemes with Mr. De Luca after Global e-Trading had already determined this scheme was too risky for it to continue performing itself. (Doc. # 274-49 at 19; Doc. # 274-50; Doc. # 274-71 at 1). "These sham transactions served no purpose other than to distort the ratio of disputed transactions and maintain the ability of these fraudulent actors to maintain access to their merchant account and acquire additional merchant accounts and hence the ability to defraud consumers." (Doc. # 274-36 at 1).

27

Even after discontinuing its VAP program, Global e-Trading still took a cut of the profits of the microtransactions scheme through its referral fees with Mr. De Luca. (Christensen Depo. at 179:1-24, 232:10-236:2, 237:3-9). Global e-Trading used a proprietary risk-based algorithm to determine how much of a refund it should issue to Brightree's complaining customers to prevent a chargeback and complaints to the Better Business Bureau or a state attorney general. (Doc. # 274-43 at 10-11; Doc. # 274-44 at 149; Carroll Depo. at 234:9-15). Likewise, there is evidence Global e-Trading knew Brightree had given it a decoy website to use in representments — an action with no legitimate purpose. (Flynn Depo. 1 at 85:13-86:18; Campbell Depo. 1 at 127:8-129:6; Doc. # 274-37 at 611-612; Carrothers Depo. at 43:6-44:5, 56:6-14). A reasonable jury could conclude that Global e-Trading was aware of its role to prevent the detection of Brightree and the Keto Enterprise's fraud so that the Keto Enterprise could continue its improper diet pill business.

Furthermore, a reasonable jury could conclude that Global e-Trading knew of and substantially assisted these predicate acts of wire and mail fraud. Again, the evidence discussed above is sufficient for a reasonable jury to

28

conclude that Global e-Trading had knowledge of the predicate
acts of Brightree and the other members of the Keto
Enterprise. For example, Global e-Trading knew about the
pricing misrepresentations by Brightree on its website.
(Carroll Depo. at 226:1–227:11, 230:3–231:3; Doc. # 274-8 at
64; Doc. # 274-51). It knew that Brightree had a decoy website
with "safer language" than its real website to show to banks
or credit card companies. (Flynn Depo. 1 at 85:13–86:18;
Campbell Depo. 1 at 127:8–129:6; Doc. # 274-37 at 611–612).
Global e-Trading knew that Brightree needed shell
corporations and straw owners to obtain additional MIDs as
well as needing a flood of sham microtransactions to keep its
MIDs below the credit card companies' thresholds. (Doc. #
266-7 at 3; Doc. # 301-1 at 10; Doc. # 274-49 at 19; Doc. #
274-50). And Global e-Trading actively assisted Brightree and
the other Keto Enterprise members in obtaining those things.
(Id.). Tellingly, Mr. Scrancher — after learning that this
lawsuit was imminent — deleted the Skype messages in which he
helped Mr. Flynn obtain shell corporations and "signers."
(Doc. # 221; Doc. # 266-6; Doc. # 301).

Despite knowing the nature of Brightree's business,
which involved wire and mail fraud, Global e-Trading
continued providing representment services to challenge

Brightree's chargebacks and provided refunds to customers to
prevent them from initiating a chargeback or reporting to
consumer protection authorities. (Doc. # 274-43 at 10-11;
Doc. # 274-44 at 149; Carroll Depo. at 234:9-15). As
Plaintiffs' expert Mr. Musante explained: Global e-Trading
"used its position to assist bad actors and fraudulent
companies to perpetuate their frauds and thwart the Card
Network Rules and industry standards. As a result, these
fraudulent firms were able to maintain their merchant
accounts, acquire new merchant accounts and win contested
cardholder disputes. As a result, the fraud continued and
consumers were harmed." (Doc. # 274-36 at 1).

Even aside from Global e-Trading's aiding and abetting
predicate acts of other Keto Enterprise members, there is a
genuine dispute whether Global e-Trading itself committed
predicate acts of wire fraud and money laundering. Plaintiffs
maintain that Global e-Trading committed numerous acts of
wire fraud. (Doc. # 311 at 2). For now, the Court need only
address a few of Mr. Scrancher's Skype messages — many of
which were only recently recovered because Mr. Scrancher
deleted them when alerted to this action. As discussed
previously, Mr. Scrancher sent Mr. Flynn multiple messages
helping him obtain shell corporations and signers for those

shell corporations so that Mr. Flynn could secure additional
MIDs that the credit card monitoring services would not
associate with Brightree. (Doc. # 301-1 at 10). These messages
are more than mere introductions to other service providers.
For example, Mr. Scrancher invited Mr. Flynn to come to Global
e-Trading's office to "white board[]" — that is, plan — how
to set up shell companies. (Id.). There is a genuine dispute
whether these messages were incident to an essential part of
the scheme to defraud. See United States v. Phillips, 647 F.
App'x 917, 918 (11th Cir. 2016) ("It is not necessary that
the transmitted information [in a wire] include any
misrepresentation or for the transmission itself to be
essential to the success of the scheme to defraud, but it can
be 'incident to an essential part of the scheme' or 'a step
in the plot.' Thus, a 'routine and innocent' mailing can form
the basis of a wire-fraud conviction if it was an essential
part of the scheme." (citations omitted)). A reasonable jury,
therefore, could conclude that these acts constitute wire
fraud.

Similarly, a reasonable jury could conclude that Global
e-Trading committed acts of money laundering though its
issuance of refunds to Brightree's customers. Again, there is
evidence of at least two risk-based refunds Global e-Trading

itself conducted on Brightree's behalf to prevent those customers from initiating a chargeback. (Doc. # 274-43 at 10-11; Doc. # 274-44 at 149). There is also evidence that these refunds were issued to facilitate Brightree's fraud by keeping Brightree's chargeback rates low so the fraud would not be detected. Again, Global e-Trading determined the amount to refund a customer based on its assessment of the customer's likelihood of initiating a chargeback or making complaints to authorities. (Doc. # 274-43 at 10-11). Global e-Trading's former CEO, Mr. Cardone, testified that refunding a customer to prevent a chargeback is "literally paying the cop not to give you a ticket" to "prevent[] the one percent rule" for chargeback ratio from being "effective." (Cardone Depo. at 42:4-23). He also testified that paying a refund after an alert to prevent a chargeback is "a great dilution tool" for diluting a merchant's chargeback ratio. (Cardone Depo. at 243:23-244:1). While Global e-Trading insists that it did not independently handle refunds and that its issuance of refunds was an innocent business practice (Doc. # 226 at 5, 17-19), a reasonable jury could disagree. See United States v. Van Alstyne, 584 F.3d 803, 815-16 (9th Cir. 2009) (affirming money laundering conviction in Ponzi scheme case where a transaction at issue "refunded the full amount

invested by James and Evelyn Easley, in response to their complaints after the scheme began to unravel" because "returning the Easleys' investment was intended to 'promote the carrying on,' 18 U.S.C. § 1956(a)(1)(A)(i), of the 'scheme' at the heart of the mail fraud counts, by discouraging detection of that scheme").

Summary judgment is inappropriate because of the genuine disputes as to this element.

### 4. Causation and Injury

"The Supreme Court has been clear that a party is only entitled to recover under RICO 'to the extent that[] he has been injured in his business or property by the conduct constituting the violation.'" Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1349 (11th Cir. 2016) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). "Thus, a defendant who commits an act of racketeering is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." Id. (citation and internal quotation marks omitted). Rather, the act of racketeering must "the but-for and proximate cause of the plaintiffs' injuries." Id. (citations omitted). "The connection between the racketeering activity and the injury can be neither remote, purely

contingent, nor indirect." Id. (citing Anza v. Ideal Steel
Supply Corp., 547 U.S. 451, 457 (2006)). "When a court
evaluates a RICO claim for proximate causation, the central
question it must ask is whether the alleged violation led
directly to the plaintiff's injuries." Anza, 547 U.S. at 461.
"The injurious conduct need not be the sole cause of the
plaintiffs' injuries, but there must be 'some direct
relation' between the conduct and the injury to sustain a
claim." Ray, 836 F.3d at 1349 (citation omitted).

Here, there is a genuine dispute of material fact
concerning whether the predicate acts of the Keto Enterprise,
including acts Global e-Trading either committed or aided and
abetted, caused Plaintiffs' injury. Plaintiffs' injury was
being charged for bottles of diet pills they were told would
be free on the website advertising the pills. (Bavencoff Depo.
at 40:23-43:11; Sihler Depo. at 32:11-33:4). As discussed
above, there is a genuine dispute over the existence of a
pattern of racketeering activity that included the false "Buy
X, Get Y" pricing for the diet pills. See, e.g., (Doc. # 274-
38 at 47) (Keto Enterprise members describing the business as
"selling $10 bottles of keto pills for $195 to dumbasses");
(Campbell Depo. 1 at 48:6-49:8) (discussing chats in which
Mr. Campbell advised Mr. Flynn "you display it as price per

34

bottle so it looks cheap [—] never show the totals"). The misrepresentations about pricing, among other things, were made by members of the Keto Enterprise on Brightree's website. These misrepresentations directly caused Plaintiffs' injury of overpaying for the diet pills. Even though these particular predicate acts of wire fraud were not committed by Global e-Trading, Global e-Trading aided and abetted those fraudulent acts that injured Plaintiffs. Additionally, as discussed previously, there is also a genuine dispute whether Global e-Trading committed acts of wire fraud and money laundering itself that kept the Keto Enterprise active to harm Plaintiffs. See In re Managed Care Litig., 150 F. Supp. 2d 1330, 1348 (S.D. Fla. 2001) ("A predicate act of extortion which does not directly injure a plaintiff may be aggregated with acts of mail and wire fraud which did directly and tangibly injure the plaintiff to form a pattern of racketeering activity.").

As Plaintiffs' expert Mr. Musante opined: "The fraudulent merchants, including the Keto Merchants, required merchant processing to perpetuate their fraud. But for [Global e-Trading], these merchants would have been tripped up by the chargeback monitoring programs and likely closed . . . ." (Doc. # 274-36 at 39). The Motion is denied as to this

element for Count One. Because there is a genuine dispute as to every element of the claim, Count One survives summary judgment.

**B.    Count Two**

Section 1962(d) makes it unlawful to conspire to violate RICO. 18 U.S.C. § 1962(d). "The essence of a RICO conspiracy claim is that each defendant has *agreed* to participate in the conduct of an enterprise's illegal activities." Solomon v. Blue Cross & Blue Shield Ass'n, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) (emphasis in original). "Plaintiffs can establish a RICO conspiracy claim by showing a Defendant: (1) agreed to the overall objective of the conspiracy; or (2) agreed to commit two predicate acts." In re Takata Airbag Prods. Liab. Litig., 524 F. Supp. 3d 1266, 1282 (S.D. Fla. 2021).

"A party may be liable for RICO conspiracy even if not liable for the alleged substantive RICO claim." Ou v. Click Labs, Inc., No. 8:22-cv-1341-WFJ-SPF, 2023 WL 2499151, at *6 (M.D. Fla. Mar. 14, 2023) (citing Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1269 (11th Cir. 2004)). "However, the parties must agree to commit an illegal act, and if the complaint fails to state a substantive RICO claim, then the conspiracy claim is without merit." Id.; see also

Jackson, 372 F.3d at 1269 ("The plaintiffs protest that the trial court erred in dismissing their RICO conspiracy claims because a party may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense. While this observation is undoubtedly correct, the plaintiffs' argument fails to acknowledge that what *is* required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute.").

Importantly, Count Two is not based on the Keto Enterprise or the actions of Brightree. Rather, it is based on the Microtransactions Enterprise, consisting of Global e-Trading, Mr. Cardone, Ms. Eaton, and Mr. De Luca. (Doc. # 102 at 123-124). As pled in the Third Amended Complaint, the "fraudulent course of conduct pursued by [the Microtransactions Enterprise] was a scheme whereby [Global e-Trading] — under the direction and control of Defendants Eaton and Cardone — would refer its clients to Johnny De Luca so that he could conduct thousands of sham microtransactions on those clients' accounts." (Id. at 124). The running of microtransactions was done "with the aim of defrauding [Global e-Trading's clients'] banks and payment processors by making it seem as if the accounts' chargeback rates were lower

than they actually were." (Id. at 124-125). Plaintiffs'
theory of injury for this claim is that "Plaintiffs lost
property (the money they spent purchasing falsely advertised
diet pills) as a result of the fact that [Global e-Trading's]
client was able to hide its fraud from payment processors and
financial institutions by fraudulently reducing its apparent
chargeback rate." (Id. at 142-143).[2]

In support of this claim, Plaintiffs obtained
significant discovery about the microtransactions performed
by Mr. De Luca for clients Global e-Trading referred. There
is no doubt that this scheme is questionable ethically and
legally. However, the Court agrees with Defendants that
Plaintiffs cannot show a direct harm to themselves
proximately caused by the Microtransactions Enterprise. (Doc.

---

[2] The Court agrees with Defendants that Count Two of the Third
Amended Complaint does not incorporate by reference the
predicate acts alleged in Count One. (Doc. # 287 at 4). And
because the predicate acts alleged in Count One involve the
Keto Enterprise rather than the Microtransactions Enterprise,
"Count [One]'s purported predicate acts may not serve as Count
[Two]'s predicate acts and do not assist Plaintiffs in
establishing their RICO-conspiracy claim." (Id. at 5). It
would be unjust, and highly prejudicial to Defendants, to
allow Plaintiffs to amend their claims in their summary
judgment briefing to now hold the Microtransactions
Enterprise responsible for predicate acts supposedly
committed by the Keto Enterprise. See Naeh Media Grp. LLC v.
City of Lauderhill, No. 23-11022, 2024 WL 1155815, at *3 (11th
Cir. Mar. 18, 2024) ("At bottom, the complaint must identify
any 'basis for liability' relied on at summary judgment.").

# 220 at 16-22; Doc. # 226 at 7-9; Doc. # 227 at 11-15). Thus, Plaintiffs and the Class lack statutory RICO standing for this claim.

The RICO statute provides a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). As mentioned previously, "[t]he Supreme Court has been clear that a party is only entitled to recover under RICO 'to the extent that[] he has been injured in his business or property by the conduct constituting the violation.'" Ray, 836 F.3d at 1349 (quoting Sedima, S.P.R.L., 473 U.S. at 496). "Thus, a defendant who commits an act of racketeering is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." Id. (citation and internal quotation marks omitted). Rather, the act of racketeering must "the but-for and proximate cause of the plaintiffs' injuries." Id. (citations omitted). "The connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect." Id. (citing Anza, 547 U.S. at 457). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." Anza,

547 U.S. at 461. "The injurious conduct need not be the sole cause of the plaintiffs' injuries, but there must be 'some direct relation' between the conduct and the injury to sustain a claim." Ray, 836 F.3d at 1349 (citation omitted). "Notably, the fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action — the injury must be direct." Id. (citing Hemi Grp., LLC v. City of New York, 559 U.S. 1, 12 (2010) (plurality opinion)).

Here, Plaintiffs' theory of harm caused by the Microtransactions Enterprise (rather than the Keto Enterprise from Count One) is that the Microtransactions Enterprise defrauded banks or payment processors by tricking them into believing Global e-Trading's clients had lower chargeback rates than they had. The flood of fake microtransactions diluted the chargeback rate of Global e-Trading's clients, making those client merchants appear more legitimate than they were. Because the banks and payment processors were tricked about the percentage of chargebacks, they continued to offer Global e-Trading's clients access to their payment processing services. Because clients like Brightree continued to have access to payment processing services, Brightree was able to accept payments from Plaintiffs and the Class for purchases of keto diet pills. And Brightree (as part of the

Keto Enterprise) charged Plaintiffs and the Class more than
they said they would. See (Doc. # 276 at 11) ("Each named
Plaintiff was defrauded into paying for bottles they did not
order based on statements on the websites at issue.").

The harm to Plaintiffs and the Class — being charged
more for diet pills than they should have been — is thus an
indirect result of the Microtransactions Enterprise's
predicate acts of wire fraud. A reasonable jury could find
that the harm to Plaintiffs was directly caused by the Keto
Enterprise — but not by the Microtransactions Enterprise.
Because Plaintiffs were indirectly harmed by the conduct of
the Microtransactions Enterprise, there is no genuine dispute
of material fact as to causation. See Hemi Grp., LLC, 559
U.S. at 10-12 (finding that causation was too attenuated where
the plaintiff City's injury resulted from defendant Hemi
Group's failure to submit customer information to New York
State, that then could not pass the information to the City,
that then could not use the information to determine which
City-based customers to pursue for unpaid taxes); Virtus
Pharms., LLC v. Woodfield Distribution, LLC, No. 8:21-cv-
02427-WFJ-SPF, 2024 WL 4235895, at *7 (M.D. Fla. Sept. 19,
2024) ("Mr. Runsdorf and the Woodfield entities engaged in or
were connected to drug trafficking activity, which resulted

in a raid and product seizure by the DEA, which ultimately
caused Virtus's losses. These intervening, intermediary
causes of harm . . . sever the direct relationship between
racketeering activities and a plaintiff's harm."), appeal
dismissed, No. 24-13349, 2025 WL 548247 (11th Cir. Feb. 19,
2025).

Plaintiffs lack statutory standing under RICO to bring
this claim. See Bivens Gardens Off. Bldg., Inc. v. Barnett
Banks of Fla., Inc., 140 F.3d 898, 908 (11th Cir. 1998)
("[T]he test for RICO standing is whether the alleged injury
was directly caused by the RICO violation, not whether such
harm was reasonably foreseeable."). Count Two is dismissed
for lack of standing.

### C.    **Affirmative Defenses**

On to Plaintiffs' Motion, seeking summary judgment on
six of Defendants' affirmative defenses: affirmative defenses
four, seven, nine, twenty, twenty-one, and twenty-three.
(Doc. # 258).

"On a plaintiff's motion for summary judgment, the
defendant bears the initial burden of showing that the
affirmative defense is applicable." Off. of Thrift
Supervision v. Paul, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997).
"To do so, [t]he defending party must rely on or submit record

evidence in support of the purported affirmative defenses to create a genuine issue of material fact preventing the entry of summary judgment." SFR Servs., LLC v. Lexington Ins. Co., No. 2:19-cv-229-JES-NPM, 2020 WL 7425265, at *2 (M.D. Fla. Dec. 18, 2020) (citation and internal quotation marks omitted). "It is '[o]nly upon such a showing [that] the burden shift[s] to [a] plaintiff regarding that affirmative defense.'" Id. (quoting Paul, 985 F. Supp. at 1470).

Because the Court has granted summary judgment to Defendants on Count Two, Plaintiffs' Motion is moot to the extent it seeks summary judgment on affirmative defenses that concern Count Two. The Court will only discuss the challenged affirmative defenses as they relate to Count One. Additionally, Defendants have withdrawn their seventh affirmative defense. (Doc. # 272 at 1). Thus, the Motion is granted as to the seventh affirmative defense of release and waiver.

Plaintiffs' Motion is denied as to affirmative defenses twenty, twenty-one, and twenty-three, which relate to double recovery of damages, proportionate reduction of damages, and prejudgment interest. The Court agrees with Global e-Trading that, because there remains a genuine dispute of material fact regarding Plaintiffs' entitlement to damages, summary

judgment should not be granted on affirmative defenses that
relate to how any damages should be calculated. (Doc. # 272
at 11). Plaintiffs may be correct that issues of prejudgment
interest, set offs to prevent double recovery, and
application of joint and several liability are to be decided
by the Court, rather than the jury. (Doc. # 225 at 11 n.28,
21, 23); see also Indus. Risk Insurers v. M.A.N.
Gutehoffnungshutte GmbH, 141 F.3d 1434, 1446 (11th Cir. 1998)
("[A]wards of prejudgment interest are equitable remedies, to
be awarded or not awarded in the district court's sound
discretion."), overruled on other grounds by Corporacion AIC,
SA v. Hidroelectrica Santa Rita S.A., 66 F.4th 876 (11th Cir.
2023). But that is not a basis to grant summary judgment on
these affirmative defenses. Rather, these issues should be
addressed in limine or at trial. See Losch v. Experian Info.
Sols., Inc., No. 2:18-cv-809-MRM, 2022 WL 17823593, at *2
(M.D. Fla. June 22, 2022) ("[T]he weight of authority suggests
that a one-satisfaction rule determination should be made by
the Court on a post-judgment motion under Rule 60(b)(5).").
aff'd sub nom. Losch v. Nationstar Mortg. LLC, No. 22-12421,
2024 WL 1282459 (11th Cir. Mar. 26, 2024).

Next, Plaintiffs' Motion is denied as to affirmative
defense four, which asserts that Plaintiffs' claim is barred

44

by laches. "Though the doctrine [of laches] is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1203 (11th Cir. 1997). "[T]he defense of laches is dependent on the specific facts of a case." Ga. Coal. for People's Agenda, Inc. v. Kemp, 347 F. Supp. 3d 1251, 1259 (N.D. Ga. 2018); see also Jeffries v. Chicago Transit Auth., 770 F.2d 676, 679 (7th Cir. 1985) ("Laches is generally a factual question not subject to summary judgment."). Although "there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run," the Eleventh Circuit has clarified that laches should not "be determined merely by a reference to and a mechanical application of the statute of limitations." Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs, 781 F.3d 1271, 1286 (11th Cir. 2015) (citations and internal quotation marks omitted).

Here, there is a genuine dispute over whether Plaintiffs inexcusably delayed in bringing their claims and whether the

delay resulted in undue prejudice to Global e-Trading. "[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim." Kason Indus., Inc., 120 F.3d at 1206. Plaintiffs were aware of their injury — the overcharge for the keto diet pills — in late 2019. (Bavencoff Depo. at 40:23-41:1; Sihler Depo. at 48:13-16). While Plaintiffs sued the Keto entities in a separate action in August 2020, they did not initiate this action against Global e-Trading until June 2023. (Doc. # 1). Plaintiffs insist they could not have learned of Global e-Trading's involvement with the Keto entities until discovery in the separate action revealed it in December 2022. (Doc. # 258 at 6). But a reasonable jury could very well disagree, given that Plaintiffs' separate action had been pending for a full two years by December 2022 and Plaintiffs' initial complaint in that action shows that Plaintiffs were aware that the Keto entities had used a chargebacks service. See Sihler et al. v. The Fulfillment Lab, Inc., et al., No. 3:20-cv-01528-LL-DDL (S.D. Cal. 2020) at (Doc. # 1 at ¶ 11) ("These scammers operate in rings . . . include[ing] . . . the companies who provide specialized software for the scammers . . . to utilize multiple merchant accounts and chargeback/re-billing screening in order to avoid fraud detection by banks

and credit card companies."). As to undue prejudice, Global e-Trading points to the degraded memory of witnesses allegedly caused by the delay in bringing this action. (Doc. # 272 at 19); see, e.g., (Flynn Depo. at 174:2-14, 198:24-199:10, 223:14-20, 236:3-14; Campbell Depo. at 21:3-8, 101:3-12, 104:7-10; Carroll Depo. at 107:15-24, 138:20-139:5). The jury must conduct the fact-intensive laches inquiry.

However, the Court grants summary judgment on Global e-Trading's ninth affirmative defense, which is that "Plaintiffs failed to exercise appropriate due diligence." (Doc. # 135 at 80). This does not appear to be a separate affirmative defense than laches. See State of Kansas v. State of Colorado, 514 U.S. 673, 687 (1995) (explaining that the "defense of laches 'requires proof of [] lack of diligence'"). Even Global e-Trading acknowledges that "[d]ue diligence is often analyzed as part of the first prong of laches (unreasonable and inexcusable delay)." (Doc. # 272 at 13 n.6). Thus, summary judgment is granted on the ninth affirmative defense as duplicative of the fourth affirmative defense of laches.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) Plaintiffs Janet Sihler and Charlene Bavencoff's Motion for Partial Summary Judgment (Doc. # 225) is **GRANTED** in part and **DENIED** in part. Summary judgment is granted only on affirmative defenses seven and nine.

(2) Defendant Global E-Trading, LLC's Motion for Summary Judgment (Doc. # 226) is **GRANTED** in part and **DENIED** in part as set forth herein.

(3) Defendants Monica Eaton's Motion for Summary Judgment (Doc. # 220) is **GRANTED.**

(4) Defendant Gary Cardone's Motion for Summary Judgment (Doc. # 227) is **GRANTED.**

(5) Count Two is dismissed for lack of RICO standing. The case will proceed to trial on Count One.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 27th day of May, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE